IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA** :
:
:
**v.** : Criminal No. 1:09-CR-384
:
: (Judge Rambo)
**JOSEPH W. NAGLE** :

**M E M O R A N D U M**

**I.**     **Background**

On September 8, 2010, the court received by facsimile a letter from Frederick Fanelli, Esquire, attorney for Dennis Campbell. In his letter, Attorney Fanelli alerted the court that his client intends to assert his attorney-client privilege at trial if asked about the contents of a five-page document that Campbell prepared for Attorney Fanelli in preparation of his defense of then-anticipated criminal charges.

On September 10, 2010, the court received a letter by e-mail from Michael Schwartz, Esquire, attorney for the Defendant in this case, Joseph Nagle. Attorney Schwartz stated that he believes Campbell never intended for his memo to be a confidential communication, and, thus, it is not subject to the attorney-client privilege, or, if the document is privileged, the crime-fraud exception applies to overcome the privilege. Both Attorney Fanelli's and Attorney Schwartz's letters were docketed, under seal, as Document number 91. On September 13, 2010, the court held a conference call involving counsel for Campbell and Nagle as well as the Government. On September 27, 2010, the court held an evidentiary hearing as to whether Campbell retained his privilege in the communication in question. All parties were present at that hearing and were represented by counsel.

**II.** **Facts**

Because the court writes primarily for the parties, the court will not go into elaborate detail about the facts underlying the felony information against Campbell and his subsequent guilty plea, or the charges underlying the indictment of Nagle.

The document in question is a five-page chronology created by Campbell on or about December 3, 2007, and last modified on December 6, 2007, which ironically is the date that Campbell's employment with Schuylkill Products, Inc. ("SPI") ended. The document was prepared by Campbell at the request of his attorney, and generally summarizes a chronology of his employment with SPI and the events giving rise to the criminal charges against him. Campbell could not remember whether he initially created the document on his work computer during working hours, or whether he created it at home on his wife's computer and then transferred it to his work computer. In any event, it is undisputed that by December 3, 2007, the document was saved as a Microsoft Word document titled "DFC Chronology" on Campbell's SPI-owned laptop in the following location: C:\Documents and Settings\DCampbell\Desktop\dfc\marikina plan. (*See* Def.'s Hr'g Ex. 3., screen shot.) Because of its location, it is apparent that this document was not saved on SPI's server, but instead was saved on the laptop's hard drive, thus making it accessible to others only if it was viewed from Campbell's computer.

Campbell testified at the hearing that his laptop was password protected, but he could not be sure whether he had given others his password. He did acknowledge, however, that there were times that Denise Wiederhold, an administrative assistant at SPI, would access his computer to look for documents

that he created, and, thus, that she must have had his password. According to both Campbell and Ms. Wiederhold, when she was asked to access Campbell's computer, she went only to the places directed to her by Campbell and that she only accessed the computer when asked to do so.

In addition to Campbell and Ms. Wiederhold, Nagle also testified at this hearing. Each of these witnesses acknowledged that they used their SPI-owned computers for both work and personal purposes, and that SPI had no policy prohibiting them from doing so. However, Nagle presented the testimony of George Paul, SPI's former human resources manager. Mr. Paul testified to and authenticated Defendant's Exhibit 1, which is a document titled "Computer & Internet Usage Policy." (*See* Def.'s Hr'g Ex. 1.) In relevant part, this policy states:

> Employee's Internet and e-mail activity is NOT private. Such activity may be monitored and reviewed periodically by authorized individuals to perform normal system maintenance, to determine whether anyone outside SPI has gained unauthorized access to the systems and to ensure employees' compliant with SPI's policies regarding such systems.

(*Id.*) Mr. Paul testified that each employee with access to a computer was given a copy of this policy at the time of its creation, or in the event that they were hired later, at the time of their hire. They were asked to sign it and a copy was to be maintained in the employee's personnel file. Mr. Paul testified that it was up to the department managers to ensure that the policy was signed. However, he testified that he did not know how the policy was enforced.

Despite this testimony, Campbell, Nagle and Wiederhold each testified that they were not aware of the written policy and none of them could be sure whether they had ever signed such a policy. There was no evidence produced at the

hearing that a signed, or unsigned, copy of the policy was in any of these individuals' personnel files. In fact, Nagle testified that he only recently became aware of the existence of this written policy despite the fact that he was the President and CEO of SPI.[1]

Campbell was fired from SPI on December 6, 2007. After his termination, he was escorted to his office by Mr. Paul so that he could gather his personal effects. Campbell testified that he informed Mr. Paul that he wanted to get some information off of his computer, specifically his Microsoft Outlook contacts, and his "DFC file." Campbell testified that he was told by Mr. Paul that he was not

---

[1] Additionally, at a hearing on his motion to suppress certain evidence obtained by the Government, Nagle testified as follows when questioned by the Government concerning his own use of his computer and the policies in place at SPI:

> Q: Did your office, Schuylkill Products and/or CDS, have a computer use policy?
> A: Nothing that I was aware of specifically written, no.
> Q: Well, whether it was written or not, were the employees instructed not to be using the computers for personal business?
> A: I don't think we so much took issue with that so long as they weren't surf[ing] the web and bringing in spam and viruses and things like that. I know there was [sic] time to time people were restricted on web access for that reason. Obviously, we didn't want someone spending six out of eight hours surfing the web for fun. But we didn't monitor per se.
>
> . . .
>
> The answer is, I think it was as informal but reasonably well-known policy that its for work?
> Q: It's for work?
> A: But we allowed personal use.
> Q: If it wouldn't interfere with work?
> A: Right.
> Q: And there was no banner or anything. I know on my computer downstairs, when I log on, there's a big banner that says, we monitor this, don't use it for anything improper. You didn't have that?
> A: No.

(Doc. 73, Tr. of Suppression Hr'g at 176:15-177:18, Jun. 24, 2010.)

4

allowed to do this at that point, but that Mr. Paul would talk to Nagle and get back to him. Campbell says that he called Mr. Paul after his termination, but that Mr. Paul never responded to his call. Mr. Paul relayed a slightly different version of events. He acknowledges that Campbell asked to get some information off of his computer, but he could not be specific as to what it was that Campbell requested. Mr. Paul also testified that he did not receive a call from Campbell after Campbell's termination.

Campbell never retrieved any information from his laptop, and the laptop remained in the possession of SPI. On or around February 21, 2008—more than two months after Campbell was terminated—Ms. Wiederhold logged on to Campbell's computer in order to look for job scope information unrelated to the facts of this case. Ms. Wiederhold testified that she could not find this information on the shared drive housed on SPI's server, and that it was not unusual for Campbell to have saved information to his hard drive that should have been saved to the company's server. While looking for the scope letter in the "DFC folder" on Campbell's laptop, Ms. Wiederhold came across a sub-folder titled "marikina plan." Because she knew about the investigation into SPI's dealings with Marikina, she opened this folder and looked at the two documents contained therein. One of the documents was saved as "021106 paln document.doc," and was a Word Document on Marikina letterhead titled "Marikina Business and Marketing Plan." The other was the document in question, which was saved as a Word Document titled "DFC Chronology.doc." (*See* Def.'s Hr'g Ex. 3, screen shot.) Ms. Wiederhold e-mailed both of these documents to Nagle on February 21 or 22, 2008. (*See* Def.'s Hr'g Ex. 4, e-mails from D. Wiederhold to J. Nagle.)

The document in question was eventually turned over by Nagle to his attorney who turned it over to the Government in discovery. The Government alerted Campbell's lawyer that Nagle intends to use this letter at trial in its cross-examination of Campbell, which lead Campbell, through his attorney, to assert that the document is subject to attorney-client privilege. Campbell now seeks a court order preserving the privilege and precluding Nagle from using the document at trial.

**III.        Discussion**

    **A.     Attorney Client Privilege**

The attorney-client privilege is the oldest of the common-law privileges. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (*citing Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 960 (3d Cir. 1984)). Like all privileges, it is an exception to the common-law maxim that the public has a right to "'every man's evidence.'" *Id.* at 359-60 (*quoting United States v. Bryan*, 339 U.S. 323, 331 (1950) (quotation of authorities omitted).) The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981).

The attorney-client privilege protects from compelled disclosure "any communication that satisfies the following elements: it must be '(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.' " *In re Teleglobe*

*Commc'ns Corp.*, 493 F.3d at 359 (citing Restatement (Third) Of The Law Governing Lawyers § 68 (2000)).

Here, Nagle does not readily dispute that the document in question was a communication made between privileged persons for the purpose of obtaining or providing legal assistance, thus satisfying the first, second, and fourth prongs of the test quoted above. Campbell testified that he prepared this chronology at the behest of his attorney in preparation of his defense of the criminal charges that he anticipated would be brought against him. At the end of the chronology itself, Campbell asks a question of his attorney that is clearly intended to solicit legal advice. These facts unequivocally establish that Campbell intended for this to be a communication between himself and his attorney in aid of his defense.[2] It is the third prong with which Nagle takes issue.

Specifically, Nagle contends that Campbell took no steps to keep this communication confidential: He prepared it on his work computer, a computer to which others had access, and he did not password protect the document, or otherwise label it in a way that would alert others that it was personal, privileged and confidential. Furthermore, Nagle argues that Campbell had no objectively reasonable basis to believe that a document stored on his work computer would remain private from others at SPI.

---

[2] At the hearing, counsel for Nagle argued that the document in question has no inherent indicia of attorney-client communication, and, in fact, when it was turned over to him by Nagle he was unaware that it was written by Campbell for his attorney. Counsel for Nagle argued that he did not become aware that this was attorney-client communication until he was informed by the Government. It is true that the document is an untitled outline that could have been written by Campbell for a variety of purposes. However, the unrebutted testimony at the hearing clearly established that Campbell drafted this document for his attorney at his attorney's request.

Based on the evidence presented at the hearing, the court concludes that Campbell took sufficient steps to ensure that this communication was kept confidential. The fact that Campbell prepared the document on an SPI computer while at SPI does not, in and of itself, destroy the confidentiality of an otherwise privileged document. Instead, in the context of workplace communication, the parties point the court to the test described in *In re Asia Global Crossing, LTD.,* 322 B.R. 247 (Bankr. S.D.N.Y. 2005), which has been cited favorably by other courts:

> In general, a court should consider four factors: (1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail; (3) do third parties have a right to access to the computer or e-mail, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?

*Id.* at 257. *See also Convertino v. USDOJ*, 674 F. Supp. 2d 97, (D.D.C. 2009) (*citing* favorably *In re Asia Global* as the standard for determining whether the intent to communicate in confidence was objectively reasonable); *Curto v. Med. World. Commc'ns, Inc.,* Civ. No. 03-CV-6327, 2006 WL 1318387 (E.D.N.Y. May 15, 2006) (same).

Here, the facts demonstrate that SPI had no policy banning the use of work computers for personal reasons. All of the former SPI-employees, including Nagle, testified that they used their work computers for personal purposes and that SPI did not prohibit this if it did not otherwise interfere with the employees' performance of their jobs. Furthermore, the computer use policy introduced at the hearing does not forbid the use of SPI-owned computers for personal purposes, it merely states that an employee's internet and e-mail activity is not private. (*See* Def.'s Hr'g Ex. 1.)

Furthermore, there was no evidence suggesting that SPI monitored its employee's use of the computer or e-mail systems. George Paul testified that it was up to the department managers to notify human resources if the policy was being violated, and that during his time at SPI they only ever fired one person for violation of this policy. In that case, the individual was trying to use his office computer to hack into the company's server. Additionally, at his suppression hearing, Nagle was clear in saying that SPI did not monitor its employees' computer use. (*See* Doc. 73, Tr. of Suppression Hr'g at 176:25 ("[W]e didn't monitor per se.").)

As to the third prong, the testimony regarding whether others had access to Campbell's laptop was equivocal at best. It is undisputed that the document in question was located on Campbell's laptop's hard drive not the company's server. Thus, the scope of access is more limited. Denise Wiederhold testified that she knew Campbell's password to access his computer; however, when questioned, she admitted that she accessed Campbell's computer only when asked to do so by Campbell and, on those occasions, he directed her to the specific place where he wanted her to look for a document. While there was testimony by Ms. Wiederhold that others in the sales department also knew Campbell's password, there was no testimony whether they accessed his laptop hard drive. Ms. Wiederhold also testified that she was never directed by Campbell to view his personal files and that she would not have done so without his permission. Aside from Mr. Wiederhold, there were no witnesses who testified that they had access to Campbell's hard drive.

As to the Computer & Internet Usage Policy, it is restricted to an Employee's Internet and e-mail activity; however, it is silent as to whether an

employee's hard drive is not private. (*See* Def.'s Hr'g Ex. 1.) More importantly, regardless of whether the document comes within the scope of the policy, Nagle did not produce any witnesses who testified with any specificity about how employees' internet, e-mail, and computer use was monitored, and there was certainly no systematized method of doing so.

Finally, as to the fourth prong, even assuming the existence of the computer use policy, there was no testimony that Campbell was aware that this policy existed or that his computer use would be monitored. Campbell testified that he was not aware that there was a written policy and that he does not recall ever having seen it or signed it. This testimony is consistent with Nagle and Ms. Wiederhold who testified that they were not aware of the written policy until recently, and they could not say whether they signed a copy of the policy. George Paul testified that he could not be sure that he gave a copy of the policy to Campbell, and that even though Campbell was on the human resources department committee who reviewed and approved the policy, that he could not be sure that Campbell was at any of the meetings where the policy was discussed. Finally, Mr. Paul testified that he was asked to review the personnel files of Nagle, Campbell, as well as Ernie Fink and Tim Hubler, and that none of these files contained copies of the computer use policy. Given this evidence, the court finds credible Campbell's testimony that he was unaware of the existence of any such policy.

In light of the foregoing assessment of the factors set forth in *In re Asia Holdings*, the court concludes that Campbell's belief that in storing the chronology on his computer's hard drive it would remain private was objectively reasonable. The fact that it was eventually discovered by Ms. Wiederhold while searching

Campbell's computer two months after he was terminated does not mean that Campbell's initial use of his SPI-owned laptop for the creation and storage of this chronology was unreasonable. Furthermore, the fact that Campbell did not label the document as privileged or confidential is immaterial because he had no reason to do so. He did not believe that anyone would look in his DFC folder for things that he did not direct them to look at. Accordingly, the court concludes that the document in question is protected by the attorney-client privilege.

### B. Crime-Fraud Exception

Nagle argues that despite a conclusion that the document is privileged, the privilege can be overcome by a showing that Campbell intended the communication to be used in furtherance of an ongoing crime, and invokes the crime-fraud exception to the attorney-client privilege.

It is well settled that the protections afforded by the privilege are not absolute and does not extend to communications made for the purpose of soliciting advice about the commission of a future crime or fraud. *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 90 (3d Cir. 1992). This is known as the crime-fraud exception, which has been narrowly construed to mean that "[t]he communication condemned and unprotected by the attorney-client privilege is advice that is illicit because it gives direction for the commission of future fraud or crime . . . . It [must be] the *causa pro causa*, the advice that lead to the deed." *Id.*

The burden to make the necessary showing for the crime-fraud exception falls to the party who seeks application of the exception. *In re Grand Jury Investigation,* No. 06-1474, 445 F.3d 266, 274 (3d Cir. 2006). Specifically, the party must:

> make a prima facie showing that (1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud. A prima facie showing requires presentation of evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met.

*Id.* (*citing In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000) (citations and internal quotation marks omitted). In a seminal case on the issue, the Supreme Court, in describing the evidentiary standard for the application of the crime-fraud exception, stated:

> There must be a showing of a prima facie case sufficient to satisfy the judge that the light should be let in . . . .
>
> . . . To drive the [attorney-client] privilege away, there must be something to give colour to the charge; there must be prima facie evidence that it has some foundation in fact. When that evidence is supplied, the seal of secrecy is broken.

*Clark v. United States,* 289 U.S. 1, 14-15 (1933) (citations, internal quotation marks, and footnote omitted.) However, the "burden is not a particularly heavy one." *In re Grand Jury Investigation,* No. 06-1474, 445 F.3d at 274. Nonetheless, the party must at least show that there exists "probable cause to believe that a crime or fraud had been committed and that the communications were in furtherance thereof." *Haines*, 975 F.2d at 95.

  Here, Nagle argues that the document in question was prepared by Campbell seeking his attorney's advice about how to continue to perpetuate the DBE-fraud underlying this case. Specifically, it is argued that Campbell set out a series of lies in this memo that he then continued to pass-off onto the Government. As examples, the document intimates that Nagle's father, Gordon Nagle, when he was the President of SPI, approved the fixed-fee kick-back from Marikina's

12

predecessor and later Marikina, as well as that it was Romeo Cruz's idea to pay a 25% kick-back as a commission to Campbell rather than Campbell's idea. Defendant asserts that both of these were lies that were later passed off to the Government in an attempt to cover-up Campbell's involvement in the DBE-fraud scheme and the kick-back scheme. It is Defendant's assertion that the document in question was written by Campbell with the implicit question: "Should I tell the Government this story?", which allegedly was false, and that this is sufficient for a prima facie showing that the crime-fraud exception exists. The court disagrees.

Nothing in the document in question leads the court to believe that it was written in an attempt to elicit legal advice that would perpetuate an ongoing crime or fraud. The document is a chronology. At the hearing, Campbell testified that he created the document in order to fill his attorney in on the events at issue and his history with SPI. That he later changed the story to something other than what is written in the document does not mean that the document itself was written with the intent to have his attorney pass this story along to the Government. There is simply nothing in the document in question that would "support a good faith belief by a reasonable person" reading it to conclude that it was designed to elicit legal advice or assistance designed to perpetrate a fraud. *Haines*, 975 F.2d at 96 (internal citations omitted).

The evidence at the hearing suggests that the document was created on December 3, 2007, and modified on December 6, 2007. (*See* Def.'s Hr'g Ex. 4, e-mails from D. Wiederhold to J. Nagle.) Mr. Campbell signed a guilty plea to a felony information charging him with one count of conspiracy to defraud and commit mail fraud with respect to the United States Department of Transportation's

13

Disadvantaged Business Enterprise Program, in violation of 18 U.S.C. § 371, on December 19, 2007. *See United States v. Campbell*, 1:08-CR-0007, Document 3, Guilty Plea Agreement, (M.D. Pa. Jan. 9, 2008). This short turn-around time—no more than 13 days—from the document's creation to when it was submitted to Campbell's counsel, and ultimately Campbell's decision to cooperate with the Government and enter into a guilty plea agreement, greatly buttresses Campbell's testimony that the document was designed to fill his attorney in on the chronology of events in order to advise him about whether to cooperate with the Government. Conversely, it mitigates against a finding that the document was designed to delay detection of Campbell's involvement and perpetrate an ongoing or future fraud or crime.

The court understands that Nagle has requested a hearing to be able to elicit additional information; however, the court does not believe that a hearing would shed any additional light onto the subject. Even if Nagle could demonstrate that certain statements in the document are false, and that Campbell continued to make those false statements to the Government that were later recanted or contradicted by others, it would still not demonstrate that *this* document was designed to elicit advice that would perpetuate a fraud or crime. Furthermore, while the party asserting the privilege is entitled to a hearing in the event that the party invoking the exception provides a prima facie showing, nothing requires the court to grant a hearing to the party invoking the exception if the communication itself lacks any indicia that it was designed to elicit an attorney's advice to perpetuate an ongoing crime or fraud. *See Haines*, 975 F.2d at 97 ("[T]he party *invoking the privilege* has the absolute right to be heard by testimony and argument.")

14

Accordingly, because the court finds that no reasonable person reading the document in question could conclude that it was designed to elicit legal advice or assistance designed to perpetrate a fraud, no hearing is necessary and the court concludes that there is no basis in fact to overcome the privileged nature of communication.

**IV.** **Conclusion**

For the foregoing reasons, the court concludes that the chronology document created by Dennis Campbell for his attorney, docketed under seal at Document 91, is a privileged attorney-client communication. The court further concludes that Defendant has failed to produce prima facie evidence that the crime-fraud exception to the attorney-client privilege is applicable to this document, and, thus, the privilege remains in intact. Accordingly, the court will preclude both the Government and Defendant from using this document for any purpose at trial.

The court will issue an appropriate order.

s/Sylvia H. Rambo<br>
United States District Judge

Dated: September 30, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA** :
:
:
v. : **Criminal No. 1:09-CR-384**
:
: **(Judge Rambo)**
**JOSEPH W. NAGLE** :

# O R D E R

In accordance with the accompanying memorandum of law, and for the reasons stated therein, **IT IS HEREBY ORDERED THAT** the Government and Defendant are prohibited from using the chronology prepared by Dennis Campbell for his attorney, docketed under seal as Document 91, for any purpose at trial because the document is an attorney-client privileged communication. The court concludes that the crime-fraud exception to the attorney-client privilege does not apply.

s/Sylvia H. Rambo
United States District Judge

Dated: September 30, 2010.