IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 1:09-CR-384-01** |
| | : | |
| v. | : | |
| | : | |
| **JOSEPH W. NAGLE** | : | **Judge Sylvia H. Rambo** |

# M E M O R A N D U M

Before the court is Defendant Joseph Nagle's motion to compel
compliance with a trial subpoena directed to Ernest G. Fink, Jr.  (Doc. 94.)  In
anticipation of trial, counsel for Nagle sent a subpoena to Fink's attorneys
compelling his appearance to testify.  In return, Fink's attorneys responded that, if
called, Fink will invoke his Fifth Amendment privilege against self-incrimination.
(*See* Docs. 94-4 & 94-5, Exs. C & D to Def.'s Mot. to Compel Compliance with
Subpoena.)

In his motion, Nagle seeks to compel Fink to comply with the subpoena
and testify at trial.  Nagle argues that Fink's testimony would be exculpatory and
essential to his defense because the charges in the case concern whether Nagle
joined a conspiracy with Fink and others, and whether he had the requisite intent to
commit the alleged fraud.  Nagle asserts that the court can compel Fink to testify by
(1) determining that Fink does not have a legitimate basis upon which to invoke his
Fifth Amendment privilege; (2) compel the United States Attorney to grant Fink use
immunity; or, (3) grant Fink judicial immunity.  The parties have briefed these
issues, and the court heard argument at the conclusion of another hearing.
Accordingly, the matter is ripe for disposition.

I.          **Background**

          Nagle and Fink were indicted on thirty-two counts on November 19, 2009.  (Doc. 1.)  The indictment consists of one count of conspiracy to defraud the United States Department of Transportation ("USDOT") in the implementation, execution and administration of its Disadvantaged Business Enterprise ("DBE") program and conspiracy to commit wire and mail fraud; eleven counts of wire fraud; six counts of mail fraud; one count of conspiracy to commit unlawful monetary transactions; eleven counts of aiding and abetting each other in the commission of unlawful monetary transactions; and, two asset forfeiture counts.  (*See id*.)  Both Nagle and Fink entered not guilty pleas to all counts.  (*See* Doc. 10.)

          On July 30, 2010, Fink entered into a plea agreement with the Government in which Fink agreed to plead guilty to Count 1 of the indictment charging conspiracy to defraud the USDOT in the implementation of its DBE-program and conspiracy to commit mail and wire fraud.  (Doc. 77.)  Fink's plea agreement does not call for Fink to be a cooperating witness in the Government's prosecution of Nagle.  Furthermore, the statement of facts supporting the plea agreement does not specifically name Nagle as part of the conspiracy, instead it uses the generic term "upper management" to describe the people with whom Fink admitted to conspiring.  (*See id*., Ex. A, Statement of Facts ¶ 16.)  The Government contends that the reason Fink did not specifically name Nagle in the statement of facts attached to his plea agreement is that he did not want to be perceived as an informant of his close friends and family.

          Nagle takes a different view and asserts that Fink could present exculpatory evidence about the role that Nagle played at SPI during the relevant

2

time frame, and specifically, that Nagle was systematically excluded by Fink from the day-to-day decision making at SPI because of a dysfunctional family relationship.  In particular, Nagle believes that Fink's testimony will demonstrate that Nagle did not join an ongoing conspiracy to commit DBE fraud or mail or wire fraud when he returned to SPI in 2004 after his father's death.

In his brief, Nagle makes the following proffer as to what it is he believes Fink's testimony will reveal:

> Gordon Nagle, the son of the now deceased founder of Schuylkill Products and Mr. Fink's brother-in-law and life-long business partner, died suddenly on January 17, 2004.  Two days later, Mr. Fink was putting in motion his plan to appoint himself President and CEO of Schuylkill Products.  His handwritten journal entry on January 19, 2004 consists of a "to do" list that includes "resolution making me president."
>
> Mr. Fink's handwritten journal also shows that Mr. Nagle stopped by his office to talk to him on or about January 20, 2004.  During that private meeting, Mr. Nagle – who left the family company in 2002 and moved to Florida after a falling out with his father – offered to return to the company if the company needed him. Mr. Fink did not accept Mr. Nagle's offer to return to the company and, instead, told Mr. Nagle words to the effect of "I'll let you know."  Mr. Fink's handwritten journal entry from January 23, 2004 states "don't have to take him back."  The note goes on to state: "mother and J. Jones control Joe's 51% interest" and, tellingly:
>
>> legal – no interest to take him back
>> practical – easier to deal with Fran (bargaining chip)
>
> The "Fran" referred to in Mr. Fink's notes is Gordon's widow and Mr. Nagle's mother.
>
> Mr. Fink did not respond to Mr. Nagle's offer to return to the company.  When Mr. Nagle called him several weeks after their meeting to follow up on their conversation, Mr. Fink told Mr. Nagle that he had discussed the idea of Mr. Nagle's return with the "committee" and that Mr. Nagle was not needed.  The defense believes that Mr. Fink's

testimony will be that, in reality, there was no "committee" or that the "committee" included Mr. Fink's co-conspirators, Dennis Campbell and Timothy Hubler, both of whom were seeking to cement their respective power bases in the company after Gordon Nagle's death.

After rejecting Mr. Nagle's offer to return to the company, Mr. Fink began a campaign to assume complete ownership and control of Schuylkill Products . . . [and] without prior notice, unilaterally decided to stop paying Fran her husband's salary barely two months after Gordon's death. Gordon's estate was not yet settled, none of his life insurance proceeds had been paid (indeed, no timeframe for those payments was known at the time), and his salary was Fran Nagle's primary means of support.

Mr. Fink also launched a plan to buy Gordon's 51% interest in Schuylkill Products from his estate using the proceeds of the life insurance policy Schuylkill Products had on Gordon's life.  The then-existing Shareholders Agreement allowed Mr. Fink to buy Gordon's shares for pennies on the dollar and become the sole owner of the company's voting shares.  Despite her husband's 51% interest in a successful family business worth millions, Fran Nagle would have been left with about $100,000.

Because of what Mr. Fink was doing to his mother, Mr. Nagle decided that he had to return to Schuylkill Products. The Estate used its 51% interest in Schuylkill Products to appoint Mr. Nagle President and CEO.  Mr. Fink was enraged by Mr. Nagle's return, which effectively demoted Mr. Fink to the number two position.  Mr. Fink insisted on retaining the title "Chairman of the Board," as a last remnant of his reign.  The early meetings between Mr. Fink and Mr. Nagle can, at best, be described as acrimonious and more than once devolved into screaming, profanity, and object throwing.

Mr. Fink and Mr. Nagle had one year from Gordon's death to negotiate a new Shareholders Agreement.  Mr. Fink stonewalled Mr. Nagle in these negotiations and did what he could to drag them past the deadline, which would once again allow him to purchase Gordon's 51% interest for approximately $100,000.  It was only because Mr. Nagle delivered an ultimatum and threatened to sell the company that Mr. Nagle and Mr. Fink were able to strike a deal. While Mr. Nagle continued to be the President and CEO of Schuylkill Products, the new Shareholders Agreement

4

afforded Mr. Nagle very little ability to make changes at the company. It contained a provision that gave Mr. Nagle and Mr. Fink veto power over each other's decisions. Mr. Fink exercised his veto power early and often.

Mr. Fink ceded as little power as possible to Mr. Nagle and insisted that the status quo be maintained. As much as he could, Mr. Fink and his inner circle of key employees, including Dennis Campbell and Timothy Hubler, excluded Mr. Nagle from the day-to-day operation of the company. To keep the peace, Mr. Nagle mostly stayed out of Mr. Fink's way.

Mr. Nagle continued to mostly stay out of Mr. Fink's way until October 2007, when Mr. Nagle learned for the first time from the FBI that, for years, Mr. Campbell and Mr. Hubler had been defrauding Schuylkill Products by taking kickbacks from Romeo Cruz. After Mr. Campbell confirmed to Mr. Nagle and Mr. Fink that this shocking revelation and betrayal was true, Mr. Nagle went to Mr. Fink and insisted that the employment of Mr. Campbell and Mr. Hubler be terminated, not an easy decision to make since Mr. Campbell was family and Mr. Hubler was the godfather to Mr. Nagle's daughter. Mr. Fink – who, unbeknownst to Mr. Nagle, was part of the conspiracy with Mr. Campbell and Mr. Hubler – did not support Mr. Nagle's decision to terminate the employment of Mr. Campbell and Mr. Hubler. While it took almost two months to get Mr. Fink to not oppose this action, in December 2007, Mr. Nagle finally terminated the employment of Mr. Campbell and Mr. Hubler and was able to eliminate at least part of the cancer that was growing inside of Schuylkill Products.

Mr. Nagle's tenure as President and CEO at Schuylkill Products from April 2004 until the execution of the search warrant in October 2007 must be viewed in light of its inauspicious beginning and the actions of Mr. Fink and others to exclude Mr. Nagle from the criminal activities which they were undertaking. The events about which Mr. Fink will be called on to testify at the trial of Mr. Nagle belie the notion that Mr. Nagle came back to the company in April 2004 and knowingly and willfully joined the conspiracy to defraud being perpetrated by Mr. Fink. Instead, the exact opposite is true. Mr. Fink's testimony will show that Mr. Nagle was unwanted, unwelcomed, and excluded. For these reasons, Mr. Fink's testimony is essential to Mr. Nagle's defense.

(Doc. 94, Br. in Supp. of Mot. to Compel Compliance with Trial Subpoena at 3-8.)

In response, both the Government and Fink assert that this narrative can hardly be considered a proffer because it is unclear where the information came from as Fink made no proffer to the Government prior to his plea, and Fink has not communicated with Nagle or his attorneys about these events.

## II.        Discussion

### A.    Whether Fink has a valid basis to assert his Fifth Amendment Privilege against Self-Incrimination

Nagle contends that Fink does not want to testify in order to avoid the unflattering picture that his story will paint of him, rather than a legitimate concern for his privilege against self-incrimination.  The Fifth Amendment, however, is not concerned with what motivates an individual to assert his right against self-incrimination; instead, the relevant issue is whether the testimony in question would be incriminatory.  *See In re Flat Glass Antitrust Litig.,*  385 F.3d 350, 371 (2004) ("As a general matter, a court should allow a witness to invoke his Fifth Amendment privilege only if the hazard of incrimination is 'substantial and 'real,' and not merely trifling or imaginary.'" (*quoting United States v. Apfelbaum*, 445 U.S. 115, 128 (1980)).)

Furthermore, the Supreme Court has made it clear that a guilty plea does not waive a defendant's Fifth Amendment rights at sentencing.  *See Mitchell v. United States,* 526 U.S. 314, 325 (1999) ("Where a sentence has yet to be imposed, however, this Court had already rejected the proposition that incrimination is completed once guilt has been adjudicated." (internal quotation marks and citation to authority omitted).)  As the Government in this case points out, the Supreme

Court in *Mitchell*, citing the Government's brief in that case, stated that a defendant "await[ing] sentencing after having pleaded guilty may assert the privilege against self-incrimination if called as a witness in the trial of a co-defendant, in part because of the danger of responding to questions that might have an adverse impact in his sentence or on his prosecution for other crimes." *Id.* at 326-27. This is precisely the circumstances in which Fink asserts his Fifth Amendment privilege.

Nagle argues, unconvincingly, that *Mitchell* can be distinguished because the testimony that Nagle seeks to elicit will not further incriminate Fink or increase his sentencing guidelines by forcing him to admit to relevant conduct about which the Government is not aware or cannot prove. However, it is impossible to tell with any certainty at this stage of the proceedings what either Nagle or the Government will ask Fink or whether it would have an adverse influence on Fink's sentencing. This is precisely the situation warned of in *Mitchell*, and the court concludes that Fink's assertion of his Fifth Amendment privilege is well-grounded.

Nagle argues that in order to mitigate any risk of self-incrimination that the court could either indicate that it will refrain from using any of Fink's testimony against him at sentencing, or, in the alternative, the court could schedule Fink's sentencing on an expedited basis so that it takes place before Nagle begins to present his case in chief. Neither alternative is palatable.

First, absent a grant of immunity, the court is not in the habit of making a promise not to consider information that may be relevant at sentencing, especially information that comes from a defendant testifying under oath. Second, there are real problems with expediting Fink's sentencing. Even assuming that the Presentence Investigative Report is prepared on-time, there is still the comment and

objection period, which is often extended by the court at the request of the parties, and which will likely require hearings to resolve.  Furthermore, an expedited sentencing schedule while the court presides over Nagle's six-week trial is impractical.  Thus, the court concludes that Fink has a valid basis upon which to assert his Fifth Amendment privilege against self-incrimination.

### B.    The Government's Use Immunity

Nagle's counsel requested that the Government consider granting Fink statutory use immunity thereby neutralizing the potential for self-incrimination.  The Assistant United States Attorney denied this request.  (*See* Docs. 94-7 & 94-8, Ltr. and e-mail exchange between counsel for Nagle and AUSA.)  The Third Circuit, in *Gov't of the Virgin Islands v. Smith*, 615 F.2d 964 (1980), has made it clear that absent a showing that the Government's refusal to grant use immunity is a deliberate attempt to distort the fact finding process, which would amount to an "unconstitutional abuse" of prosecutorial authority, the court cannot compel the United States Attorney to grant such immunity from prosecution.  *Id.* at 969.  Nagle has made no such showing in this case, and the court will not intrude upon the discretionary decision making of the United States Attorney's Office.

### C.    Judicial Immunity

Finally, Nagle argues that the court has the inherent authority to confer judicial immunity to Fink, and that it should do so in order to preserve Nagle's Sixth Amendment right to confront witnesses and to preserve his due process right to a fair and fully informed trial.

In *Smith, supra,* the Third Circuit held that a trial court has the inherent authority to judicially immunize a potential defense witness whose testimony would

not otherwise be heard because of the witness's invocation of the Fifth Amendment privilege against self-incrimination, but which, if heard, would be clearly exculpatory and essential to the defendant's case. *Smith*, 615 F.2d at 972. The authority for this power arises from the "the due process right to have clearly exculpatory evidence presented to the jury, at least when there is no *strong* countervailing systemic interest which justifies the exclusion. . . ." *Id.* at 970 (internal quotation marks omitted) (emphasis added).

In announcing this rule, the Third Circuit held that a court's ability to grant judicially conferred immunity is "clearly limited" only to those instances where all of the following criteria are met: "[1] [I]mmunity must be properly sought in the district court; [2] the defense witness must be available to testify; [3] the proffered testimony must be clearly exculpatory; [4] the testimony must be essential; [5] and there must be no strong governmental interest which countervail against a grant of immunity." *Id.* at 972. The parties do not dispute that the first two factors have been met: Nagle filed a motion seeking the court to immunize Fink; and, Fink is available to testify as evidenced by the fact that his attorney accepted service of the subpoena directed to him. However, the parties dispute whether Nagle has satisfied the other factors, and the court will address each of them in turn.

In *Smith*, the Third Circuit did not define what it meant when it required the testimony in question to be "clearly exculpatory." However, case law in the Western District of Pennsylvania has determined that the definition should resemble the test for prejudice used in ineffective assistance of counsel claims, i.e. "the defendant must show that there is a reasonable probability that, but for the unavailability of the witness's testimony, the result of the proceeding would have

been different." *United States v. Sampson*, 661 F. Supp. 514, 519 (W.D. Pa. 1987); *see also, United States v. Pratt*, Criminal No. 06-77, 2007 WL 1655369 (W.D. Pa. Jun. 6, 2007) (*citing Sampson*).  In other words, in order for the evidence to be considered "clearly exculpatory," Nagle must demonstrate that this testimony would make a dispositive difference in the outcome of his case.

The difficulty here is that no one – not Nagle, not the Government, and not the Court – knows exactly what Fink would testify to if he were immunized. The Government contends that for this reason the court cannot conclude that Fink's testimony would be clearly exculpatory.  In contrast, Nagle asserts that he has a good reason to believe that Fink will testify to the version of events as he relayed them because most of the information is memorialized in Fink's journal, correspondence, and conversations between the two of them.  Nagle asserts that this is not a case of who is responsible for the crimes charged—four people have already plead guilty to conspiracy to defraud—and thus, the most contentious issues at trial will not be whether a conspiracy or fraud occurred, but rather whether Nagle *joined* that conspiracy at any time during the relevant period in question.  The court agrees with this analysis.

In a case like this one, the jury will inevitably be asked whether it is possible that the CEO and President of a medium-sized, family owned corporation was aware of, and participated in, the scheme to defraud PennDOT and the USDOT. The Government will undoubtedly attempt to make the case that it is not possible given the scope and pervasiveness of the scheme within SPI that Nagle did not participate in the conspiracy.  Nagle intends, among other witnesses, to use the testimony of Fink to demonstrate that Nagle was systematically excluded from the

10

decision making at SPI by Fink, Campbell, and Hubler.  Furthermore, he hopes to demonstrate that after the Government searched SPI and seized its business records, that it was Fink who sought to protect Campbell and Hubler and that Nagle believed that they should immediately be fired.

If Fink testifies like Nagle believes that he will, it could make a dispositive difference in the outcome of the proceedings.  It is evidence, that if believed, would tend to demonstrate that Nagle did not join the conspiracy as alleged in 2004.  The Government cites the television show "The Sopranos" as authority for the proposition that simply because individuals do not like each other does not mean that they cannot agree to conspire.  While this is undoubtedly a true statement, it does not minimize the significance of the strained relationship between the Nagle and Fink families upon the death of Gordon Nagle.  The term "clearly exculpatory" does not mean that the evidence in question must be exculpatory beyond all scientific certainty — i.e., that it must factually prove a defendant's innocence.  Instead, the term means that but for the inclusion of the evidence there is a reasonable probability that the result of the proceedings would be different.  *See Sampson*, 661 F. Supp. at 519.  Here, the court is convinced that there is a reasonable probability that the testimony of Fink may dispositively affect the outcome of the proceedings, thus, the court concludes that it is clearly exculpatory.

Furthermore, the evidence is essential to Nagle's defense.  While Nagle will undoubtedly be able to demonstrate the allegedly dysfunctional relationship between him and Fink through the testimony of others, the best source of this information comes from Nagle and Fink themselves.  It is unclear whether Nagle intends to testify at trial, but if he chooses not to do so, as is his constitutional right,

the best source of this evidence comes from Fink. The Government's contention that the information is readily available from other sources does not hold water. No other source – save Nagle himself – could testify to the interactions between Nagle and Fink to which others were not privy. Moreover, the court does not believe that Nagle's availability to testify, which would require him to waive his own Fifth Amendment privilege, means that Fink's testimony is not essential. A jury very likely would give greater credence to the testimony of a co-defendant who has already plead guilty, and has nothing to gain by misleading the jury, than it would to the individual who is on trial. Accordingly, the court concludes that Fink's testimony is essential to Nagle's theory of the case and his defense of the charges brought against him.

Finally, the Government has not articulated a *strong* countervailing interest that would preclude the court from conferring judicial immunity. The articulated interest is that the Government wants to avoid an immunity bath whereby Fink can testify without fear of prosecution and without any clear indication as to what he will say. The court notes that the fact that Fink did not proffer prior to his plea, and the fact that he did not enter into a cooperation agreement with the Government, is the product of an apparent negotiation between the Government and Fink's counsel. The Government likely had very good reasons for agreeing to permit Fink to enter a plea agreement to one count in a thirty-two count indictment without first insisting on a proffer and/or a cooperation agreement. However, the Government cannot hide behind its decision to allow Fink to plead without a proffer, and yet insist that it has a strong interest in preventing the immunization of a witness for whom it does not have a proffer. If the court succumbs to this reasoning, it

12

would appear to be a rigged game that would allow the Government to selectively decide which witnesses to allow to enter plea agreements without proffers, and then shield those witnesses from any testimony by asserting that they have a strong interest in preventing them from being immunized without knowing what they will say.

Fink has already pled guilty and agreed to an extensive statement of facts, which provide a basis for the relevant Sentencing Guidelines. Furthermore, the Government has already decided that it is content to allow Fink to plead to only one count of a thirty-two count indictment, and thus any interest they have in holding onto the remaining thirty-one counts in the indictment can hardly be considered "strong."

At issue in this case is a clash between Nagle's due process rights in effectively presenting his defense and Fink's Fifth Amendment right in not incriminating himself. The court can protect both by granting Fink judicial immunity. Given that the Government's only articulated interest is not particularly strong under the circumstances of this case —namely that they have already prosecuted Fink and agreed to a compromise plea agreement—the court concludes that granting Fink judicial immunity from further prosecution for any truthful testimony given at trial is the only way to balance the competing interests at stake and ensure a fair trial for Nagle.

## IV.        <u>Conclusion</u>

In accordance with the foregoing discussion, the court will grant Defendant Joseph Nagle's motion to compel compliance with the trial subpoena

directed at Ernest G. Fink, Jr., and will compel Fink to testify at trial. In order to protect Fink's Fifth Amendment privilege not to be compelled to testify against himself, the court will grant Fink immunity from prosecution for any truthful testimony that he presents at trial. The court's authority to grant judicial immunity to Fink from further prosecution is derived from its inherent authority to effectuate Nagle's compulsory due process rights because the court believes that Fink's testimony is essential to his effective defense from prosecution.

   The court will issue an appropriate order.

        s/Sylvia H. Rambo
        United States District Judge

Dated: October 4, 2010.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 1:09-CR-384-01** |
| | : | |
| v. | : | |
| | : | |
| | : | |
| **JOSEPH W. NAGLE** | : | **Judge Sylvia H. Rambo** |

## O R D E R

In accordance with the attached memorandum of law, **IT IS HEREBY
ORDERED THAT** Defendant's Motion to Compel Compliance with the Trial
Subpoena Directed to Ernest G. Fink, Jr., (Doc. 94), is **GRANTED**.  Ernest G. Fink,
Jr. is **ORDERED** to be available to testify as a defense witness in the trial of this
matter, and such testimony will be given under the protection of judicial immunity
from prosecution for all truthful testimony given at trial.




s/Sylvia H. Rambo
United States District Judge

Dated:  October 4, 2010.