IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:09-CR-384-01** |
| **v.** | : | |
| **JOSEPH W. NAGLE** | : | **Judge Sylvia H. Rambo** |

## M E M O R A N D U M

Following a four-week criminal trial, Defendant, Joseph W. Nagle, was convicted by a jury in the United States District Court for the Middle District of Pennsylvania of various crimes related to his involvement in multiple federally funded highway construction products. The 26 counts of which Defendant was found guilty included several counts of wire fraud, in violation of 18 U.S.C. § 1343, mail fraud, in violation of 18 U.S.C. § 1341, and engaging in unlawful monetary transactions, in violation of 18 U.S.C. § 1957. The jury also found that Defendant knowingly participated in a conspiracy to commit these acts in order to maximize productivity and profits for the company of which he was president, in violation of 18 U.S.C. §§ 371 and 1956(h). Specifically, Defendant was found to have participated in an elaborate scheme in which a certified disadvantaged business enterprise was improperly used as a "pass-through" to satisfy the disadvantaged business enterprise requirements on certain federally funded highway projects.

Presently before the court is Defendant's post-trial motion for judgment of acquittal notwithstanding the verdict pursuant to Federal Rule of Criminal Procedure 29, or in the alternative, motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. (*See* Docs. 222, 232, 239 & 256.) In his motion and briefs in support thereof, Defendant raises a litany of issues relating to the sufficiency and weight of the evidence, the Government's actions during trial and pre-trial discovery,

this court's handling of the trial itself, and the propriety of certain jury instructions. The Government has opposed the motion in all respects. (*See* Docs. 226, 236, 242 & 257.) The court has considered the submissions of both parties and post-trial evidence submitted in support of Defendant's numerous allegations of prosecutorial misconduct. For the reasons that follow, Defendant's motion will be denied in its entirety.

**I.**       **Background**

Due to the breadth of challenges in Defendant's motion, the court will set forth portions of the record pertinent to the issues raised.

**A.**    **Pre-trial**

On November 19, 2009, a federal grand jury sitting in the Middle District of Pennsylvania indicted Defendant and Ernest G. Fink ("Fink") on 32 counts, consisting of one count of conspiracy to defraud the United States Department of Transportation in the implementation, execution, and administration of its Disadvantaged Business Enterprise ("DBE") program and conspiracy to commit wire and mail fraud, and one count of conspiracy to commit unlawful monetary transactions. (Doc. 1.) The indictment also charged the defendants with committing, or aiding and abetting the commission of, 28 substantive violations of the aforementioned laws, as well as two asset forfeiture counts. (*Id.*) Both Defendant and Fink entered not guilty pleas to all counts. (*See* Docs. 11 & 12.)

### 1. <u>Motion To Suppress Electronic Evidence</u>

On April 4, 2010, Defendant filed a motion to suppress,[1] which sought to exclude electronic evidence obtained as a result of the search of the companies' servers. (Doc. 41.) Following a hearing on the issue, the court denied Defendant's motion, finding that Defendant lacked standing to challenge the search because he did not have a personal expectation of privacy in the content of the seized electronic information. (Doc. 89.)

### 2. <u>Defendant's Motion To Compel</u>

On July 30, 2010, Fink entered into a plea agreement with the Government, in which he agreed to plead guilty to Count One of the indictment, charging conspiracy to defraud the United States Department of Transportation in the implementation of its DBE program and conspiracy to commit mail and wire fraud. (Doc. 77.) Fink's plea agreement did not require Fink to be a cooperating witness in the Government's prosecution of Defendant. (*Id.*) On September 20, 2010, Defendant filed a motion requesting the court to compel Fink's compliance with a trial subpoena. (Doc. 94.) In support of his motion, Defendant argued that Fink's testimony would be exculpatory and essential to his defense, namely that Defendant was systematically excluded from the day-to-day operations at SPI, which would demonstrate that Defendant did not join the ongoing conspiracy to commit DBE fraud or mail or wire fraud when he returned to SPI in 2004. (*See id.*) After considering the potentially exculpatory evidence Fink could provide, the court

---

[1] The motion was originally filed jointly by Defendant and Fink. (Doc. 41.) However, on July 30, 2010, Fink entered into a plea agreement with the Government. (Doc. 77.) On August 16, 2010, at his change of plea hearing, Fink withdrew his motion to suppress (*see* Doc. 86), and entered a plea of guilty (Doc. 87).

granted Fink judicial immunity for his testimony.  (Doc. 120.)  The matter was stayed pending the Government's interlocutory appeal of the court's ruling.  (Doc. 125.)  The Third Circuit affirmed this court's grant of judicial immunity (Docs. 140 & 141), and Fink testified at trial.

### 3.  Defendant's Motion To Preclude Evidence of His Wealth

On October 4, 2010, Defendant filed a motion which sought to exclude evidence of Defendant's earnings and assets.  (Doc. 119.)  The motion focused on the exclusion of seventeen exhibits, which included, *inter alia*, Defendant's tax returns, the agreement of sale of SPI to Northeast Prestressed Products, and records of leased vehicles, which included the make and model of vehicles leased by SPI for Defendant's use.  (*See id.*)  In support of his motion, Defendant argued that the financial evidence was irrelevant and, if relevant, the documents' probative value was substantially outweighed by the potential for prejudice.  (*See id*.)  Regarding the tax records, Defendant argued that, because SPI was a Subchapter S corporation, the tax returns were misleading because he actually received only a portion of the income during the relevant time frame because the profits of SPI, though distributed and taxed, were reinvested by the company.[2]  (*See id*.)  Regarding the sales agreement, which reflected that SPI was sold to Northeast Prestressed Products for $9.25 million, Defendant argued that the evidence was misleading because more than $7 million in debt was paid off with the proceeds of sale, and that Defendant's share

---

[2]  The Government's proffered reasons for introducing this evidence was to demonstrate that Defendant had an incentive to commit DBE fraud because doing so increased SPI's profits, which ultimately benefitted Defendant through the distribution of those profits.  The court found that, although there was the potential for some prejudice or misleading of the jury as a result of the introduction of the tax information, such potential could be cured by a limiting instruction as well as cross-examination.

of the proceeds was considerably less than the sales price indicated.[3] (*See id.*)
Regarding SPI's records related to the leased vehicles, which indicated that SPI had
leased a luxury vehicle for Defendant's use, Defendant argued that the leases were
highly prejudicial and served virtually no evidentiary value.[4] (*See id.*) On October
6, 2012, the court sustained Defendant's objection related to Government Exhibit
85.11, to the extent that the exhibit indicated the make and model of the vehicle
leased for Defendant by SPI, but denied the motion in all other respects. (Doc. 126.)
The permitted portions of the financial evidence were introduced at trial.

## B.    Trial

Trial began on March 12, 2012. The Government called 35 witnesses-
many of them former employees of SPI. Defendant moved for a judgment of
acquittal at the close of the Government's case on March 29, 2012 (*see* Doc. 175),[5]
which the court denied in an order dated March 30, 2012. (Doc. 184.) Defendant

---

[3] The Government's proffered reasons for introducing this evidence was to demonstrate that Defendant had an incentive to commit DBE fraud because doing so increased SPI's profits and resulted in SPI being a profitable company. Like evidence of Defendant's income, the court was confident that any unfair prejudice to Defendant could be cured through effective cross-examination and a limiting instruction.

[4] The Government's proffered reasons for introducing this evidence was to demonstrate that Defendant received benefits other than salary. (Doc. 126, p. 3 of 4.)

[5] On March 29, 2012, the Government concluded its presentation of evidence and rested its case. Subsequently, Defendant made both an oral and written motion or judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. (Doc. 175.) Defendant's oral motion argued that insufficient evidence had been presented to prove Defendant "willfully" participated in the charged conduct, and the charges, therefore, must be dismissed as a matter of law for the Government's failure to establish the requisite mental state. Defendant's written motion only challenged the unlawful monetary transaction charges and conspiracy to commit the same, arguing that Defendant should be acquitted of those counts because: (1) the unlawful monetary transactions were "part and parcel" of the underlying mail and wire fraud claims; (2) the monies obtained through the underlying mail and wire fraud scheme were not "proceeds" as defined by the statute; and (3) the government failed to meet the statutory requirement that the charged monetary transactions exceeded $10,000.00. (Doc. 175, pp. 3-4 of 18.)

presented testimony from four witnesses, including his own. Following these proceedings, and after less than two days of deliberation,[6] the jury convicted Defendant of nearly all charges levied against him.[7]

Following the jury's verdict, Defendant filed the instant post-trial brief raising a multitude of challenges to his convictions, the Prosecutor's conduct both pre-trial and during trial, and this court's handling of the case. In his initial brief (Doc. 222), Defendant argued that: (1) the Government presented insufficient evidence to sustain the convictions, namely that the Government failed to prove beyond a reasonable doubt that Defendant did not act in good faith, and the court should, therefore enter a judgment of acquittal notwithstanding the verdict; and (2) the court should vacate the jury's verdict and grant a new trial in the interests of justice. (*See id.*) In support of the latter argument, Defendant argued that: (a) the verdict was against the weight of the evidence; (b) the Government violated its *Brady* obligations; (c) the Prosecutor made improper and prejudicial closing arguments to the jury; (d) the court gave an erroneous jury instruction on willful blindness; (e) the court erroneously excluded an important defense witness; and (f) the court erroneously denied Defendant's pre-trial suppression motion and pre-trial motion to preclude evidence on Defendant's wealth. Lastly, Defendant argued he was entitled to judgment of acquittal on the money laundering convictions because: (a) the convictions fail as a matter of law under *United States v. Santos*, 553 U.S. 507 (2008); (b) each money laundering transaction merged with the mail and wire fraud

---

[6] Before the jury returned its verdict, the Government dropped the forfeiture counts (Counts 30 & 31) on April 5, 2012. (*See* Doc. 192.)

[7] Defendant was convicted of all but four counts of wire fraud (Counts 5, 6, 7 & 10). (Doc. 197.)

convictions; and (c) there was insufficient evidence to support the money laundering convictions. The court will discuss Defendant's challenges in turn.

### 1. Overviews

The court will, by necessity, segregate its discussion in terms of the key pieces of evidence applicable to the issues identified above, but one should not miss the forest for the trees. The reasonableness of the jury's verdict is dependent upon viewing the evidence as a whole, and while Defendant argues the weakness of certain trees, the court concludes that, when viewing the totality of the evidence, a reasonable jury could find beyond a reasonable doubt that Defendant conspired to commit the crimes for which he was convicted.

### a. Overview of the DBE Program

Pursuant to regulations adopted by the Department of Transportation at the direction of Congress, a state that receives federal funds for highway construction projects must set an annual goal for participation in such projects by disadvantaged business enterprises. *See* 49 C.F.R. § 26.21. Prime contractors, in turn, must ensure that the subcontracts awarded in connection with a highway construction project meet the DBE participation goal for that project. A DBE is a for-profit small business that is at least 51-percent owned by one or more socially and economically disadvantaged individuals, and whose daily business operations are controlled by at least one of those individuals. 26 C.F.R. § 26.5. A DBE must be certified by the state in which it operates. In order to satisfy DBE participation goals, a DBE that is awarded a subcontract on a project must perform a commercially useful function – that is, the DBE itself must perform, manage, and supervise the subcontract work and must negotiate price, order, install, and pay for the materials used. 26 C.F.R. §

26.55.  A contractor does not receive credit for DBE participation if the relationship between the contractor and the DBE is such that the DBE's "role is limited to that of an extra-participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation."  26 C.F.R. § 26.55(c).

### b.  Overview of the Companies

At the time of the indictment, Defendant was the president, chief executive officer, and majority owner of Schuylkill Products, Inc. ("SPI"), and its wholly-owned subsidiary, CDS Engineers, Inc. ("CDS").  However, the existence of SPI and the scheme for which Defendant was convicted commenced well before Defendant's assumption of these leadership positions. (*See* Tr. 2427-29.)  Thus, a full understanding of Defendant's involvement in this matter requires a review of the historical context of the scheme and an understanding of SPI's corporate structure.

SPI was a family-owned Subchapter S company incorporated in Pennsylvania during the 1950s, and was based in Cressona, Pennsylvania.  (Tr. 2794.)  The company was engaged in bridge beam manufacturing, including pre-stressed concrete bridge beams, for use on highway construction projects. Defendant's grandfather, W. Joseph Nagle, started the company and ran the business until his death in 1980. (*See* Tr. 2795-96.)  From 1980 through 2004, the company was controlled by Defendant's father, Gordon Nagle ("Gordon") and Fink, an uncle by marriage to Defendant.  (Tr. 2804.)  Upon Gordon's death in 2004, Defendant assumed control of Gordon's ownership shares and became the majority owner of SPI.  Defendant and Fink, the minority owner of the company, became the sole stockholders of SPI.  (Tr. 2605-06.)  Fink served as vice president and chief

operating officer of SPI. (Tr. 2724, 2729.) Also following Gordon's death, Dennis F. Campbell ("Campbell") became vice president of sales for SPI and Timothy G. Hubler ("Hubler") became vice president of field operations. (Tr. 2749.)

CDS was incorporated in Pennsylvania in 1985 by Gordon, and was also based in Cressona, Pennsylvania. After Gordon's death, CDS was absorbed as a wholly-owned subsidiary of SPI. (*See* Gov. 4.2.) CDS operated as the engineering and erection division of SPI. Neither SPI nor CDS were ever certified as DBEs, and were ineligible for such a certification.

Marikina Engineers and Construction Corporation ("MECC") was a company incorporated in Connecticut in March 1989 by Romeo Cruz ("Cruz"), an individual of Filipino descent who was the sole owner of the company. In June 1989, MECC was certified as a DBE in Connecticut. In May 1992, MECC was certified as a DBE by the Pennsylvania Department of Transportation ("PennDOT"), and was subsequently certified as a DBE by the regulatory authorities in several other states in which it did business. In November 1999, Cruz incorporated Marikina Construction Corporation ("Marikina") in Pennsylvania, and was based in Ashland, Pennsylvania. Marikina was certified by PennDOT as a DBE shortly thereafter.

### c. <u>Overview of the Schemes</u>

As explained in more detail below, the crimes for which Defendant was convicted related to his involvement in SPI's improper use of Marikina as a "front" to acquire subcontracts, and consequently funds, allocated by certain government programs for companies certified as DBEs. However, during the investigation into the company's actions, two separate fraudulent schemes were discovered, neither for which Defendant was charged. Those separate frauds were referred to as the

9

"kickback" and "high-low" schemes, and were not directly related to the DBE fraud. However, due to the importance defense counsel placed upon their existence, a brief description of those schemes is warranted.

## I.  The DBE Scheme

Stated briefly, the evidence presented at trial demonstrated that, for the nearly fifteen-year period between 1993 and 2007 (Tr. 2125),[8] SPI used Marikina to serve as a "front" on bids for numerous highway construction projects sponsored by PennDOT and the Southeastern Pennsylvania Transportation Authority ("SEPTA"), and partially funded by the federal government (*see* Tr. 526).  The fraud was extensive.  Between 1993 and 2007, Marikina received hundreds of subcontracts worth in excess of $100 million, making it PennDOT's largest recipient of DBE-designated funds.  (*See* Tr. 525-26.)  Marikina received these subcontracts to "furnish and install" bridge beams from general contractors to whom PennDOT had awarded the prime contracts.  (*See, e.g.,* Tr. 533-34.)  Most of the bridge beams used by Marikina on these projects were manufactured by SPI, but some required Marikina to install non-SPI products.  (*See* Tr. 232.)

---

[8]  There was evidence that SPI was engaged in using other DBEs as a front prior to its use of Marikina.  In the early 1980s, SPI used a company called Pennsylvania Concrete Products ("PCP"), which was set up by Gordon and Fink but "owned" by I.C. Patel, SPI's chief engineer of Indian nationality.  (*See* Tr. 2427-28.)  During its existence, PCP was the erection division of SPI, but acted as a "pass-through" for SPI in order to "do the erection and sell [SPI's] product" by a minority-owned company.  (Tr. 2427.)  When PCP was disqualified by PennDOT as a result of it being actually owned by SPI (*see* Tr. 2428), SPI began to use SPECTRA Services as a pass-through, which was a company owned by a minority (Tr. 2429).  When the owner of SPECTRA retired in the early 1990s, Gordon suggested that Hubler's wife start, in her name, a woman's disadvantaged business.  (Tr. 2435.)  When Hubler's wife refused, SPI engaged Cruz and Marikina, at the direction of Gordon (Tr. 2226), to fill the DBE requirement (Tr. 2434-35).  In short, in terms of the DBE scheme, the DBE company changed, but the contract flow remained the same.  (*See* Tr. 2439.)  Defendant knew about the relationship between SPI and SPECTRA and believed the contract flow between SPI and Marikina was identical.  (Tr. 2851, 2941.)

Although Marikina was the subcontractor of record, Marikina did not perform a commercially useful function, and in reality, the subcontracts were found, negotiated, coordinated, performed, managed, and supervised by SPI and CDS personnel. Profits for the jobs flowed through Marikina to CDS and SPI, less a "fixed fee" that was paid to Marikina. (*See* Gov. 100.3; *see also* Tr. 184.) For example, if an SPI beam was used, Marikina remitted all of the funds to SPI. If a third-party's beam was used, Marikina submitted the funds, less the cost of the third party beam. In either case, SPI would give Marikina a fixed fee and keep the balance of the total subcontract payment within SPI. Although laborers received paychecks from Marikina when they worked on "Marikina" jobs, Marikina sent invoices to CDS for the amount paid to the workers, and CDS reimbursed Marikina from its operating account for those amounts. (*See* Gov 100.3; Tr. 758, 2090, 2608, 2778-80; *see also* Gov. 83.1; Gov. 83.3.)[9] Thus, the profits on erection work performed by CDS on Marikina's subcontracts went to CDS's bottom line in exchange for Marikina receiving the fixed fee. (Tr. 2608.) Cruz, who owned Marikina, knowingly allowed SPI and CDS to use his company as a front on the projects. Thus, the scheme resulted in money, which the government had intended to go to legitimate DBEs performing commercially useful functions, being funneled through

---

[9] George Paul, the human resources director for SPI testified that, although it was not uncommon for distinct companies to "borrow" workers in the construction industry (Tr. 754), the evidence presented at trial demonstrated that amounts paid by Marikina for "borrowed" CDS/SPI workers were reimbursed by CDS/SPI (Tr. 758).

Marikina directly to SPI, a non-DBE.[10] Ultimately, this arrangement resulted in increased profits for SPI. (Tr. 2599; *see also* Gov. 4.1.)

Revenue generated by the fraud was a substantial part of SPI's business, and during Defendant's tenure as president, both SPI and CDS experienced increased profits, due, at least in part, to the companies' receipt of numerous subcontracts through Marikina, which SPI was otherwise not eligible to receive. (*See* Gov. 4.1.) During the relevant time, SPI/CDS's aggregate annual revenue was between 18 million and 26 million dollars, with 20-25% being attributed to CDS. (*See* Tr. 2599.)

### ii. <u>The Kickback and High-Low Schemes</u>

During his interview of Cruz, Agent Thomas Marakovits of the Federal Bureau of Investigation, learned about the kickback and high-low schemes. (Tr. 163, 438.) The kickback scheme, which was proposed by Hubler and Campbell during initial discussions with Cruz (*see* Tr. 2521-23), related to the fixed fee paid to Marikina, whereby Cruz would pay to each Campbell and Hubler 25 percent of the fixed fee he received from the DBE fraud (Tr. 789-90).[11] Hubler estimated that, between 2000 and 2007, the kickback scheme resulted in his receipt of $500,000.00 in additional income. (Tr. 2512.) This scheme was kept secret from all but those who were directly involved, namely Cruz, Campbell, and Hubler. (*See* Tr. 2519.)

---

[10] The relationship between Marikina and SPI made Marikina more attractive to general contractors, as it was easier for general contractors to meet DBE goals by subcontracting with Marikina that to install beams furnished by SPI . (*See* Tr. 2482 ("[A general contractor] only had to deal with [SPI] and [it] would meet [its DBE] goal.").) Moreover, by using Marikina to furnish the beams, the general contractor received DBE credit on the cost of beams *and* erection. (*See* Tr. 101-03.)

[11] Hubler testified that he and Campbell had a kickback arrangement with SPECTRA Services, wherein SPECTRA Services would pay ten percent of the fixed fee to each Campbell and Hubler. (Tr. 2483.)

Ultimately, Hubler and Campbell's employment with SPI was terminated due to the discovery of the kickback scheme.  (Tr. 2762.)[12]

The high-low scheme, in which only Hubler and Cruz participated (*see* Tr. 537), was possible due to SPI/CDS's reimbursement of Marikina's "direct costs." This scheme was suggested by Cruz (Tr. 2513), and involved the "padding" of the certified payrolls, whereby two separate certified payrolls were created: the "low," which accurately reflected the labor involved on the job; and the "high," which included employees who never worked on the job and inflated hours.  (*See* Tr. 792.) Cruz would send both the high and the low labor invoice to Hubler, and Hubler would decide which to process.  (*See* Tr. 793-94.)  If the high was processed, SPI/CDS would reimburse Marikina for the amount reflected on the high invoice, and Hubler and Cruz would evenly split the difference between the amount paid and the actual cost for labor.  (Tr. 793.)  No one, other than Hubler and Cruz, was aware of the high-low scheme (*see* Tr. 794, 2518), and Hubler was fearful that he would be fired if the company discovered the scheme (Tr. 2508).

## 2.  Evidence Presented at Trial

In defense counsel's opening statement, it was clear that the issue for the jury was not whether DBE fraud existed at SPI, but rather whether Defendant

---

[12]  Pishock testified that, on three separate occasions, he received money directly from Cruz for doing work not directly related to his job at CDS/SPI. (Tr. 1634.)  Specifically, Pishock received $675.00 from Cruz in 2003 as a result of Pishock's expediting an order for beams. (Tr. 1635.)  Once in 2005, and again in 2007, Pishock received approximately $1,000.00 and $1,300.00, respectively, for his assistance in helping negotiate two contracts on behalf of Cruz that did not involve CDS. (Tr. 1636; *see also* Tr. 1159-60.)

At trial and in post-trial submissions, Defendant attempted to paint Pishock's receipt of this money as "kickbacks" akin to those received by Hubler and Campbell. (Doc. 222, pp. 46-47 of 119; *see also* Tr. 1679-81.)  The court rejects such an analogy.  As later explained in more detail, these three instances reflect isolated incidents and do not rise to the level of the consistent scheme that existed between Campbell, Hubler, and Cruz. (*See infra* Part I.B.1.b.)

was a knowing participant.  Nevertheless, the Government presented a significant amount of evidence for the purpose of establishing the existence and extent of the complex DBE scheme.  Defendant's post-trial motion challenges, *inter alia*, the sufficiency and weight of the evidence.  Accordingly, the court will first discuss the evidence presented to establish the scheme before addressing evidence presented to establish Defendant's participation.

### a.    <u>Outline of Witnesses</u>

At trial, the prosecution presented the testimony of the following 35 witnesses: Robert C. Ashby, the Deputy Assistant General Counsel for Regulation and Enforcement for the United States Department of Transportation; Thomas Marakovits, the supervisory senior resident agent with the Federal Bureau of Investigations; William Evans, an agent with the FBI who participated in the search of SPI headquarters; Joshua J. Swims, a special agent with the FBI who participated in the investigation of SPI; Michael Purcell, an employee in the Inspector General's office for the United States Department of Transportation; Joseph Butto, a former employee of Citizens Bank who was involved with SPI's account and line of credit; James Fox, a former employee of the financial advisory company who consulted for SPI prior to its sale in 2008; Amy Marshall, an attorney who assisted Northeast Prestressed Products in its asset purchase transaction of SPI; Al Marshall, an attorney who represented SPI in various matters and represented Fink in connection with a shareholders agreement related to the operation of SPI; George Paul, the former human resource administrator at SPI who testified pursuant to an immunity

agreement; Joecylita Gloria,[13] a former employee of Marikina whose actions helped facilitate the fraud at issue who testified pursuant to an immunity agreement; Romeo Cruz,[14] who owned Marikina and entered a guilty plea for his participation in the fraud at issue and who testified pursuant to a plea agreement; Becky Mescher-Vuxta,[15] the manager of contract awards for PennDOT; James Yee, the contract administrator supervisor for the Bureau of Project Delivery within PennDOT; Dustin Hobaugh, the chief of the DBE Title 6 Division within PennDOT's Bureau of Equal

---

[13] Gloria, the sole full-time employee of Marikina (Tr. 776-76), testified as to her involvement in the fraud. After coming to the United States in May 2002, Gloria was hired by Cruz to work for Marikina based in Connecticut. (Tr. 764.) Although Gloria never met or spoke directly with Defendant (Tr. 956), she had extensive dealings with Campbell, Kofluk, Pishock, Hubler, Mack, and Quandel. (Tr. 778.) Throughout the course of the fraud, Gloria was instructed as to the portion of payments that Marikina would retain, which was determined by Campbell (Tr. 782), and the location to send the balance. (Tr. 780.) Marikina never accepted a bid on a contract that was not approved by Pishock or Campbell. (Tr. 800-01.) Gloria had minimal contact with the general contractors through whom Marikina would receive subcontracts. (*See* Tr. 781.) In fact, Gloria testified that Marikina had virtually no actual involvement with the subcontracts, except for creating and certifying payroll. (Tr. 795-96.)

[14] Cruz, the owner of Marikina who was intimately involved with all three schemes and was supposedly controlling the company despite being described as a man who "didn't know anything about erecting beams" (Tr. 2445), corroborated much of the testimony of the other witnesses regarding the structure of the schemes and the relationship between Marikina and SPI/CDS. Cruz testified that, prior to meeting Hubler and Campbell in 1992, Marikina was a legitimate company certified as a DBE in Connecticut. (Tr. 994.) Following the retirement of Pedro Zornosa, the owner of SPECTRA Services, and the consequential termination of the relationship between SPI and SPECTRA, Gordon instructed Campbell and Hubler to meet with Cruz and "give him the layout of the land" (Tr. 2226-27; *see also* Tr. 2435), and explain the fixed-fee relationship (Tr. 2228). Cruz immediately accepted the arrangement (*see id.*), and the pending SPECTRA contracts were transferred to Marikina (Tr. 2230). The contract flow did not change during the relationship between SPI and Marikina (Tr. 2231), and Cruz's job function was largely limited to certifying payroll (Tr. 2444), a task he was able to perform while frequently in the Philippines during 2004 through 2007 (*see* Tr. 1033-34; Gov. 121.5-121.8). Similar to the testimony of Gloria, Cruz testified that, after the commencement of the relationship between SPI and Marikina, he frequently communicated with Campbell, Kofluk, Pishock, Hubler, Mack, and Quandel, but rarely spoke directly with Defendant. (Tr. 1112-13, 1161.)

[15] Mescher-Vuxta testified that, after a DBE goal is set, the project is advertised through Engineering Construction Management System ("ECMS"), computer software that is used by PennDOT to advertise all of the projects and open bids, execute contracts, and manage the construction process. (Tr. 1170-71.) SPI employees used ECMS to obtain the subcontracts for Marikina. (Tr. 1786.)

Opportunity; Lillie Claitt, the director of SEPTA's DBE program; Jeannie Daniels, the investigator in charge for PennDot's Office of Chief Counsel; Sharon Lenart, the former investigator in charge of DBE certification investigations; Lester Aungst, III, the owner of a company that made magnetic signs for SPI, CDS, and Marikina; Daniel Cuccurullo, who was a structural draftsman at CDS and had a small vinyl graphics sign business that made decals with Marikina's logo; William Knecht, II, the vice president of a commercial printing company who printed business cards for SPI employees with Marikina's information; April Quandel, a former employee of SPI who testified pursuant to an immunity agreement; Melissa Mack-Reichwein ("Mack"), the former transportation administrator at SPI who testified pursuant to an immunity agreement; Mark Pishock, the former sales manager of SPI who testified pursuant to an immunity agreement; Philip Groody, the former transportation manager at SPI who testified pursuant to an immunity agreement; Denise Logan, a former receptionist and sales assistant who testified pursuant to an immunity agreement; Mark Hoover, a former field engineer for SPI who testified pursuant to an immunity agreement; Timothy M. Hubler ("T.M. Hubler"),[16] who is the son of Timothy G. Hubler and was a former employee of SPI; Kurt Kauffman, who was an enforcement officer for the Pennsylvania Public Utility Commission Bureau of Investigation and Enforcement; Helene Kofluk, the former accounts receivable administrator of SPI who testified pursuant to an immunity agreement; Milka

---

[16] T.M. Hubler's full-time employment at CDS commenced in 2000. (Tr. 1878.) T.M. Hubler testified that, in addition to creating erection drawings for the company, he performed IT work for both SPI/CDS and Marikina. (Tr. 1878-81.) T.M. Hubler's testimony corroborated the testimony of many of the other witnesses in terms of his involvement in assisting SPI/CDS with technology-based work involving Marikina, including setting up Marikina email addresses for SPI employees and creating the Marikina website. (*See generally* Tr. 1888-91.) T.M. Hubler did not enter into an immunity agreement with the Government. (Tr. 1917.)

DeLellis, the former accounts payable clerk for SPI who testified pursuant to an immunity agreement; Dennis Campbell,[17] who was indicted and entered a guilty plea for his actions in connection with the fraud and whose testimony was given pursuant to a plea agreement; Timothy G. Hubler,[18] who was similarly indicted and entered a guilty plea for his actions in connection with the fraud and whose testimony was given pursuant to a plea agreement; Robert Barrett, Jr., a former staff accountant for SPI who testified pursuant to an immunity agreement; and Mary Grigoruk, a special agent with the IRS criminal investigation division.

In addition to his own testimony, Defendant presented the testimony of the following three witnesses in his case-in-chief: George Litsch, the former vice president of manufacturing for SPI; Ernest Fink, the former vice president and minority owner of SPI, who was indicted with Defendant in this matter for his involvement in the fraud, but had entered a guilty plea prior to Defendant's trial and testified on Defendant's behalf pursuant to the court's grant of judicial immunity; and Thomas Barlow, the former president of the local union who interacted with Defendant in connection with union contracts. Defendant also sought to introduce the evidence of a third-party investigator, Jim Barnacle. (*See* Tr. 2673.) Defense

---

[17] The testimony of Campbell, the former sales manager at SPI who was admittedly heavily involved in both the DBE fraud as well as the kickback scheme, corroborated the testimony of other witnesses with regard the methods the companies employed to conceal the fact that SPI/CDS workers were performing the commercially useful functions supposedly performed by Marikina. (Tr. 2123-24.) At trial, Campbell's description of his own specific involvement, as well as that of others, was consistent with documentary evidence and the testimony of other witnesses alike. (*See, e.g.,* Tr. 2127.)

[18] The testimony of Hubler, the former vice president of CDS (*see* Tr. 2431-32) who was admittedly heavily involved in both the DBE fraud, kickback scheme, and high-low scheme, corroborated the testimony of other witnesses with regard to the methods the companies employed to conceal the fact that SPI/CDS workers were performing the commercially useful functions supposedly performed by Marikina, which included Hubler frequently being represented as a Marikina employee. (*See, e.g.,* Tr. 2463.)

counsel gave the following proffer regarding the subject matter of Barnacle's testimony, which he claimed would be used solely for the impeachment of Hubler:

> Mr. Hubler told Mr. Barnacle that Joy Gloria told him prior to the search of [SPI] that the FBI was at the offices of Marikina and that she was under a gag order not to discuss the FBI investigation with [SPI], CDS, or anyone else.

(Tr. 2674.) Following argument, the court excluded the testimony of Barnacle. (Tr. 2702.)

### b.  Evidence Establishing the Existence of Fraud

Although tedious, the following review of evidence presented at trial in support of the substantive counts is warranted in light of Defendant's challenge to the weight and sufficiency of the evidence. At trial, Agent Marakovits testified that an investigation into fraud was initiated after Bob Green, a former employee of CDS, contacted the FBI to report, what he characterized as, DBE fraud. (Tr. 150-51.) During that investigation,[19] it was determined, *inter alia*, that, although Marikina was the subcontractor of record for multiple SEPTA and PennDOT projects, the work conducted pursuant to the subcontracts was performed by employees of SPI and CDS (Tr. 155), and that funds issued to Marikina from general contractors were transferred to SPI, normally within one week of deposit (Tr. 158). The investigation culminated in several searches. On September 12, 2007, a search warrant was

---

[19] Agent Marakovits testified at length regarding the assistance Green provided to the FBI in the initial stages of the investigation. The investigation included, *inter alia*, surveillance of job sites where Marikina was a subcontractor, at which trucks were present that displayed Marikina's logo but were registered to SPI. In addition, Agent Marakovits testified that Cruz was frequently out of the country, and that packages were frequently sent between Marikina, SPI, CDS, and Hubler's house. (Tr. 154-58.) Agent Marakovits also testified that Green was paid $5,000.00 for his assistance in the investigation; however, it was determined post-trial that Green was actually paid $5,300.00. (*See infra*, Part II.B.2.a.iv.)

executed at Marikina's Connecticut "office," which was located in the basement of Cruz's home. (Tr. 159-60.) During the search, and for a second time during the following day, Marakovits interviewed Cruz, at which time he discovered the existence of the "kickback" and "high-low" schemes. (Tr. 163.) On October 10, 2007, approximately one month following the search of Marikina, Marakovits executed a search warrant upon SPI headquarters in Cressona, Pennsylvania, and Hubler's house in Ashland, Pennsylvania. (Tr. 164.)

Particularly relevant to Defendant's motion challenging the sufficiency of the evidence is Agent Marakovits's testimony regarding the discovery of numerous documents related to each of the counts for which Defendant was charged and convicted. Specifically, Defendant was convicted at Count 2 of wire fraud in connection with the transmission of a Marikina daily time sheet on June 6, 2006. (Doc. 197.) In support of Count 2, Agent Marakovits testified that he found, during the search of Marikina, a document titled "Memo" from Campbell to Cruz dated September 21, 2005, in reference to project number 5052000, that listed a total contract value of $9,865.00, which was comprised of $7,865.00 for "CDS Erect" and $2,000.00 for "Marikina fee." (Gov. 110.1A.) Along with that Memo, Agent Marakovits found a contract on CDS letterhead, which was addressed to Marikina and explained that CDS would unload and erect five pre-stressed concrete beams for the lump sum price of $7,865.00. (Gov. 110.1B.) The contract was signed by Cruz, on behalf of Marikina, and Defendant, on behalf of CDS. (*Id.*) In addition, Agent Marakovits discovered a document titled "Daily Time Sheet," also referencing job number 5052000. (*Id.*; *compare* Gov. 27.6, p. 1 of 8, *with* Gov. 27.6, p. 2 of 8.) A

fax header displayed on the document indicated it had been faxed by Marikina on June 6, 2006.[20] (Gov. 110.1C; *see* Tr. 273-75.)

Defendant was convicted at Count 3 of wire fraud in connection with the transmission of a Marikina daily time sheet on August 30, 2005. (Doc. 197.) In support of Count 3, Agent Marakovits testified that he found, during the search of SPI, a document titled "Memo" from Campbell to Cruz dated February 25, 2005, in reference to project numbers 5042590, -91, and -92, that listed a total contract value of $988,431.00.00, which was comprised of $885,000.00 for "NESL Beams," $93,431.00 for "CDS" and $10,000.00 for "Marikina fee." (Gov. 110.2A.) Along with that Memo, Agent Marakovits found a contract on CDS letterhead, which referenced, *inter alia*, project numbers 5042590, -91, and -92. (Gov. 110.2B) The Memo was addressed to Marikina, and explained that CDS would unload and erect multiple beams for the lump sum price of $332,702.00. (*Id.*) The contract was signed by Cruz, on behalf of Marikina, and Defendant, on behalf of CDS. (*Id.*) In addition, Agent Marakovits discovered a document titled "Daily Time Sheet," also bearing the job number 5042591 (Gov. 110.2C; *compare* Gov. 28.6, p. 1 of 8, *with* Gov. 28.6, p. 2 of 8.) A fax header displayed on the document indicated it had been faxed to Marikina on August 30, 2005.[21] (Gov. 110.2C; Gov. 28.6, p. 1 of 8; Tr. 283.)

Defendant was convicted at Count 4 of wire fraud in connection with the transmission of a Marikina daily time sheet on August 22, 2005, at Count 14 of

---

[20] The same document, without any post-fax handwriting, was found during the search of SPI, but that document neither displayed a fax header nor had handwriting. (Gov. 27.6, p. 2 of 8.)

[21] The same document, without any post-fax handwriting, was found during the search of SPI, but that document neither displayed a fax header nor had handwriting. (Gov. 28.6, p. 2 of 8.)

mail fraud in connection with the mailing of a CDS check on November 21, 2005, at Count 16 of mail fraud in connection with the mailing of a New Enterprise check on November 17, 2005, and at Count 23 of unlawful monetary transactions in connection with the deposit of the New Enterprise check into SPI's bank account on November 18, 2005.[22] (Doc. 197.) In support of these counts, Agent Marakovits testified that he found, during the search of Marikina, a document titled "Memo" from Campbell to Cruz dated July 16, 2004, in reference to project number 5041300, that listed a total contract value of $808,945.00, which was comprised of $808,945.00 for "NESL Beams & tax," $138,445.00 for "CDS" and $10,000.00 for "Marikina fee." (Gov. 110.3A.) Along with that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing job number 5041300, which was addressed to Marikina and explained that CDS would unload and erect multiple beams for the lump sum price of $138.445.00. (Gov. 110.3B.) The contract was signed by Cruz, on behalf of Marikina, and Defendant, on behalf of CDS. (*Id.*) In addition, Agent Marakovits discovered a document titled "Daily Time Sheet," referencing job number 5041300 (Gov. 110.3C; *compare* Gov. 29.6, p. 1 of 12, *with* Gov. 29.6, p. 2 of 12.) A fax header displayed on the document indicated it had been faxed to Marikina on August 22, 2005.[23] (Gov. 110.3C). Specifically related to Count 14, Agent Marakovits testified that he found, during the search of Marikina, a copy of a check payable to Marikina from CDS for $10,000.00. (Gov. 39.1, p. 1 of 9.) The check was mailed on November 21, 2005, via Federal Express, from CDS in

---

[22] Each of these counts pertains to transactions involving SPI job number 5041300.

[23] The same document, without any post-fax handwriting, was found during the search of SPI, but that document neither displayed a fax header nor had handwriting. (*See* Gov. 29.6, p. 2 of 12.)

21

Pennsylvania to Marikina in Connecticut. (Gov. 39.1, p. 6 of 9; *see also* Tr. 2013.) Specifically related to Count 16, Agent Marakovits testified that he found, during the search of Marikina, a copy of a check payable to Marikina from New Enterprise, the general contractor, for $148,445.00 (Gov. 41.1, p. 1 of 11.) Handwriting on the check information provided as follows: "11/17/05 Endorsed to Helene SPI Fedex #8545-6147-1090." (*Id.*) The check was mailed on November 17, 2005, via Federal Express, from Marikina in Connecticut to SPI in Pennsylvania. (Gov. 41.1 at p. 10 of 11; *see also* Tr. 2013.) The check was endorsed by Marikina, stamped "CDS Engineers, Inc., for deposit only to the account of," and was deposited directly into SPI's account on November 18, 2005. (*See* Gov. 47.1; *see also* Tr. 2019-20.)

Defendant was convicted at Count 8 of wire fraud in connection with the transmission of a change order on September 11, 2006, at Count 9 of wire fraud in connection with the transmission of a lien waiver on January 8, 2007, and at Count 29 of unlawful monetary transactions in connection with the deposit of a check into SPI's bank account on January 8, 2007.[24] (Doc. 197.) In support of Counts 8, 9, and 29, Agent Marakovits testified that he found, during the search of SPI, a document titled "Memo" from Campbell to Cruz dated December 23, 2004, in reference to project number 2042410 that included two contracts for the project. (*See* Gov. 110.7A.) The Memo listed a total contract value between SPI and Marikina of $205,582.00, which was comprised of $201,582.00 for "beams, erect, tax," and $4,000.00 for "Marikina." (*Id.*) Additionally, the Memo listed a total contract value on the "PDOT contract" as $205,582.00, which was comprised of $159,893.00 for "material" and $45,689.00 as "labor & equipment." (Gov. 110.7A.) Along with that

---

[24] Each of these counts pertains to transactions involving SPI job number 2042410.

Memo, Agent Marakovits found a contract on CDS letterhead, referencing job number 2042410, which was addressed to Marikina and explained that CDS would provide labor and equipment, and unload and erect multiple beams for cost plus a $4,000.00 fixed fee. (Gov. 110.7B.) The contract was signed by Cruz, on behalf of Marikina, and Campbell, on behalf of CDS. (*Id.*) Specifically related to Count 8, Agent Marakovits discovered, in Marikina's job files, a change order from the general contractor to Marikina. (Gov. 110.7C; Gov. 33.5.)[25] The document displayed two fax headers, which indicated it had been faxed between SPI and Marikina on September 11, 2006. (Gov. 110.7C; Gov. 33.5.) The fax cover sheet requested Cruz to sign and return the change order. (Gov. 33.5, p. 2 of 2.) The change order, as found in Marikina's job files, also had the following handwritten notation: "9/11- Joy - ok to sign," and was signed "Helene." (Gov. 110.7C; Gov. 33.5; *see also* Tr. 2006-07.) Specifically related to Count 9, Agent Marakovits discovered, in Marikina's job files, a document titled "requisition, waiver and release," which was signed by Cruz on behalf of Marikina and notarized by Carol Campbell, a SPI employee. (Gov. 110.8C; Gov. 34.1.) Along with those documents, Agent Marakovits found a copy of a check from the general contractor to Marikina in the amount of $270,675.24. (Gov. 34.1.) The following handwritten notation was on the copy: "Joy - rec'd direct today. Mark your records," and was signed "Helene." (*Id.*) The documents found at Marikina displayed fax headers indicating

_____

[25] This document listed the job number as 50404, which is a different job number as compared to the Memo (Gov. 110.7A) and contract between CDS and Marikina (Gov. 110.7B). However, "SR-78" is listed on the aforementioned Memo and contract, and is similarly listed on the Change Order.

that they had been faxed on January 8, 2007.[26] (Gov. 110.8C; Gov. 34.1, pp. 1-3 of 7.)[27] Specifically related to Count 29, through a subpoena issued to M&T Bank, Agent Marakovits discovered a copy of a check, which was dated January 4, 2007, and payable to Marikina from Balfour Beatty, the general contractor, in the amount of $270,675.24. (Gov. 110.27C; Gov. 53.1.) The check was endorsed by Marikina and stamped "for deposit only into the account of [SPI]." (Doc. 110.27C.) The check was deposited into SPI's bank account on January 8, 2007. (Gov. 110.27C; Gov. 53.1; *see also* Tr. 375-77.)

Defendant was convicted at Count 11 of wire fraud in connection with the transmission of a Marikina daily time sheet on November 18, 2005. (Doc. 197.) In support of Count 11, Agent Marakovits testified that he found, during the search of Marikina, a document titled "Memo" from Campbell to Cruz dated April 28, 2005, in reference to project number 5050070, that listed a total contract value of $356,162.00, which was comprised of $304,290.00 for "Steel Material," $36,872.00 for "CDS" and $15,000.00 for "Marikina fee." (Gov. 110.10A; Gov. 36.2, p. 3 of 168.) Along with that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing job number 5050070, which was addressed to Marikina and outlined the scope of work to be completed for the lump sum price of $36,872.00. (Gov. 110.10B; Gov. 36.2, p. 15 of 168.) The contract was signed by Cruz, on behalf of Marikina, and Defendant, on behalf of CDS. (Gov. 110.10B; Gov. 36.2, p. 15 of 168.) In addition, Agent Marakovits discovered a document titled "Daily Time

---

[26] The Requisition, Waiver and Release document was also mailed, and therefore, it supports the charge of mail fraud at Count 13. (*See* Gov. 38.1.)

[27] The same documents, were found during the search of SPI. The documents found at SPI did not display the fax headers. (Gov. 34.1, pp. 4-7 of 7.)

Sheet," also referencing the job number 5050070.[28]  (Gov. 110.10C; *compare* Gov. 36.6, p. 1 of 11, *with* Gov. 36.6, p. 2 of 11.)  A fax header displayed on the document indicated it had been faxed by Marikina on October 18, 2005.[29]  (Gov. 110.10C.)

Defendant was convicted at Count 12 of wire fraud in connection with the transmission of an application for a United States Department of Transportation number.  (Doc. 197.)  In support of Count 12, Agent Marakovits testified that he discovered the application for a United States Department of Transportation number that listed Marikina as the motor carrier, and was certified by Melissa Reichwein on January 19, 2006.  (Gov. 37.1; Gov. 110.11.)  At trial, it was stipulated that the document was submitted via the internet and traveled in interstate commerce between Pennsylvania and Massachusetts.  (Tr. 328.)

Defendant was convicted at Count 15 of mail fraud in connection with the mailing of a letter on May 9, 2005.  (Doc. 197.)  In support of Count 15, Agent Marakovits testified that he found, during the search of SPI, a document titled "Memo" from Campbell to Cruz dated January 28, 2005, in reference to project number 5043410, that listed a total contract value of $201,500.00, which was comprised of $160,500.00 for "Hi Steel beams & tax," $37,200.00 for "CDS" and $3,800.00 for "Marikina fee."  (Gov. 110.14A; Gov. 40.1A, p. 57 of 68.)  Along with that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing job number 5043410, which was addressed to Marikina and explained that CDS

---

[28]  The daily time sheet listed a typed job number of 5050290, which was crossed out and job number 5050070 was written in its place.  (*See* Gov. 36.6, p. 1 of 11).

[29]  The same document, without any post-fax handwriting, was found during the search of SPI.  (Gov. 36.6, p. 2 of 11.)  The document found at SPI neither displayed a fax header nor had handwriting.  (Gov. 36.6, p. 2 of 11.)

would unload and erect multiple beams for the lump sum price of $37,200.00. (Gov. 110.14B; Gov. 40.1A, p. 58 of 68.) The contract was signed by Cruz, on behalf of Marikina, and Defendant, on behalf of CDS. (Gov. 110.14B.) In addition, Agent Marakovits discovered a document on Marikina letterhead, referencing the job set forth in the contract between CDS and Marikina, which was addressed to Loftus Construction, the general contractor. (*See* Gov. 110.14C (referencing Loftus Construction, Inc., and job file # 504341-E).) The letter was signed by Hubler, on behalf of Marikina, and was dated May 9, 2005. (Gov. 110.14C; *see also* Gov. 40.6, p. 1 of 3.) Agent Marakovits also found a Federal Express invoice for a May 9, 2005 shipment from CDS in Pennsylvania to Loftus Construction in New Jersey. (Gov. 40.6, p. 2 of 3.)

Defendant was convicted at Count 17 of mail fraud in connection with the mailing of a check on June 20, 2005, and at Count 21 of unlawful monetary transactions in connection with the deposit of a check into SPI's bank account on June 21, 2005.[30] (Doc. 197.) In support of Counts 17 and 21, Agent Marakovits testified that he found, during the search of Marikina, a document titled "Memo" from Campbell to Cruz dated December 17, 2004, in reference to project number 2043280, that included two contracts for the project. (*See* Gov. 110.16A.) The Memo listed a total contract value between SPI and Marikina of $227,852.00, which was comprised of $224,852.00 for "beams, erect, tax," and $3,000.00 for "Marikina." (Gov. 110.16A; Gov. 42.2, p. 5 of 175.) Additionally, the Memo listed a total contract value on the "PDOT contract" as $227,852.00, which was comprised of $183,240.00 for "material" and $44,612.00 for "labor & equipment." (Gov.

---

[30] Both counts pertain to transactions involving SPI job number 2043280.

110.16A.)  Along with that Memo, Agent Marakovits found a contract on CDS letterhead also referencing job number 2043280, which was addressed to Marikina and explained that CDS would provide labor and equipment and unload and erect multiple beams for cost plus a $3,000.00 fixed fee.  (Gov. 110.16B; Gov. 42.2, p. 6 of 175.)  The contract was signed by Cruz, on behalf of Marikina, and Campbell, on behalf of CDS.  (Gov. 110.16B.)  In addition, Agent Marakovits found, during the search of SPI, a copy of a check payable to Marikina from Hawbaker, the general contractor, for $204,220.00.  (Gov. 42.5, p. 1 of 10.)  Handwriting on the check copy provided as follows: "Joy- Rec'd direct today job 2043280- Please mark your records," and was signed "Helene."  (Gov. 42.5, p. 1 of 10; *see also* Tr. 2014-15.)  The check was mailed on June 20, 2005, via Federal Express, from the general contractor to SPI.  (Gov. 42.5, p. 9 of 10.)  A faxed version of the check and check information, including the handwritten notation, was found during the search of Marikina and displayed a fax header indicating it had been transmitted from SPI on June 21, 2005.  (*Id.* at p. 2 of 10.)  The check was endorsed by Marikina, and stamped "for deposit only to the account of [SPI]."  (Gov. 45.2.)  The check was deposited into SPI's bank account on June 21, 2005.  (Gov. 110.19C; Gov. 45.2.)

Defendant was convicted at Count 18 of mail fraud in connection with the mailing of a check on April 11, 2005.  (Doc. 197.)  In support of Count 18, Agent Marakovits testified that he found, during the search of SPI, a document titled "Memo" from Campbell to Cruz dated September 24, 2004, in reference to project number 2042240, that included two contracts.  (*See* Gov. 110.17A; Gov. 43.1, p. 9 of 11.)  The Memo listed the total contract value between SPI and Marikina as $265,741.00, which was comprised of $260,741.00 for "beams, erect, tax," and

$5,000.00 for "Marikina." (Gov. 110.17A.) Additionally, the Memo listed a total contract value on the "PDOT contract" as $265,741.00, which was comprised of $214,787.00 for "material" and $50,954.00 for "labor & equipment." (*Id.*) Along with that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing job number 2042240, which was addressed to Marikina and explained that CDS would provide labor and equipment, and unload and erect multiple beams for cost plus a $5,000.00 fixed fee. (Gov. 110.17B.) The contract was signed by Cruz, on behalf of Marikina, and Hubler, on behalf of CDS. (*Id.*) In addition, Agent Marakovits found, during the search of Marikina, a copy of a check payable to Marikina from Nyleve, the general contractor, for $230,898.00. (Gov. 110.17C; Gov. 43.5.) Handwriting on the check provided as follows: "Joy- we rec'd this check direct. You need to complete and sign the attached release & send it to Lisa Brown at Nyleve. Thanks Joy!" and was signed "Helene." (Gov. 110.17C; Gov. 43.5; *see also* Tr. 2016-17.) The check was mailed on April 11, 2005, via Federal Express, from the general contractor in Pennsylvania to SPI in Pennsylvania. (Gov. 43.5, p. 10 of 11.)

Defendant was convicted at Count 20 of unlawful monetary transactions in connection with the deposit of a check into SPI's bank account on May 2, 2005. (Doc. 197.) In support of Count 20, Agent Marakovits testified that he found, during the search of Marikina, a document titled "Memo" from Campbell to Cruz dated October 1, 2004, in reference to project number 2042380, that included two contracts. (Doc. 110.18A.) The Memo listed the total contract value between SPI and Marikina as $980,000.00, which was comprised of $966,000.00 for "beams, erect, tax," and $14,000.00 for "Marikina." (*Id.*) Additionally, the Memo listed the

total contract value on the PennDOT contract as $980,000.00, which was comprised of $766,554.00 for "material" and $213,446.00 for "labor & equipment." (*Id.*) Along with that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing job number 2042380, which was addressed to Marikina and explained that CDS would provide labor and equipment to unload and set multiple beams for cost plus a $14,000.00 fixed fee. (Gov. 110.18B.) The contract was signed by Cruz, on behalf of Marikina, and Hubler, on behalf of CDS. (*Id.*) In addition, during the search of SPI's business records, Agent Marakovits discovered a copy of a check, which was dated April 29, 2005, and payable to Marikina from Rolston Paving, the general contractor, in the amount of $565,440.00. (Gov. 44.5, p. 3 of 21; *see* Tr. 349.) Handwriting on the check provided as follows: "Joy- rec'd direct 5/2/05," and was signed "Helene." (Doc. 44.5; *see also* Tr. 2018.) A copy of the check, including the handwritten notation, was also found in Marikina's business records; however, the copy found in Marikina's records contained a fax header, which indicated it had been transmitted from SPI on May 2, 2005. (Gov. 44.5.) The check was endorsed by Marikina, and stamped "for deposit only into the account of [SPI]." (Gov. 44.6; Doc. 110.18C; *see also* Tr. 2018.) The check was deposited into SPI's bank account on May 2, 2005. (Gov. 110.18C; Gov. 44.6.)

Defendant was convicted at Count 22 of unlawful monetary transactions in connection with the deposit of a check into SPI's bank account on December 22, 2006. (Doc. 197.) In support of Count 22, Agent Marakovits testified that he found, during the search of SPI, a document titled "Memo" from Campbell to Cruz dated May 19, 2006, in reference to project number 2061140, that listed a total contract value of $412,950.00, which was comprised of $407,950.00 for "beams, erect, tax"

and $5,000.00 for "Marikina." (Gov. 110.20A; Gov. 46.1B, p. 10 of 67.) Along with that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing job number 2061140, which was addressed to Marikina and explained that CDS would provide labor and equipment to unload and set multiple beams for cost plus a $5,000.00 fixed fee. (Gov. 110.20B; Gov. 46.1B, p. 58 of 67.) The contract was signed by Cruz, on behalf of Marikina, and Campbell, on behalf of CDS. (Gov. 110.20B.) In addition, during the search of SPI's business records, Agent Marakovits located a copy of a check, which was dated December 21, 2006, and payable to Marikina from Fulkroad & Sons, the general contractor, in the amount of $366,113.00. (Gov. 46.5; Gov. 46.1B, p. 44 of 67; *see also* Tr. 357.) Handwriting accompanying the check provided as follows: "12/26- Joy, received Friday, 12/22 direct & deposited," and was signed "Helene." (Doc. 46.5.) A copy, including the handwritten notation, was also found in Marikina's business records; however, the copy found in Marikina's records contained a fax header, which indicated it had been transmitted from SPI on December 26, 2006. (Gov. 44.5.) The check was endorsed by Marikina, and stamped "for deposit only into the account of [SPI]." (Gov. 110.20C; Gov. 46.6; *see also* Tr. 2019.) The check was deposited into SPI's bank account on December 22, 2006. (Gov. 110.20C; Gov. 46.6; *see also* Tr. 2019.)

Defendant was convicted at Count 24 of unlawful monetary transactions in connection with the deposit of a check into SPI's account on January 9, 2006. (Doc. 197.) In support of Count 24, Agent Marakovits testified that he found, during the search of Marikina, a document titled "Memo" from Campbell to Cruz dated July 14, 2005, in reference to project number 2051870, that listed the total contract value

as $141,000.00, which was comprised of $116,838.00 for "beams & tax," $21,162.00 for "CDS," and $3,000.00 for "Marikina." (Gov. 110.22A; Gov. 48.2, p. 3 of 128.) Along with that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing job number 2051870, which was addressed to Marikina and explained that CDS would provide labor and equipment to unload and set multiple beams for a lump sum price of $3,000.00. (Gov. 110.22B; Gov. 48.2, p. 4 of 128.) The contract was signed by Cruz, on behalf of Marikina, and Campbell, on behalf of CDS. (Gov. 110.22B; Gov. 48.2, p. 4 of 128.) In addition, through a subpoena issued to M&T Bank, Agent Marakovits discovered a copy of a check, which was dated January 6, 2006, and payable to Marikina from HRI, the general contractor, in the amount of $123,021.00. (Gov. 110.22C; Gov. 48.5; *see* Gov. 48.5, p. 59 of 59.) The check was endorsed by Marikina, and stamped "for deposit only into the account of [SPI]." (Doc. 110.22C; Gov. 48.5; *see also* Tr. 2020.) The check was deposited into SPI's bank account on January 9, 2006. (Gov. 110.22C; Gov. 48.5; Tr. 363; *see also* Tr. 2020.)

Defendant was convicted at Count 25 of unlawful monetary transactions in connection with the deposit of a check into SPI's bank account on April 17, 2006. (Doc. 197.) In support of Count 25, Agent Marakovits testified that he found, during the search of Marikina, a document titled "Memo" from Campbell to Cruz dated October 27, 2005, in reference to project number 2052560, that listed a total contract value of $209,560.00, which was comprised of $204,560.00 for "beams, erect, tax," and $5,000.00 for "Marikina." (Gov. 110.23A; Gov. 49.2, p. 3 of 135.) Along with that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing job number 2052560, which was addressed to Marikina and explained that CDS

would provide labor and equipment to unload and set multiple beams for cost plus a $5,000.00 fixed fee.  (Gov. 110.23B; Gov. 49.2, p. 4 of 135.)  The contract was signed by Cruz, on behalf of Marikina, and Campbell, on behalf of CDS.  (Gov. 110.22B; Gov. 49.2, p. 4 of 135.)  In addition, through a subpoena issued to M&T Bank, Agent Marakovits discovered a copy of a check, which was dated January 6, 2006, and payable to Marikina from J.D. Eckman, the general contractor, in the amount of $181,127.00.  (Gov. 110.23C; Gov. 49.5; Gov. 49.3, p. 77 of 78.)  The check was stamped "for deposit only into the account of [SPI]."  (Doc. 110.23C; Gov. 49.5.)  The check was deposited into SPI's bank account on April 17, 2006.  (Gov. 110.23C; Gov. 49.5; *see* Tr. 365-67, 2020.)

Defendant was convicted at Count 26 of unlawful monetary transactions in connection with the deposit of a check into SPI's bank account on June 8, 2006. (Doc. 197.)  In support of Count 26, Agent Marakovits testified that he found, during the search of Marikina, a document titled "Memo" from Campbell to Cruz dated December 15, 2005, in reference to project number 2052900, that listed a total contract value of $3,519,346.00, which was comprised of $3,489,346.00 for "beams, erect, tax," and $30,000.00 for "Marikina."  (Gov. 110.24A; Gov. 50.2, p. 3 of 180.)  Along with that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing job number 2052900, which was addressed to Marikina and explained that CDS would provide labor and equipment to unload and set multiple beams for cost plus a $30,000.00 fixed fee.  (Gov. 110.24B; Gov. 50.2, p. 4 of 180.)  The contract was signed by Cruz, on behalf of Marikina, and Campbell, on behalf of CDS.  (Gov. 110.24B.)  In addition, through a subpoena issued to M&T Bank, Agent Marakovits discovered a copy of a check, which was dated June 7, 2006, and payable

to Marikina from Susquehanna Valley Supply, the general contractor, in the amount of $1,080,331.35.  (Gov. 110.24C; Gov. 50.5; Gov. 50.3, p. 89 of 95.)  The check was stamped "for deposit only into the account of [SPI]."  (Doc. 110.24C; Gov. 50.5.)  The check was deposited into SPI's bank account on June 8, 2006.  (Gov. 110.24C; Gov. 50.5; Tr. 368-69; *see also* Tr. 2021.)

Defendant was convicted at Count 27 of unlawful monetary transactions in connection with the deposit of a check into SPI's bank account on August 7, 2006. (Doc. 197.)  In support of Count 27, Agent Marakovits testified that he found, during the search of Marikina, a document titled "Memo" from Campbell to Cruz dated December 9, 2005, in reference to project number 2052860, that listed a total contract value of $579,087.00, which was comprised of $571,087.00 for "beams, erect, tax," and $8,000.00 for "Marikina."  (Gov. 110.25A; Gov. 51.2, p. 3 of 102.) With that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing project number 2052860, which was addressed to Marikina and explained that CDS would provide labor and equipment to unload and set multiple beams for cost plus a $8,000.00 fixed fee.  (Gov. 110.25B; Gov. 51.2, p. 4 of 102.) The contract was signed by Cruz, on behalf of Marikina, and Campbell, on behalf of CDS.  (Gov. 110.25B; Gov. 51.2, p. 4 of 102.)  In addition, through a subpoena issued to M&T Bank, Agent Marakovits discovered a copy of a check, which was dated July 28, 2006, and payable to Marikina from Susquehanna Supply, the general contractor, in the amount of $509,498.00.  (Gov. 110.25C; Gov. 51.3, p. 26 of 44; Gov. 51.5.)  The check was endorsed by Marikina, and stamped "for deposit only into the account of [SPI]."  (Doc. 110.25C; Gov. 51.5; *see also* Tr. 2021.)  The check

was deposited into SPI's bank account on August 7, 2006.  (Gov. 110.25C; Gov. 51.5; Tr. 370-72; *see also* Tr. 2021.)

Defendant was convicted at Count 28 of unlawful monetary transactions in connection with the deposit of a check into SPI's bank account on November 22, 2006.  (Doc. 197.)  In support of Count 28, Agent Marakovits testified that he found, during the search of Marikina, a document titled "Memo" from Campbell to Cruz dated June 21, 2006, in reference to project number 2061290, that listed a total contract value of $120,000.00, which was comprised of $117,500.00 for "beams, erect, tax," and $2,500.00 for "Marikina."  (Gov. 110.26A; Gov. 52.2, p. 3 of 47.)  With that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing project number 2061290, which was addressed to Marikina and explained that CDS would provide labor and equipment to unload and set multiple beams for cost plus a $2,500.00 fixed fee.  (Gov. 110.26B; Gov. 52.2, p. 4 of 47.)  The contract was signed by Cruz, on behalf of Marikina, and Campbell, on behalf of CDS.  (Gov. 110.26B; Gov. 52.2, p. 4 of 47.)  In addition, through a subpoena issued to M&T Bank, Agent Marakovits discovered a copy of a check, which was dated November 17, 2006, and payable to Marikina from Hawbaker, the general contractor, in the amount of $71,172.00.  (Gov. 110.26C; Gov. 52.3, p. 31 of 32; Gov. 52.5.)  The check was endorsed by Marikina and stamped "for deposit only into the account of [SPI]."  (Doc. 110.26C; Gov. 52.5; *see also* Tr. 2022.)  The check was deposited into SPI's bank account on November 22, 2006.  (Gov. 110.26C; Gov. 52.5; Tr. 374-75; *see also* Tr. 2022.)

Defendant was convicted at Count 30 of unlawful monetary transactions in connection with the deposit of a check into SPI's bank account on August 23,

2007. (Doc. 197.) In support of Count 30, Agent Marakovits testified that he found, during the search of Marikina, a document titled "Memo" from Campbell to Cruz dated January 25, 2007, in reference to project number 2063920, that listed a total contract value of $192,546.00, which was comprised of $188,546.00 for "beams, erect, tax," and $4,000.00 for "Marikina." (Gov. 110.28A; Gov. 54.2C, p. 3 of 24.) With that Memo, Agent Marakovits found a contract on CDS letterhead, also referencing project number 2063920, which was addressed to Marikina and explained that CDS would provide labor and equipment to unload and set multiple beams for cost plus a $4,000.00 fixed fee. (Gov. 110.28B; Gov. 54.2C, p. 4 of 24.) The contract was signed by Cruz, on behalf of Marikina, and Campbell, on behalf of CDS. (Gov. 110.28B; Gov. 54.2C, p. 4 of 24.) In addition, through a subpoena issued to M&T Bank, Agent Marakovits discovered a copy of a check, which was dated August 21, 2007, and payable to Marikina from McMinn's Asphalt Company, the general contractor, in the amount of $351,610.90. (Gov. 110.28C; Gov. 54.5.) The check was endorsed by Marikina and stamped "for deposit only into the account of [SPI]." (Doc. 110.28C; Gov. 54.5; *see also* Tr. 2022.) The check was deposited into SPI's bank account on August 23, 2007. (Gov. 110.28C; Gov. 54.5; Tr. 377-80; *see also* Tr. 2022.)

### c. <u>Evidence Proving Defendant's Mental State</u>

The majority of evidence presented to establish Defendant's knowing participation in the DBE scheme was circumstantial in nature. However, three co-conspirators, all of whom pleaded guilty in connection with the scheme, presented direct evidence as to Defendant's mental state and knowing participation related to

the DBE fraud.  On cross-examination, Dennis Campbell unequivocally implicated

Defendant's participation in the conspiracy:

> Q:    And Ernie Fink was part of your criminal
>       conspiracy, wasn't he?
>
> A:    Yes, he was.
>
> Q:    [Defendant] was not, correct?
>
> A:    Yes, he was.

(Tr. 2360.)  On redirect, Campbell confirmed his testimony as follows:

> Q:    Now you were also asked by [defense counsel] if
>       you conspired with [Defendant] yesterday.  And
>       what was your answer? Did you conspire with
>       [Defendant] and others at [SPI] to defraud the U.S.
>       Department of Transportation?
>
>                    *    *    *
>
>       Did you conspire with [Defendant]?
>
> A:    Yes.
>
> Q:    And were all of your efforts that we went through for
>       eight hours on your testimony on direct, all those
>       emails of concealment, were those efforts authorized
>       by [Defendant]?
>
> A:    All of the efforts?
>
> Q:    The concealment efforts?
>
> A:    Yes.

(Tr. 2419-20.)  During his direct examination, Hubler likewise directly implicated

Defendant's involvement with regard to the various "concealment activities":

> Q:    Who authorized those [concealment] activities?
>
> A:    My bosses, which were [Defendant] and Ernie
>       [Fink].

36

> Q:    Were those activities discussed at the meetings you
>        previously talked about?
>
> A:    The activities were discussed at meetings.
>
> Q:    Was it discussed that you were impersonating a
>        Marikina employee?
>
> A:    It wasn't said that way, no.
>
> Q:    What was - - how was it said?
>
> A:    It was said that we had to cover our butts . . . .

(Tr. 2502-03.)  Fink, who testified following the court's grant of judicial immunity, admitted to his involvement in the scheme and directly refuted Defendant's position that Defendant was excluded from the fraud.  Specifically, Fink testified that Defendant was intimately familiar with and directly participated in the operations of SPI/CDS:

> Q:    Now, after you reached this [shareholder] agreement
>        with [Defendant] did you ever try to exclude him
>        from the decision making process?
>
> A:    Never.

(Tr. 2749.)

> Q:    Was [Defendant] ever excluded from any of [the
>        strategic planning, budget, sales operations, and job
>        costs] meetings?
>
> A:    No.
>
> Q:    And did he participate actively in those meetings?
>
> A:    Certainly.

(Tr. 2772-73.)

> Q:    Now during the time period [Defendant] was
>        President, would you agree with his own assessment
>        that he was intimately familiar with and fully
>        involved in all aspects of the business?

> A:    Yes.

(Tr. 2768.)  Moreover, Fink confirmed that Defendant was the supervisor of

Campbell and Hubler, both of whom were directly and heavily involved in the fraud:

> Q:    And I think you said Dennis Campbell was the
>       person in charge of sales for [SPI]?
>
> A:    He was the VP of sales, yes.
>
> Q:    And that was one of the areas you said [Defendant]
>       was in charge of in your division of labors?
>
> A:    Correct.
>
> Q:    And you said Tim Hubler was in charge of field
>       operations?
>
> A:    Yes.
>
> Q:    And who was in charge of Mr. Hubler?
>
> A:    [Defendant].

(Tr. 2765.)  Nevertheless, Defendant maintained that he was continually excluded

from the fraud by Hubler, Campbell, and Fink, and that he had a good faith belief

that the relationship between Marikina and SPI/CDS was legitimate.  Thus, whether

Defendant had knowledge of the fraudulent nature of the relationship between the

companies was the critical issue for the jury.  The Government sustained its burden,

in large part, by way of circumstantial evidence establishing that Defendant was

intimately involved with SPI's business and knowingly acted for the purpose of

furthering the scheme to defraud the Department of Transportation's DBE program.

The following is a recitation of evidence presented at trial tending to establish

Defendant's knowing and willful involvement in the DBE fraud.

      **i.**   **Defendant was a long-time employee and was
intimately familiar with all aspects of SPI**

Defendant's claim of ignorance as to the improper nature of the relationship between the companies was belied by his exposure to, and familiarity with, the contract flow between SPI, CDS, and Marikina. Defendant's employment at SPI was extensive, and he held a variety of positions prior to becoming president. (*See* Tr. 2799.) In 1984, after obtaining a civil engineering degree, Defendant began to work full-time at SPI as a plant engineer, until he was promoted to contracts manager. (*See* Tr. 2802-04 .) As contracts manager, Defendant worked in the "White House," the same location in which other members of SPI's upper management, including Fink and Campbell, had offices. (Tr. 2805.) In that capacity, Defendant learned the flow of contracts between the companies (*see* Tr. 2855-56), which had been in existence since the "mid '80's" (Tr. 2859).

Defendant admitted that, as contracts manager, there were occasions when he instructed Cruz, and drafted letters to general contractors on behalf of Marikina. (Tr. 2923-24.) For example, in March 1995, Defendant authored a letter to be sent to a general contractor with whom Marikina had subcontracted work. (Gov. 116.1E.) The substance of the letter, which was worded as if it had come from Marikina, addressed certain concerns related to Marikina. (*See id*.) On top of the typed letter was the following handwritten notation written by Defendant: "[Cruz]/Fernando - Look this over. If OK, type it up & fax to [the general contractor]." (*Id.*) At trial, Cruz testified that he followed the handwritten instructions and typed the letter on Marikina letterhead, and sent it to the general contractor without change. (Tr. 1049.)

In 1999, Defendant was promoted to the position of vice president and chief engineer (Tr. 2807), which, according to Defendant, was a promotion with little

significance because his job responsibilities remained "pretty much the same as before" (Tr. 2808), except as vice president, he was also responsible for the estimators and quality assurance department (Tr. 2808-09). As vice president and chief engineer, Defendant worked in the transportation building, which was the same workplace location as Hubler, Mack, and Defendant's own wife. (Tr. 2808.) Defendant remained vice president and chief engineer for approximately four years until he voluntarily terminated his employment in December 2002, which, according to Defendant, was a result of the working conditions. (*See* Tr. 2810-11.)

Gordon died in January 2004 (Tr. 2825-26), at which time Defendant inherited his father's shares of SPI (*see* Tr. 2826-27). In April 2004, Defendant voted the inherited shares to install himself as president of SPI. (Tr. 2830-31.) As president, Defendant received the same salary as Fink, to wit, $200,000.00 per year. (Tr. 2903.) Fink and Defendant negotiated a shareholders agreement, whereby Defendant was the majority owner of SPI, CDS became a wholly-owned subsidiary of SPI, and Defendant and Fink became the sole members of the board of directors. (Tr. 2831-32; Gov. 4.2.)[31]

Gordon's death resulted in SPI defaulting on bank financing agreements. (*See* Tr. 2767.) Joseph Butto, a commercial lender for Citizens Bank, testified that he was involved with issuing SPI a line of credit following Defendant becoming president of SPI. (*See* Tr. 599-601.) In response to several questions posed by Citizens Bank during the course of the underwriting process related to SPI,

---

[31] The shareholders agreement provided that any dispute was to be resolved by binding arbitration, which could be demanded by any shareholder or director. (Gov. 4.2, Sec. 14.) Neither Fink nor Defendant ever invoked the dispute resolution provision. (*See* Tr. 654.)

Defendant issued the following statement regarding his qualifications and familiarity with the industry and with SPI in particular:

> [Defendant] is a registered Professional Engineer with a B.S. in Civil Engineering from Penn State and was employed by SPI full time from May 1984 until December 2002. [Defendant] held many positions at the company, including Plant Engineer, Contracts Manager, and finally as Vice-President and Chief Engineer from 1998 to 2002. *[Defendant] is intimately familiar with and fully involved in all aspects of the business* with a strong background in sales/marketing and contracts, engineering, and production. Joe now serves as President and CEO.

(Gov. 4.5 (emphasis supplied); *see also* Tr. 608, 2901.) At trial, Defendant confirmed that his statement to Butto was an accurate characterization of his knowledge of the business (Tr. 2901),[32] and Butto testified that such assurances influenced the lender's level of confidence in granting SPI's line of credit. (Tr. 609.) Defendant remained president and majority owner of SPI until April 2009, at which time SPI was sold to Northeast Prestressed Products for $9.25 million. (*See* Gov. 5.1; *see also* Tr. 636.)

---

[32] At trial, the following exchange occurred:

[AUSA]:   You were, by your own words, intimately familiar with and fully involved in all aspects of the business with a strong background in sales and marketing and contracts, engineering and production; correct?

[Defendant]:   I believe so, yes.

*   *   *

[AUSA]:   Well, when you wrote that letter to Mr. Butto, were you lying to him?

[Defendant]:   No.

(Tr. 2901-02.)

### ii. Defendant directed SPI employees to use and update Marikina's ECMS information

Many of the government contracts at issue were obtained by way of the Engineering Construction Management System ("ECMS"), computer software PennDOT used to advertise projects and open bids, execute contracts, and manage the construction process. (Tr. 1170-71.) A company must sign an agreement and become registered with PennDOT before obtaining a username and password for ECMS. (Tr. 1172-73.) A company's ECMS password must be changed monthly. (*See* Tr. 2783; *see also* Gov. 71.30.) Although a company registered on ECMS may not share or otherwise disseminate its password (Tr. 1173), SPI employees regularly used Marikina's ECMS password to access PennDOT's database. Denise Logan, a sales assistant at SPI who primarily worked for Campbell and Pishock, testified that, as part of her job responsibilities, she updated six ECMS passwords on a monthly basis, which included four passwords for SPI and two passwords for Marikina. (Tr. 1784.) Logan's job responsibility in this respect was derived from Defendant's suggestion that "SPI will need to appoint an administrator to update passwords (every 30 days) and maintain the database of approved SPI, CDS, and Marikina users." (Gov. 71.30 (email from Defendant); *see also* Tr. 2179-80, 2783, 2999-3000.)

### iii. Defendant was familiar with DBE fraud and understood the contract flow at SPI

42

Although Defendant did not frequently have direct involvement with many of the lower-level employees or day-to-day operations of SPI, such as accounts receivable (*see, e.g.,* Tr. 1962-63) and accounts payable (*see, e.g.,* Tr. 2101), there was overwhelming evidence that Defendant was "intimately familiar … and fully involved" with the operation of SPI, including the contract flow and the DBE requirements. (*See* Gov. 4.5.) For example, William Evans, a former special agent with the FBI who participated in the search of the companies, testified that, during the search of SPI, he discovered a packet of documents in a credenza in Defendant's office. (*See* Tr. 471-81; Gov. 55.1.) The packet, which was dated March 2, 2006, contained five documents, and a sticky note containing initials EK, EF, and JN. (Gov. 55.1, p. 3 of 6.) Three of the documents within that packet were contracts, all relating to job number 2053160. The first contract was dated December 16, 2005, and was on SPI letterhead. (*Id.*) The contract was signed by Cruz, on behalf of Marikina, and Defendant, on behalf of SPI, and provided for the sale and erection of four prestressed concrete spread box beams for $45,500.00. (Gov. 55.1.) The purpose of the contract was explained on the cover sheet of the packet which provided as follows:

> Document #1: SPI to Marikina contract showing that SPI is furnishing beams erected. Allows SPI to utilize use tax instead of sales tax on the entire contract. If this contract were written only for SPI to supply beams delivered to the jobsite, SPI would be liable to collect and remit sales tax at 6% on the entire beam contract, instead of just use tax (6% on raw material only).

(*Id.* at p. 2 of 6.) The second contract was dated December 15, 2005, and was on CDS letterhead. (*Id.* at p. 4 of 6.) This contract was signed by Defendant, on behalf of SPI, and Campbell, on behalf of CDS, and provided for the unloading and erecting

43

of four prestressed concrete box beams for $7,644.00.  (*Id.*)  The purpose of the

contract was explained on the cover sheet of the packet which provided as follows:

> Document #2: CDS to SPI contract for unloading and
> erection by CDS.  Shows that SPI is subcontracting the
> erection to CDS, and somewhat insulates SPI from erection
> liability.  This also allows for flow of revenue to CDS from
> SPI.  In the event of a mishap, this shows that CDS is
> responsible for the erection, not SPI.

(*Id.* at p. 2 of 6.)

The third contract was also dated December 15, 2005, and was on CDS

letterhead.  (*Id.* at p. 5 of 6.)  This contract was signed by Cruz, on behalf of

Marikina, and Campbell, on behalf of CDS, and provided for the provision of labor

and equipment to unload and set four prestressed concrete spread box beams for

project 2053160 for cost plus a fixed fee of $1,500.00.  (*Id.*)  The explanation of the

purpose of this contract set forth on the cover sheet of this packet provided as

follows:

> Document #3: CDS to Marikina contract for labor and
> equipment provided by Marikina at cost plus fixed fee.
> *This allows CDS to reimburse Marikina for direct costs
> and maintain gross profit within CDS*.

(*Id.* at p. 2 of 6 (emphasis supplied).)  The cover sheet further provided that,

"Marikina also has a contract with the [General Contractor] to furnish and erect

beams," although this "external contract" was not included in the packet.  (*Id.*)

In the same drawer of the credenza, Evans found an article, dated May

8, 2006, from a website, Engineering News-Record ("ENR"), to which Defendant

had an active subscription.  (*Id.* at p. 6 of 6; *see also* Gov. 63.1; Tr. 484-85.)  The

article was titled "U.S. DOT Is Cracking Down On DBE Contracting Fraud," and

discussed DBE fraud cases wherein "prime contractors . . . hire real DBEs that don't actually do the work." (Gov. 55.1, p. 6 of 6.)

From these documents found in Defendant's office, it was clear that Defendant knew the details of the contract flow between SPI, CDS, and Marikina (Tr. 3019), understood that the profit flowed through Marikina to CDS/SPI (Tr. 3020-21), and was aware that an arrangement in which a DBE company is awarded a subcontract but does not actually do any of the work was unlawful (*see* Gov. 55.1).

     **iv.** **Defendant knew the relationship between the companies was improper and had to be concealed**

The Government presented evidence warranting the jury's conclusion that Defendant either knew or deliberately avoided confirming that the relationship between SPI/CDS and Marikina was improper. Gloria testified that Marikina neither provided workers nor materials for Pennsylvania jobs. (*See* Tr. 801.) Because Marikina did not own vehicles, the company relied upon SPI/CDS to provide transportation to the job sites. (*See id*.) This proved to be problematic, however, as vehicles bearing CDS or SPI logos would be on job sites for which, according to the contracts, neither CDS nor SPI was involved. (*See* Tr. 2178-79.) In an email chain in February 2005, which Defendant received, certain upper-level management personnel addressed this concern. (*See generally* Gov. 67.1.) Specifically, on February 9, 2005, Campbell sent the following email:

> This is for additional discussion and thought.
>
> I was on site at #1 Contr while Marikina was setting Terre Hill box culverts on Monday 7 Feb 2005.
>
> There was the Marikina crew performing the work while a [SPI] stake body was carrying equipment.

> Wednesday 2 Feb 2005 I was on site at market Street
> Constructors, Levittown where Marikina is assembling
> steel for MSC. There was a CDS truck on site with the
> Marikina equipment.
>
> We need to discuss options for signage on these
> trucks while Marikina is performing work.
>
> Either remove all signage relating to SPI and CDS or
> the use of magnetic Marikina signage.

(Gov. 67.1; Tr. 2177-79.) At trial, Campbell explained the basis for his concern as

follows: "[H]aving [SPI] and CDS vehicles out on job sites that were supposedly

being performed by Marikina was not a good visual." (Tr. 2179.) Groody replied in

an email as follows:

> We had this discussion before, keep this in mind for
> our discussion. Both trucks mentioned must display DOT
> number which is issued to SPI (green stake body) and CDS
> (cube van) and owners name. Magnetic signs could be
> used for job site but not while in transit.
>
> If I am not mistaken Ed Katchur also looked into the
> possibility of leasing the green stake body to CDS when
> they were doing all the work but it was a major tax issue,
> not 100 percent sure on this.

(Gov. 67.1.) Recognition of this problem prompted SPI/CDS to lease vehicles to

Marikina as to permit the vehicles to bear Marikina's Department of Transportation

number and company logo. (*See* Tr. 2167-69, 2171.) The leases were executed by

Gloria, on behalf of Marikina, and Defendant, on behalf of SPI (Tr. 926-28; *see, e.g.,*

Gov. 66.1A; Gov. 66.3A; Gov. 66.5; Gov. 66.6A), and contained no payment terms

pursuant to Defendant's suggestion (Tr. 2175; *see also* Tr. 803). At trial, Campbell

testified as follows regarding the decision not to include payment terms in the leases:

> Q: Now did you have any other discussions . . . about the actual payment for the lease for the vehicles and how that would be handled?
>
> A: In the lease document itself, whether there would be a charge for actually leasing, if you are going to pay a lease value for the vehicle, yes.
>
> Q: Right. And who did you have the discussion with?
>
> A: It was a group with [Defendant], Ernie Fink, Phil Groody, myself are the ones I can remember that are in this discussion.
>
> Q: Okay. And what was your suggestion as far as how to handle that as far as the lease agreement was concerned?
>
> A: For a value assigned to a lease, my suggestion again was an extra work order or a change order to reimburse Marikina for any lease charge.
>
> Q: And was - - what was [Defendant]'s response?
>
> A: Ultimately, after reviewing the document, it was [Defendant]'s suggestion that we just strike any charge whatsoever. Just make it a no-cost lease.

(Tr. 2175.) Gloria testified that Marikina was not responsible for any incidental costs associated with the leased vehicles, as any payment issued by Marikina related to the vehicles was, in fact, reimbursed by SPI by way of a "change order." (Tr. 803-04, 2172.)[33] At trial, Campbell testified regarding a discussion he had with

---

[33] SPI used change orders to conceal various types of reimbursement payments between SPI and Marikina, including automobile insurance premiums (*see* Tr. 2173), fees charged by an accounting company that assisted Marikina with an audit (*see* Tr. 916-919, 2176-77, 2782-84), certifications (*see* Tr. 2181), and association membership for Marikina (Tr. 2175-76). Defendant was aware that SPI used change orders to conceal various reimbursement payments. (*See* Tr. 2978.) On September 16, 2004, Defendant sent an email to Campbell, Katchur, Fink, and Hubler regarding "Marikina erector cert[ification]." (Gov. 75.1.) The email provided, in pertinent part, as follows:

(continued...)

Defendant concerning the structure of the leases and the method through which SPI

would pay for costs associated with the leases:

> Q: Did you have any discussions with [Defendant] regarding the payment provisions of whether or not there would be any payments from Marikina to [SPI]?
>
> A: Yes, there were discussions, yes.
>
>                     *  *  *
>
>       There were insurance payments that needed to be made. Marikina, as the leaseholder holding the lease, was going to, initially was going to be also have to be paying for the annual vehicle insurance. And there was discussions on how to facilitate that in order to get Marikina reimbursed for their expenditures.
>
> Q: For the insurance?
>
> A: Correct.
>
> Q: And what was your discussion? What was your suggestion and what was the discussion?
>
> A: Well, my first discussion - - my first offer was that the reimbursement to Marikina be handled by a change order within the company.
>
> Q: What did you mean by a change order?

_____

(...continued)
      With the upcoming hollow core erection jobs, Marikina will likely have to be PCI certified.

                    *  *  *

      If one of these h/c jobs is to be erected in October, will need to plan to get certification done ASAP. [T.M. Hubler] is set to do audits.

                    *  *  *

      How are we going to handle dues payments? CDS reimburse?

(*Id.*; Tr. 2779-80.)

A:     If Marikina would submit a bill for 1500, 1200
       dollars, whatever the premium ended up being, to
       find a project where a change order could be created
       to generate the dollars to pay for the amount.

Q:     And what would be the purpose of doing it as a
       change order instead of just issuing them a check for
       auto insurance on a vehicle?

A:     Well, the idea of either [SPI] or CDS just writing a
       check to Marikina was taking away the disguise or
       the concealment of the relationship between the three
       companies.

(Tr. 2172-73; *see, e.g.*, Gov. 67.10.)  Similarly, Fink testified that he had routine

discussions with Defendant and other upper-management about reimbursing

Marikina's various expenses.  (Tr. 2779-80.)  In fact, Defendant confirmed that, at

the time of the search, he knew CDS was reimbursing Marikina by way of change

orders (*see* Tr. 2968-69),[34] but testified that he did not question the procedure

because that "was [Campbell]'s area" (Tr. 2969; *see also* Gov. 67.10).[35]

---

[34] Defendant admitted that he was aware SPI reimbursed Marikina for certain expenses (Tr. 2872), but explained that he did not believe it was illegal for SPI to pay these expenses incurred by Marikina.  (Tr. 2873.)  Defendant further testified that although his signature appeared on multiple reimbursement change orders, he did not read what he signed.  (Tr. 2873-74.)  Defendant also knew Marikina used CDS personnel, and that SPI was reimbursing Marikina's payroll.  (Tr. 2957-58.)

[35] At trial, the following exchange occurred regarding Defendant's complacency with SPI's reimbursing Marikina by way of work orders:

Q:     [Campbell] said there would be nine installments [of insurance
       premiums], approximately 365 each.  Then he said, I would recommend
       that Marikina send us an extra work order on the job they work on that
       period to cover the insurance premium.  Do you see that?

A:     Yes.

*     *     *

Q:     Did you say to Mr. Campbell in response, why do we need an extra work
       order?  Why don't we just reimburse them?  This is a legitimate mentor

                                                                    (continued...)

49

Defendant knew Marikina used SPI/CDS vehicles (Tr. 2869), and was aware that Daniel Cuccurullo, who was employed by SPI as a structural draftsman and had a vinyl graphic sign business on the side, and Lester Aungst, III, the owner of Aungst Signs in Schuylkill Haven, Pennsylvania (*see generally* Tr. 1368-71), were creating Marikina decals and magnetic placards for the vehicles (*see* Gov. 67.6) at the direction of Groody (*see* Tr. 1734-36).[36] Both sets of decals were ordered and paid for by CDS. (Tr. 1387-88.) Hubler testified that, before the leases were executed, the CDS workers were directed by Defendant and Fink to cover the SPI/CDS logos with the magnetic Marikina placards when on a Marikina job site. (Tr. 2476.) Following the execution of the leases, however, permanent Marikina decals were placed on the vehicles. (Tr. 2477.) Defendant was fully aware of the entire process related to Marikina's acquisition of the trucks. (Tr. 2997-99.)

---

[35] (...continued)
protégé program, we can reimburse them? Why do we need to have an extra work order? Did you tell him that?

A:      This was [Campbell]'s area. If that was his suggestion and that's the way he and Marikina wanted to handle it, what do I know?

(Tr. 2969.)

[36] Philip Groody, the former transportation manager at SPI, testified regarding his involvement with acquiring Marikina logos for the vans. (Tr. 1734.) Much of Groody's testimony was in the form of authenticating emails he received regarding acquiring Marikina logos for the CDS/SPI trucks that were the subject of the leases. The emails demonstrated that Defendant was well-apprised of Groody's actions regarding the ordering of Marikina decals from Cuccurullo and Aungst. (*See, e.g,* Gov. 67.1 (Defendant copied on email chain regarding Marikina employees being transported in SPI/CDS trucks where no SPI/CDS involvement); Gov. 67.2 (email chain between Groody and Defendant regarding putting Marikina's name on the trucks); Gov. 67.3 (email from Defendant directing Mack to obtain a Marikina DOT number to put on the truck); Gov. 67.4 (email from Defendant requesting an update "on getting Marikina [its] own DOT number"); Gov, 67.12 (Defendant copied on email chain regarding lease agreements for vehicles); Gov. 67.13 (Defendant copied on email chain confirming decals were on vehicles and lease agreements were on file).)

Defendant directed Mack, an SPI employee, to submit the paper work necessary for Marikina to obtain U.S. DOT numbers. (*See* Tr. 1574.) Specifically, in a June 21, 2005 email, Defendant directed Mack[37] to "get forms together for Marikina to get their own DOT number." (Gov. 67.3; *see also* Gov. 67.4.) Defendant failed to explain the reason that directed an SPI employee to obtain the DOT number for Marikina despite his purported "good faith belief" that the companies were separate. (Tr. 2872.)[38]

### v. Defendant knew SPI employees had overwhelming involvement with Marikina's daily operations

The evidence presented at trial proved Defendant knew that SPI/CDS employees had overwhelming involvement with Marikina's daily actions related to its DBE subcontracts, to the extent that nearly all of Marikina's work was being done by SPI employees.[39] Although he had infrequent direct contact with most lower-

---

[37] Mack, the former transportation administrator of SPI who was hired in 1986, testified that, as part of her job responsibilities, she would distribute Marikina payroll forms to CDS. (Tr. 1537-38.) Mack testified that, after the job was completed, she would receive the completed form and would fax it to Marikina. (Tr. 1538.) Additionally, Mack scheduled the crane rentals for erection jobs through Marikina. (Tr. 1538-40.)

[38] Defendant testified that he believed the purpose of putting the Marikina DOT numbers and logos on SPI/CDS vehicles was related to insurance, namely that SPI was insuring vehicles used by Marikina which was "not right." (Tr. 2871-72.) Defendant explained it was "just the rule" that, in order for Marikina to insure the vehicles, they must have a lease, and that in order to have a lease, Marikina needed a DOT number, and that if Marikina was leasing the vehicle, the vehicle had to display Marikina's DOT number and logo. (Tr. 2872.) However, Marikina's insurance costs were reimbursed by SPI, which directly contradicted Defendant's purported concern that SPI was paying Marikina's insurance on the vehicles. Moreover, such an explanation does not justify why Defendant directed an SPI employee to obtain the DOT numbers for Marikina. (*Id.*)

[39] Hubler testified as to who was actually doing the work on Marikina subcontracts:

A:    [Cruz] had to handle the payroll, run the payroll through and try to attend any meetings that minority business owners are required at.

(continued...)

51

Q: What were you and [Campbell] going to do?

A: I was going to do the bidding, the estimating, and do the actual erecting. [Campbell] was going to handle the contracts and plant procurement.

Q: And what about like who the workers were that were actually going to be on the job site to perform the erections?

A: The workers were all going to be CDS employees.

Q: Who was going to supervise those employees?

A: They were going to be supervised at that time by me. And when [Cruz] had a minority or two minorities, we would use them on the job, too. They were used primarily to unchain trucks and hookup.

(Tr. 2444.) Hubler continued to explain how SPI employees performed Marikina's commercially useful functions:

A: For 99 percent of the work, the jobs, the blueprints came from [SPI]. They printed them out under CMS. Estimate the cost of the erection, I done that. Create quotes for a general contractor was done by [SPI]. Negotiate price, done by [SPI] sales team. Create Marikina contract to general contractor, that was done at [SPI]. Review subcontracts from general contractor, that was [SPI]. Create erection drawing, I would go out and set a job out, bring them back to CDS, which was part of [SPI], drafts people, they would produce the drawings under Marikina box on the drawing. Crane rentals, they were done by me or [Mack] at [SPI] or Barb [Nagle] at [SPI] or [Quandel] at [SPI].

    \*   \*   \*

All the coordination of the erection schedule was done by [Mack], . . . because she was the one that scheduled the trucks out of [SPI], and everything had to be scheduled together in order to do the job, so she did the schedule. She set the schedule up with the contractor, told me what it was, and then I had to make a goal.

    \*   \*   \*

All the labor c[a]me from CDS, which was part of [SPI]. Vehicles came from CDS, [SPI]. Materials and all supplies came out of [SPI].

Q: And the supervision of the job site employees?

A: That was CDS people and myself at times.

    \*   \*   \*

The payroll was created at [SPI]. The hours were handed in, and either Barb [Nagle] or [Quandel] did the payroll. The certified payroll reports were done by Marikina by a girl that worked for [Cruz] up in Connecticut.

(continued...)

52

level employees (*see, e.g.,* Tr. 1520-21, 2877), Defendant admitted that he knew SPI employees were doing work on behalf of Marikina. (Tr. 2875-77.)

At trial, multiple former SPI employees testified regarding their daily involvement as related to Marikina. Several employees, namely Mack, Quandel, Kofluk, Logan, and Carol Campbell occasionally joked that they should be on Marikina's payroll for all the significant amount of work they performed on Marikina's behalf. (*See, e.g.,* Tr. 1418, 1540, 1971.) Although the close relationship between SPI and Marikina was not kept a secret throughout the company, most of the lower-level employees were not privy to the details of the relationship (*see, e.g.,* Tr. 1625-1629), such as the fixed-fee arrangement or that Marikina's direct costs were reimbursed by SPI (*see, e.g.,* Tr. 1612-13, 1624).

Defendant received information from SPI employees that related to Marikina-specific procedures and documents. Quandel[40] testified that she co-authored a memo, dated January 10, 2006, which was addressed solely to Defendant regarding "recommended scheduling changes procedure for Marikina projects." (Tr. 1484-92; Gov. 71.9A.) The purpose of the January 10, 2006 memo related to "enhanc[ing] communication inside and out of Marikina when scheduling erect crews for projects." (Gov. 71.9A; *see also* Tr. 2149-50.) Attached to the memo were several documents, including a form letter, on Marikina letterhead, indicating

---

[39] (...continued)
(Tr. 2449-50.)

[40] April Quandel, the transportation administrative assistant for SPI who was hired in February, 2005, testified that, as part of her job responsibilities, she would receive three types of invoices from Marikina through Hubler, namely the crane invoices, the labor invoices, and the fixed fee invoices (Tr. 1423-25), and would file one copy and send the original to Fink (Tr. 1424). Additionally, Quandel distributed both Marikina and CDS checks to the CDS workers. (Tr. 1425.)

that "if [a general contractor had] any questions or special concerns, please contact [Quandel]." (Gov. 71.11A, pp. 5-6 of 8.) The form letter was signed by Timothy Hubler, Operation Manager of Marikina. (*Id.*) In addition, there was a document titled "Marikina Contract Checklist" (*Id.* at p. 7 of 8.), which was intended to help ensure that the file contained everything in order. (Tr. 1494-95.)

Defendant was also the recipient of an email from Hoover, also to Mack and Pishock, that memorialized a policy for SPI's scheduling of jobs involving only Marikina. (Gov. 71.6; *see also* Tr. 1600, 1669, 1854-55, 2924, 2987.) Attached to the email was a form on Marikina letterhead, which was to be addressed to the general contractors and signed by Quandel. (Gov. 71.7.) In response to Hoover's request for feedback, Defendant not only approved the policy, but also edited the form letter by "add[ing] one clarification."[41] (Tr. 2924-25; Gov. 71.7; *see also* Tr. 2987-88.)

Defendant was aware of Marikina-specific issues that arose in the course of Marikina jobs. For example, on January 28, 2005, Pishock[42] wrote an email to upper management, including Defendant, that Baltimore City imposed a contract limit on Marikina that had been exceeded by a contract between the general contractor and Marikina. (Tr. 1662; Gov. 96.4.) On a separate occasion on July 3, 2007, Pishock wrote an email to several recipients, including Defendant, in which he

---

[41] Defendant testified that he did not know that SPI employees had access to Marikina letterhead. (Tr. 2925.) The form letter attached to the August 1, 2005 email was on Marikina letterhead. (Gov. 71.7.)

[42] Pishock testified that he prepared quotes and negotiated contracts for both jobs that involved an SPI beam as well as jobs that instead involved a beam from a different supplier, *i.e.*, jobs in which SPI would not be involved. (*See* Tr. 1639-41.) Moreover, Pishock was familiar with issues arising in connection with Marikina's involvement on contracts. (*See, e.g.,* Tr. 1660-62.)

indicated that he had altered a contract for the purposes of not collecting Marikina's fee directly.[43] (Gov. 92.11A.) This alteration appeared on the Revised Sales Value and Production Report, which deleted the portion of the job cost pertaining to Marikina. (*Compare* Gov. 92.11A, *with* Gov. 92.11.)

Defendant was also aware that SPI employees had involvement with the drafting of Marikina scopes and contracts. (*See, e.g.,* Tr. 2875-76.) Logan testified that she downloaded plans from ECMS and give the specifications to the SPI estimators, and would prepare the scope letter that would be given to the general contractor.[44] (*See* Tr. 1786.) The scope letters set forth the division of labor for the manufacture of beams by SPI and the erection of beams by Marikina. (Tr. 1787.) Logan testified that she included in the scope letters standard language, which would be occasionally updated. (Tr. 1803.) For instance, on July 25, 2006, Campbell sent an email to several individuals within SPI, including Defendant, regarding the terms and conditions of the scope letters and contracts. (Gov. 71.28.) The email provided, in pertinent part, as follows:

Some consideration changes to our scopes and contracts.

\*   \*   \*

*To the Marikina scopes and contracts.*

---

[43] Specifically, Pishock explained the basis of the email as follows:

This was a job that was in Maryland, so we weren't going to collect - -[Cruz] was going to collect the money and keep his fee rather than submit all the money to [SPI/CDS] and then have [SPI/CDS] write him a check for his fee.

(Tr. 1674.)

[44] In addition to utilizing ECMS to download plans, Logan accessed ECMS, using Marikina's login information, to acknowledge Marikina's participation on a contract. (Tr. 1794.)

> *Marikina does not included* [sic] *removal of and patching of rigging lifters in the beams.*

> \*    \*    \*

> Please review and add any suggestions or changes.

> Are there any other areas we want to address?

> We will need to change our templates.

(Gov. 71.28 (emphasis supplied); Tr. 1804.) If a general contractor gave a commitment, Logan would pass along the information for the preparation of contract documents. (Tr. 1788.) Additionally, Pishock testified that when he prepared bids, he would issue scope letters and negotiate contracts on behalf of Marikina (Tr. 1640-41), and would use Marikina letterhead (Tr. 1641).

      Defendant was aware that Hubler decided whether Marikina was to bid on a project, that SPI employees would provide pricing on Marikina contracts, and that SPI would track Marikina jobs. For example, Hoover kept records of Marikina jobs. (*See* Tr. 1843-44.) In an email chain, on which Defendant was copied, Hoover identified flaws in the existing system for tracking Marikina jobs. (Gov. 71.13.) The chain for that email included the following response from Campbell with regard to the tracking report:

> As far as pending jobs, we do not track Marikina pricing. *The decision to bid a project is totally up to [Hubler].* When he bids a project he sends an estimate (in most cases) to us, *we prepare a Marikina quotation on Marikina letterhead and send it out*. We follow up on these quotes on an "oh by the way" basis, we are a second hand source when it comes to the Marikina SPI relationship.

(Gov. 71.13 (emphasis supplied).) Defendant was copied on this response, as well.[45] (Gov. 71.13; Tr. 2928.)

Defendant was aware that SPI/CDS employees provided support to Marikina. (Tr. 2875.) Specifically, Defendant knew Campbell provided support to Marikina with contracts and disputes and that Hubler provided support to Marikina with field supervision. (*Id.*) Defendant further testified that he knew Jason Hubler provided support to Marikina as a foreman (Tr. 2876), that Pishock provided support to Marikina by way of reviewing contracts (*Id.*), that Mack provided support to Marikina with scheduling (*Id.*), and that Quandel provided support to Marikina with filing (Tr. 2876-77). However, Defendant denied knowing that Quandel had a Marikina cell phone (Tr. 2877), that Hubler had Marikina business cards (Tr. 2876), or that the fax header was changed to display Marikina as the origin of the communication (Tr. 2877), and did not know that Kofluk used Cruz's signature stamp (Tr. 2878.).

### vi.    Defendant knew SPI employees were held out to be Marikina personnel

Like many other witnesses, Defendant was aware that SPI/CDS employees were representing themselves as Marikina employees. (*See* Tr. 2875.) For instance, Pishock admitted that he knew such practices were routinely used (*see* Tr. 1652); however, he testified that he refused to do the same because he "knew it was wrong"[46] (Tr. 1653). For example, like several other CDS and SPI employees,

---

[45]  Defendant testified that he did not recall receiving this email, despite him clearly being copied on the exchange. (Tr. 2928.)

[46]  Pishock held this assessment of these practices despite Campbell telling him that the contract flow, which was very complex (Tr. 1685), was legal (Tr. 1686), and that SPI/CDS could mentor

<span style="font-family:monospace">(continued...)</span>

Quandel represented to non-SPI suppliers that she was employed by Marikina, rather than SPI, in an attempt to conceal the relationship between the companies. (Tr. 1429.) This misrepresentation, however, resulted in confusion, and, in January 2006, Quandel sent her superiors, including Defendant,[47] the following email in which she requested guidance as to how she should represent herself:

> I have four letters that I have to send out to contractors and suppliers for Marikina. According to Dennis Campbell's last email he has the letters signed by [Gloria] and [Cruz] instead of myself.
>
> Which letter format should I be using?
>
> When I call to check up on the letters sent who do I say I work for? CDS or Marikina?
>
> The letters that I was sending had our CDS phone number, the [Campbell] letter only has Marikina's #[.] [Campbell] had mentioned about us having a meeting, could we do this ASAP so that I can get these letters out.

(Gov. 71.9; *see also* Tr. 1446.) This concern prompted SPI's management to put in place procedures that would "deflect all the incoming contractor questions regarding scheduling of [Marikina] work to [Quandel] so that she didn't have to be guessing who it was and answering the phone either [SPI] or CDS." (Tr. 2151.)

Defendant was also aware that certain SPI employees had email addresses with a Marikina domain name. (Tr. 2931; *see also* Gov. 65.4 (stating, in an email addressed to Defendant, "I have given [Hoover] a Marikina Domain email

---

[46] (...continued)
a DBE such as Marikina (Tr. 1691). Campbell denied ever telling Pishock that the relationship between SPI/CDS and Marikina was legal. (Tr. 2299.)

[47] Quandel did not address her first email to Defendant. (*See* Gov. 71.9.) However, it is clear Defendant received Quandel's original email because he was added onto the email chain by Hoover's reply. (*See* Gov. 71.9.)

mhoover@marikinacorp.com"); Tr. 1856.)  In an email from Defendant, he
recognized potential problems with Marikina's use of SPI's email addresses, and
requested as follows:

> Could you please talk to John about the feasibility of
> separate domain names for CDSengineers and Marikina for
> email?
>
> Much cleaner, and *less chance of problems with the outside
> world*, if they are separate but still have the same access as
> spibeams.  I don't like CDS and Marikina using spibeams'
> email.

(Gov. 65.3 (emphasis supplied); *see also* Tr. 2981-83.)  During his testimony,
Defendant explained, unconvincingly, that the "less chance of problems with the
outside world" concerned financial liabilities.  (Tr. 2866-67.)  Hoover used his
Marikina email address when communicating with PennDOT regarding Marikina
business.  (Tr. 1859, 2148.)

Quandel testified that, in addition to her email address with a Marikina
domain name (Tr. 1430), she was given a separate cell phone, paid for by SPI, to use
when making Marikina-related calls (Tr. 1432; *see also* Tr. 1556, 1559).  Quandel
also testified that there was a Marikina letterhead template saved on her computer,
which she used for Marikina-related correspondence.  (Tr. 1431.)

On projects that SPI was not involved as the supplier, Mack represented
to general contractors that she was employed by Marikina, rather than SPI, in an
attempt to conceal the relationship between the companies.  (Tr. 1547-51, 1553.)
This required Mack to introduce herself as a Marikina employee during telephone
calls with general contractors or suppliers and to use Marikina letterhead.  (Tr. 1553.)
Mack testified that, in 1997, a SPI fax machine was adjusted as to allow it to display

Marikina on the header. (Tr. 1554-55.) Mack testified that when she was sending certain Marikina-related documents to general contractors and suppliers, she would switch the fax header to display Marikina as the transmission's source. (Tr. 1554-56.) Campbell and Hubler both explained that the purpose of altering the fax header was that any information generated from Quandel on behalf of Marikina would not reflect that it came from either CDS or SPI's offices. (Tr. 2221; Tr. 2454.)[48] Many SPI employees, including Defendant's wife, utilized the adulterated headings to give the appearance that the document originated from Marikina in Connecticut. (*See* Tr. 2456-58; Gov. 7.3; Gov. 7.4.)

Hoover testified that he frequently represented himself as a Marikina employee when on the phone or in the field. (*See, e.g.,* Tr. 1840, 1842, 1849, 1856.) Moreover, Defendant knew Hoover represented himself as an employee of Marikina through faxes and letters, inasmuch as Defendant proofread documents SPI employees authored on Marikina letterhead. (Tr. 2958-59; *see also* Gov. 71.5C.)

Although he was a CDS employee, T.M. Hubler performed a significant amount of work for Marikina, identified himself as a Marikina employee while on Marikina job sites, and had Marikina business cards. (Tr. 1883-84.) T.M. Hubler also testified that, during the course of his employment with CDS, he created erection drawings for Marikina, that were "sealed" by Defendant. (Tr. 1887.)

---

[48] Specifically, Hubler explained that SPI employees were to utilize the adulterated fax machine when sending faxes on behalf of Marikina because it:

> [S]how[ed] that the information that the contractors were getting [was] coming from Marikina. That's why the letterhead was put on the top of there, so it would not give the impression that anything was done by [SPI].

(Tr. 2454.)

Hubler testified that SPI purchased business cards for his use that represented that he was the general manager of Marikina (Tr. 2464), and that he distributed those cards to contractors and employees of the federal and state departments of transportation. (Tr. 2463.) Moreover, Hubler was provided a Marikina email address (Tr. 2465-66), and used Marikina stationary for correspondence with general contractors (Tr. 2468-69; *see, e.g.,* Gov. 105.5 (letter dated April 23, 2007); Gov. 105.6 (letter dated June 17, 2005); Gov. 105.7 (letter dated June 2, 2006); Gov. 105.8 (letter dated June 20, 2005); Gov. 110.14C (letter dated May 9, 2005)). Like Quandel, Hubler had a separate mobile phone, paid for by SPI, that he used when acting in his "Marikina capacity." (Tr. 2476.)

Many SPI personnel, including Defendant, also represented Hubler as a Marikina employee. For example, in correspondence dated March 11, 2002, Defendant sent the following fax, on SPI letterhead, to a general contractor, in which he represented Hubler to be a Marikina employee:

> We will be meeting at the Associated Pennsylvania Constructors (APC) Board Room on 800 North Third Street Harrisburg, PA 17102-2009 . . . .
>
> Gordon Nagle, *Tim Hubler (Marikina)*, myself, and Dwight Weibel will be in attendance.
>
> There are a couple of Sheratons and Holiday Inns within close proximity to the airport and our meeting spot.

(Gov. 106.2 (emphasis supplied); Tr. 2984-85.) Defendant continued to represent Hubler as a Marikina employee following his appointment to president of SPI. In a June 20, 2005 letter to a general contractor from SPI, Defendant represented Hubler as an employee of Marikina, despite his knowing Hubler was a long-time employee of SPI/CDS:

> On 6/7, *Tim Hubler of Marikina Engineers and Constructors (the erector)* met with your superintendent to coordinate final erection plans and was informed at that time that the owner had decided at some point in time (we do not know when) that daytime erection would not be permitted. In addition to that additional restriction, we were also informed at that time that erection would not be permitted Friday night or Saturday night.

(Gov. 71.1A; Tr. 2984-85.)[49]

Defendant knew the importance of concealing the "employee sharing" relationship that existed between SPI/CDS and Marikina. In an email chain dated December 4, 2006, SPI upper-level management discussed apparel for SPI/CDS employees in recognition of CDS's safety record. (Gov. 71.34.) Specifically, Fink wrote the following:

> What we talked about was a reward for CDS employees not Marikina. *Gotta keep the Companies separate*. All three Companies have their own Workers Comp and associated ratings and accident history.

(Gov. 71.34 (emphasis supplied); Tr. 3001.) Defendant echoed Fink's concern to keep the employees' appearances separate:

> *Cant have Marikina guys walking around jobsites with CDS jackets*. If they're going to advertise anybody's safety record, the thinking was it should be Marikina's. CDS Engineer guys can have SPI t-shirts, as far as I'm concerned.

(Gov. 71.34 (emphasis supplied); *see also* Tr. 3002-03.)[50]

---

[49] Defendant cited poor word choice as the reason his correspondence said "Tim Hubler of Marikina Engineers and Constructors (the erector)," rather than indicating that Hubler was, in fact, representing Marikina. (*See* Tr. 2985.)

[50] Despite the email to the contrary, Defendant explained at trial that "[he] didn't want [the
(continued...)

Although Defendant conceded at trial that he was aware SPI employees were being represented, by themselves and others, as Marikina employees (*see, e.g.,* Tr. 2875, 2946), Defendant explained that Campbell told him that there was a federal mentor-protégé program, in which non-DBEs, such as SPI, could mentor DBEs. (Tr. 2880.)[51] Although not prohibited by the Federal Regulations (Tr. 128-29), Ashby, who was employed by the United States Department of Transportation as the Deputy Assistant General Counsel for Regulation and Enforcement, testified as to the relevant federal regulations, and clarified that PennDOT's DBE program does not have a mentor-protégé program. (Tr. 147.)[52] Significantly, Defendant was unable to give a credible explanation as to the purpose of SPI employees representing themselves as Marikina employees, even if a mentor-protégé program existed. (*See, e.g.,* Tr. 2947, 2985.)

### vii. Defendant knew SPI employees utilized Marikina letterhead, and used Marikina letterhead himself

Contrary to his assertions that "he didn't know a thing about Marikina's letterhead" (Tr. 2924), the evidence presented at trial made clear that Defendant knew SPI employees used Marikina letterhead when corresponding with general contractors with whom Marikina had subcontracts (*see* Tr. 2958-60). Correspondence on Marikina letterhead originating from SPI offices was

---

[50] (...continued)
workers] to have jackets." (Tr. 3003.) This testimony, of course, was contradicted by the plain language set forth in the email.

[51] Campbell denied ever telling Defendant there was a mentor-protégé program. (Tr. 2299.)

[52] Moreover, even if such a program existed, to comply with the regulations, the DBE must remain independent, can only use the non-DBE on every other contract, and must still perform a commercially useful function. (Tr. 147.)

commonplace; Mack testified that, during her employment with SPI, she would frequently receive intra-company correspondence regarding Marikina which was on Marikina letterhead. (*See* Tr. 1568-70.)

The use of Marikina letterhead was another measure taken to ensure the "outside world" thought it was dealing with Marikina personnel rather than SPI employees. (Tr. 2158-60; *see also* Gov. 65.4.) For instance, Campbell testified that he routinely used Marikina stationary (Tr. 2160), and drafted letters to general contractors that appeared to be sent from Marikina (Tr. 2160-61). Specifically, on July 28, 2005, Campbell wrote an email to several members of SPI's management, including Defendant, to which he attached a letter to a general contractor that was to be signed by Cruz. (*See* Gov. 71.4.) The letter was on Marikina letterhead, and was intended to "head off further confrontation." (*Id.*; *see also* Tr. 2161.) On another occasion, Campbell sent an email to Gloria, on which several members of SPI's management, including Defendant, were copied, directing Gloria to print the attached documents and fax to a general contractor. (Gov. 71.5B.) The first letter attached to the email was on SPI letterhead, was addressed to Marikina, and signed by Campbell. (*Id.* at p. 3 of 3.) The second letter was on Marikina letterhead, referenced the first letter, and appeared to be sent from Cruz. (*Id.* at p. 2 of 3.)

Campbell was not the only SPI employee to write correspondence to be sent to general contractors that appeared to be sent from Marikina. For example, on March 29, 2005, Hoover wrote an email to Defendant requesting input on a letter he drafted that was on Marikina letterhead and appeared to be from Hubler, in his

capacity as Superintendent for Marikina. (Gov. 71.5C.) Defendant expressed approval of the letter as written.[53] (*Id*.; Tr. 2961.)

Defendant's involvement with correspondence on Marikina letterhead was not limited to his review of letters prepared by others. In March 2005, Defendant authored a letter addressed to a general contractor on a job that had no SPI involvement (Tr. 2916-17.) The letter appeared to come from Marikina because it was signed "Romeo P. Cruz, President." (Gov. 112.14D.) Further, although the letter, as originally submitted by Defendant, was not on any letterhead (*Id.*), Campbell testified that he printed it out on Marikina letterhead before sending it to Marikina for distribution[54] (Tr. 2167; Gov. 112.14B). Defendant admitted that he

---

[53] On cross-examination, Defendant testified that he read the letter, which misrepresented Hubler as an employee of Marikina, and knew that the letter was on Marikina letterhead. (Tr. 2960-61.)

[54] Although Defendant denied knowing that the letter was put on Marikina letterhead prior to distribution (*see* Tr. 2882), it was clear from the body of the letter that the author intended it to come from Marikina. The body of the letter was as follows:

> We understand that the schedule conflicts between Market Street Construction (MSC) and American Bridge have been resolved to the satisfaction of both parties and that American Bridge has agreed to provide the detailed scheduling information to MSC so there will be no material schedule impacts to the project as a result of fabrication delays by American Bridge.
>
> Given the above, we also understand that there will be no progress payment suspensions to either Marikina or American Bridge.
>
> Also, in accordance with our discussions yesterday, MSC agrees to defend and hold harmless Marikina from any and all claims, attorneys' fees, or costs as a result of any scheduling disagreements between MSC and American Bridge.

> Very truly yours,
> Marikina . . . .

(continued...)

authored the letter without speaking to Cruz, and wrote the letter with the intent for it to appear as though it was written by Cruz. (Tr. 2881.)

### viii. **Defendant participated in upper-level SPI management meetings at which Marikina operations were discussed**

Defendant's claim that he lacked the intent to defraud because he was excluded from the fraud by Hubler, Campbell, and Fink was belied by his consistent participation in upper-level management meetings during which Marikina-specific business was discussed. Through its relationship with Marikina, SPI became a "one-stop shop" for general contractors, inasmuch as SPI had the ability to design, manufacture, deliver, and erect bridge beams (Tr. 2192), and provide the general contractor with an easy way to meet DBE goals (Tr. 2194 ("[Being a one-stop shop] was an easy vehicle available to [general contractors] to satisfy their requirement in their contracts to meet DBE goal."); Tr. 2482 ("You only had to deal with us and you would meet your [DBE] goal.").[55] The "one-stop shop" concept was discussed as a

---

(...continued)
                        Romeo P. Cruz, President
                        Cc: tgh, mh, f
(Gov. 112.14B.)

[55] Pishock concisely explained the benefit to general contractors who subcontracted with Marikina as follows:

Q:    Can you give us an example [of the benefit for DBE erection credits for the beams]? For example, if you had a beam that cost a hundred thousand dollars, what would the erection cost be for something like that, a ballpark range?

A:    A hundred thousand dollars worth of beams, the erection would be, I guess, somewhere around 25,000 [dollars].

Q:    So if the contractor was just buying erection services, he would only get $25,000.00 DBE credit?

A:    That's correct.

Q:    But if he bought the beam and the erection from the DBE firm, he'd get

(continued...)

strength at strategic planning meetings, at which Defendant was present (*see* Gov. 119.1), and as a marketing strategy (Tr. 2192), whereby SPI's management, including Defendant, recognized that being a "one-stop shop" gave SPI an edge over the company's non-DBE competitors (*see* Tr. 2194; Tr. 2952-56). For example, in a July 25, 2006 email from Defendant concerning a rival company, Defendant acknowledged that being a one-stop shop was unique in the industry. (*See* Gov. 79.1; Tr. 2194.)[56] The "one-stop shop" concept was also included as a "key strength" in SPI's strategic plan. (Gov. 3.2, p. 13 of 32; *see also* Tr. 2273-75.)

The value that Marikina added to SPI was a topic frequently discussed at strategic planning team meetings, which SPI/CDS "upper management" attended. (Tr. 2276-78.) For example, at a strategic planning meeting in February 2006, there was a discussion of the amount of revenue that Marikina could absorb. (Gov. 80.1; Tr. 2279, 2775.) In fact, Marikina was a topic of discussion at several strategic planning meetings. (Tr. 2480, 2775; *see also* Gov. 80.1 (minutes from February 2006); 80.3 (minutes from May 2006); 80.5 (minutes from February 2007); 65.5 (minutes from February 2007); 65.6 (minutes from June 2007).) Campbell testified that the idea for the website, which was created by T.M. Hubler (Tr. 1888-91), arose from a conversation with Defendant at a strategic planning meeting (Tr. 2221-22).

---

[55] (...continued)
        how much?
    A:      125,000 [dollars].

(Tr. 1642.)

[56] In an email in response, Campbell acknowledged the appeal of the relationship between SPI/CDS and Marikina over legitimate DBEs who can "actually [perform] the work." (Tr. 2196; Gov. 79.2.)

Pending jobs, including those that specifically involved Marikina contracts, were discussed at the weekly sales and production meeting,[57] at which Defendant was regularly present (Tr. 1646, 2118), and participated (Tr. 2772-73). The actual cost of jobs, including the payroll reimbursement and fixed fee arrangements between CDS and Marikina would be discussed at the monthly job cost meetings,[58] at which Defendant was regularly present and participated. (Tr. 1647-48, 1650, 2597, 2608, 2772-73.) A "Job Cost Report" that broke down the job costs to

---

[57] Pishock explained the subject matter of the sales and production meetings as follows:

Q:      What was discussed in these weekly sales and production meetings?
A:      Everything from jobs that were not bid yet, jobs that were bid and going to either [be] successful or unsuccessful, and jobs that were already contracts on the books and were in the engineering and production phase.

*     *     *

Q:      During these meetings, would the Marikina contracts and the erections be discussed?
A:      Yes.

(Tr. 1646.)

[58] Pishock explained the subject matter of the job cost meetings as follows:

Q:      What was discussed in the job cost meetings?
A:      We went through all the jobs that were produced in that month, and we compared the estimate versus actual. The first part of the meeting was the plant production.
Q:      And would those discussion entails [sic] labor costs?
A:      Yes.
Q:      Would they entail the labor costs of both the CDS employees and the costs that were paid by - - labor costs that were paid by Marikina?
A:      Yes.
Q:      And reimbursed by CDS?
A:      Yes.

(Tr. 1647-48.)

indicate the variance between the estimate and actual amounts was prepared for each job cost meeting. (*See, e.g.,* Gov. 91.13.) Calculations were prepared for costs directly impacting Marikina, even if the costs did not directly impact SPI/CDS. (Tr. 1666-67; Tr. 2609; *see also* Gov. 91.13 ("Labor charges- Marikina").) Campbell testified that Marikina's labor costs, and CDS's reimbursement thereof, was a regular topic of conversation during the job cost meetings. (Tr. 2182-84; *see also* Tr. 2614.)

Furthermore, issues related to SPI's reimbursement of Marikina's costs were the subject matter of certain sales operation meetings, at which Defendant was present.[59] (Tr. 2186.) Specifically, the timing of the reimbursements was frequently an issue that Cruz brought to Campbell's attention, which Campbell would relay to other upper-level SPI management, including Defendant. (Tr. 2185-86.) Campbell testified as follows regarding issues with Cruz concerning the timing of payroll reimbursement:

> [Cruz] only had - - [Cruz] was doing the certified payrolls and issuing the checks on a weekly basis to the crews that performed the work, and his expectation was to get immediately reimbursed from CDS to keep his funds available.

(Tr. 2184.) Campbell further testified that Cruz would call or send him emails regarding delays in reimbursement. (Tr. 2185.) For example, on December 1, 2004, Cruz sent the following email to Campbell[60] regarding the timing of reimbursements:

---

[59] Campbell testified that he, Fink, Katchur, and Defendant were present at these "sales operation meetings." (Tr. 2186.)

[60] Although the email was sent from Cruz to only Campbell, the email chain indicated that Campbell forwarded Cruz's email to Defendant, Fink, Hubler, and Katchur. (*See* Gov. 76.2.) Defendant remained a recipient on the remainder of the chain. (*See id.*)

> As of today we have 66,000.00 on payroll and they
> concentrate on paying the crane, please help me get paid[.]
> I am behind to pay my bill.
>
> Approximately 8,000.00 for these week . . . I am worried
> that my cash flow is too low and might bounce my check.
>
> Thanks a lot on your big help . . . . . . . . [Cruz]

(Gov. 76.2.) In response, Campbell emailed Defendant and Fink advising them of the delay for reimbursement, to which Fink sent the following reply:

> Invoice processing time is the cause. [Cruz] or [Hubler] can
> no longer take vacations.
>
> Labor has always been and remains the first item to be paid
> on any job. The crane bills are not paid till our funds are
> received. Labor is paid after the invoice is received,
> approved and entered on A/P.

(*Id.*) Campbell's email in response acknowledged that the cause of the problem was delays in processing paperwork and suggested solutions to minimize the delay:

> It's a big number . . . we need to tighten up our processing
> methods . . . both marikina and CDS.
>
> I'm going to put a bug in [Cruz]'s ear to get the payroll
> info to CDS much quicker, there are times when he
> stretches the invoicing to 17 days only hurting himself.
>
> [Hubler,] you need to approve the invoices as you receive
> them, SPI needs to enter the payroll invoices as received.

(*Id.*)

Moreover, Pishock testified regarding "brainstorming meetings," during which participants discussed methods to streamline procedures involving Marikina subcontracts. (Tr. 1669.) Although Defendant was not always present during these meetings, suggestions from the meetings were presented to Defendant for approval prior to implementation. (*Id.*; Gov. 71.7.)

### ix.  **Defendant knew Marikina checks were directly deposited into an SPI bank account**

Despite his claiming otherwise (*see* Tr. 2979-81), Defendant was aware that checks from general contractors to Marikina completely bypassed Marikina and were deposited directly into SPI's bank account (*see* Gov. 77.1; Tr. 2878-79, 2980). Early in his testimony, Defendant discussed that, due to delays in collections, SPI's "day-to-day cash flow" was a line of credit.  (Tr. 2839.)  Although Defendant infrequently dealt with the day-to-day processing of accounts receivable (*see* Tr. 2877), Kofluk testified that she would occasionally seek help directly from Defendant when there were collection issues.[61]  (Tr. 1963.)

Kofluk testified that the frequent cash flow problems at SPI were largely due to delays in receiving checks from general contractors.  (Tr. 1960-61.) With respect to cash flow issues related to Marikina, Kofluk explained the cause of the cash flow problems as follows:

> Well, in the case of Marikina, they had an office in Orwigsburg.  And we found that most of the time they

---

[61]  Helene Kofluk, the accounts receivable administrator who was hired by SPI in 1981, testified that her job responsibilities included handling payments from the general contractors.  (Tr. 1951, 1955.)  In addition to contacting the general contractor directly, Kofluk used Marikina's ECMS password to check whether a general contractor had been paid.  (Tr. 1961-62.)  Kofluk explained that she would occasionally seek help directly from Defendant when there were collection issues.  (Tr. 1963.)

Like many SPI employees, Kofluk was familiar with invoices between SPI and CDS and explained that, if SPI collected money directly from the general contractor, it then would submit payment to CDS for the erections.  (*See* Tr. 1966.)  Kofluk was aware of the relationship between Marikina and SPI/CDS, and understood that Marikina would subcontract the erection work to CDS.  (Tr. 1969.)  Based on her understanding of the relationship, Kofluk believed that Marikina was involved solely for the purpose of obtaining DBE credits (Tr. 1969-70) and believed that the company added no independent value to the projects (Tr. 1971).

In terms of her responsibilities in accounts receivable, Kofluk was familiar with the fixed fee arrangement.  (Tr. 1974.)  Kofluk was aware Campbell set the fixed fee (*Id.*), and knew the amount of the fixed fee based on the summary memo for the project (Tr. 1976-77).

> were not there and they were having their mail picked up
> once a week by someone and then sent up to their office in
> Connecticut and then a lot of times there were checks in
> there that were for us for our beams. So it would sit there
> for a week.
>
> Then it would get sent to Connecticut. Then
> Marikina would get it and deposit it and then send us our
> check. So it was taking like two weeks for us to get a
> check that was like sitting down the road 10 minutes away.
> So we had talked about having someone go down and pick
> up the mail, letting us look through the mail for our checks,
> sending the rest of the mail up to Marikina.

(Tr. 1958-59.) Both Defendant, as president of SPI, and Fink, as vice president and

chief financial officer, were aware of the cash flow issues experienced by SPI,

especially as related to SPI's receipt of payment on Marikina contracts. (*See* Tr.

2035, 2189; Gov. 77.1.) On May 12, 2004, in an email to several management

personnel, Defendant suggested the following as a possible remedy to the cash flow

problem:

> For contractors that are equipped for direct deposit (some
> already get paid by PennDOT this way) we should request
> that we receive electronic payments. *On Marikina
> contracts, payment would have to flow through Marikina
> and they would have to be set up to direct deposit to SPI.*

(Gov. 77.1 (emphasis supplied).)[62]  Fink sent the following reply to Defendant's

suggestion:

> We get our money available faster by 2 days when we take
> the check to the bank. When receiving Marikina invoices

---

[62]  During his direct examination, Defendant testified that he intended to propose a
"legitimate wire transfer of funds from the [General Contractor] or whoever to Marikina to SPI." (Tr.
2879.) He further explained that he used "the payments would have to flow through Marikina"
language because "[t]he entire construction industry is a, quote, unquote, pass-through, flow-through."
(*Id.*)

> over $100,000 we have the contractor send the check
> directly to us.

(*Id.*)

Although she was a SPI employee, Kofluk frequently took measures in an attempt to expedite the process of SPI's receipt of general contractor's payments to Marikina. (*See generally* Tr. 1957.) Kofluk testified that payments from general contractors were deposited into SPI's bank account by various methods. In some instances, Kofluk directed general contractors to send payments due to Marikina directly to SPI to "get them quicker." (Tr. 1957.) In those situations, Kofluk would deposit checks payable to Marikina directly into SPI's bank account by endorsing the check with Cruz's signature stamp. (Tr. 1979.) If the general contractor sent payment directly to Marikina in Connecticut, Kofluk would direct Gloria to send the checks via Federal Express. (Tr. 1980.) Kofluk testified that it was standard procedure to use Cruz's signature stamp when she would receive a check payable to Marikina, regardless of whether the check came from the general contractor directly or through Marikina. (Tr. 1981-82.)

Although SPI received the checks faster when the general contractors would send directly to SPI rather than Marikina, Cruz was concerned about potential implications of such a continuous practice. On May 28, 2004, Kofluk sent the following email to Fink regarding Cruz's objection to the direct-deposit method for certain checks:

> I understand from [Pishock] that [Cruz] talked to
> [Campbell] about us having a lot of these checks sent
> directly to [SPI]. He didn't mind a few, but doesn't feel we
> should keep doing this. Must show he collected for his
> records to keep up his DBE. Doesn't want problems to
> arise. You may want to talk to [Pishock] or [Campbell] as

> to exactly what [Cruz] told them.  It was the week I was
> away.

(Gov. 77.2.)  In Fink's response, to which he copied Pishock and Campbell, he

recognized the issue, and stated his understanding of the arrangement as follows:

> This isn't an emergency.  I thought you said whenever over
> 100 grand it's ok for contractor to send directly to us.
> Would be good to have a clear understanding of this.

(Gov. 77.2.)  In Campbell's response, to which he added Katchur and Defendant[63] to

the chain, he stated the following:

> Spoke to [Cruz] regarding SPI receive and direct
> deposit of monies.

> His needs are to control sales (recorded from beams,
> box culverts, etc) dollars to stay around $ 3m to protect his
> DBE and SBA status.  His original benchmark was checks
> above $275 were directed to SPI for disposition, we had
> money difficulties, he lowered the threshold to $100, in the
> last couple of weeks we grabbed checks under $100 which
> raised concerns that all checks were going to be direct to
> SPI and Marikina was not going to have any sales to book.

> [Cruz] will work with us any way he can.  He can
> not get into a situation where all checks are direct, we need
> to clear with [Cruz] how he wants to handle the dollars.

> The State of Maryland insists that the funds be paid
> to the minority, the contractor must show a canceled check
> that was received and deposited by the DBE, so direct from
> Maryland is out.

---

[63] Kofluk did not address her first email to Defendant.  However, it is clear Defendant received Kofluk's original email and Fink's response thereto because he was added onto the email chain by Campbell's reply.  (*See* Gov. 77.2.)  Moreover, Campbell's addition of Defendant as a recipient on the chain concerning Cruz's displeasure with Marikina checks being deposited directly into SPI's bank account further discredited Defendant's position that he was excluded from the fraud by Campbell and Hubler.

> Bottom line, there is not [sic] dollar limit . . . . . . . .
> he just wants to be involved so he can make the call
> regarding direct to SPI or through Marikina.

(Gov. 77.2; Tr. 2190-91.)  Based on the evidence presented at trial, including

Defendant's own email (Gov. 77.1), as well as other emails from upper-level SPI

management that Defendant received (Gov. 77.2), it is clear Defendant knew that

Marikina checks were being deposited directly into SPI's bank account, despite his

understanding that the checks had to "flow through Marikina" (Gov. 77.1).

### x.  Defendant knew Marikina's profits increased SPI's profits, and profited from SPI's success

Defendant was aware that the contract flow resulted in CDS's receipt of

the gross profits from Marikina contracts (Tr. 3020-21; *see* Gov. 55.1 ("This allows

CDS to reimburse Marikina for direct costs and maintain gross profit within CDS.")),

which, in turn, resulted in CDS's revenues being "exceptional" (Gov. 91.6; *see also*

Tr. 2630).[64]  On one occasion, Defendant actively sought general contractor's use of

Marikina as a DBE erector, despite a different DBE erector already being

---

[64] On cross-examination, Defendant testified that he did not know whether the CDS profits flowed to SPI, although he knew CDS was a wholly-owned subsidiary of SPI:

> Q:  But is there any doubt in your mind that sales revenue was generated for CDS and [SPI] on [jobs that did not involve SPI beams]?
> A:  There was no [SPI] revenue.  CDS, yes.
> Q:  Well, CDS was a wholly-owned subsidiary of [SPI], correct?
> A:  Correct.
> Q:  So any revenue generated to CDS eventually goes to [SPI]?
> A:  I'm not an accountant, I don't know.
> Q:  Well, what's your understanding of what a wholly-owned subsidiary is?
> A:  My understanding is that [SPI] owned CDS.

(Tr. 2945.)

subcontracted.  (*See* Gov. 81.1.)  Groody testified regarding an occasion in 2006 when SPI's storage yard was filled to capacity with completed product.  (Tr. 1752.) This event prompted Defendant to compose a letter, dated March 10, 2006, which provided, in part, as follows:

> We are contacting all of our customers who are awaiting shipment of large product to explore all possible means to get product out of our yard. *We understand that in the case of your job, the DBE erector appears to be either unavailable or unprepared to go to work immediately. However, SPI knows of another DBE erector who is ready and willing to go to work immediately, at an equal or lower price.*
>
> Please contact me ASAP to discuss alternatives.

(Gov. 81.1 (emphasis supplied).)  Based on the evidence presented at trial, it was clear that Defendant knew that increased profits for Marikina meant increased profits for SPI/CDS.

### 3.  Closing Arguments

Defense counsel objected to three portions of the Prosecutor's closing argument, which were each addressed at a side bar conference.  (*See* Doc. 220, Tr., Side Bar Conference, Apr. 4, 2012 (hereinafter "Tr., Sidebar, Apr. 4, 2012, ___ ").) The following portions of the Prosecutor's closing argument are relevant to Defendant's challenges.

In the Government's summation, after thanking the jurors for their four weeks of service, the Prosecutor stated as follows:

> This trial has also, another reason I want to thank you is it's not been the most exciting trial at portions, and I admit that, and I think I have even audibly heard some groans coming from the jury box as I droned on with exhibit, you know, 3.2, and can you read the email, from

who, to what, what date. If I offended anybody doing that, please don't take it out on the government's case, take it out on me.

We have a job to do here. We take it seriously. We have the burden of proof. We accept that burden of proof, and as an assistant United States attorney representing the United States, I want to do the best for my client, which is the United States. So that's why I droned on and on, at least at the early stages. Hopefully you're not going to want to head to the exists now as I drone on and on and I keep your attention. It's not going to be as long, I expect I'll be here maybe an hour and a half or so, some[what] similar to my opening statement. That's the first thing I wanted to talk [about]. The second thing I want to talk about before I even get into the case, I want to thank the agents, Mr. Marakovit[s], Mr. Rodeschin, Mr. Purcell. I think they've shown extreme dedication and professionalism in this case. They've assisted myself and Mr. Daniel through the trial, and even prior to trial.

You heard evidence in this case that this investigation started in 2006. We're in 2012. We're talking six years here, and you saw a tip of the iceberg on that chair with those volumes and those black binders of evidence. You saw a tip of the iceberg, the documents that we produced to you during the course of this trial, but you saw pictures when they executed search warrants at Marikina and they executed search warrants at [SPI], the boxes and boxes of documents that they had to sift through, that they had to review, that they had to analyze, and that they had to organize so we could get to this point here today to give you a case that was somehow comprehensible and somehow understandable that we could satisfy our burden of proof, and it wasn't just the paper records.

You saw all these e-mails. That means computers had to be searched, and in a business the size of [SPI] or even Marikina, you're talking about gigabytes of information. That's a lot of information to review to find

e-mails that you think your case needs to address that are
relevant to the case. So I want to thank the agents sincerely
for doing that job.

(Tr. 3129-31.)[65]

Shortly thereafter, the Prosecutor concisely set forth the "one issue [for

the jury] to decide" (Tr. 3132) as follows:

[T]he issue is did [Defendant] willfully participate in this
ongoing and massive scheme to defraud the United States
Department of Transportation's DBE program, to defraud
PennDOT, to defraud SEPTA, to defraud the various
general contractors and suppliers. . . . Did he proceed in
good faith, or did he know there was a fraud here and
participate in it, willfully and knowingly.

(Tr. 3132-33.) The Prosecutor then addressed the evidence presented at trial and the

asserted defense that Defendant was excluded from the "inner circle" of upper-

management at SPI:

This scheme was not invented by [Defendant]. We don't
claim he invented the scheme. . . . [T]his scheme was
invented as far as [SPI] is concerned by Gordon Nagle,
[Defendant's] father, and Ernie Fink. That's who invented
the scheme, but that doesn't mean [Defendant] didn't
willfully join it when he came back as president in 2004,
because he knew what was going on.

---

[65] Following the Prosecutor's summation, defense counsel made the following objections:

At the very beginning[, the Prosecutor] wanted to thank the agents for their
dedication and professionalism. We believe in essence [he] was vouching for
the agents' credibility, which as the court knows is going to be attacked by us
and I think it was improper for him to vouch for their credibility. He also said
that the evidence that's been presented in the courtroom is just the tip of the
iceberg, suggesting that there's evidence that the jury should consider that it
hasn't even been shown, and we believe that was improper.

(Tr., Sidebar, Apr. 4, 2012, 2.)

(Tr. 3134-35.)

The Prosecutor highlighted the significance of certain pieces of evidence throughout his closing argument. Relevant to the motion *sub judice*, the Prosecutor emphasized Government Exhibit 65.4, an email from Defendant to several upper-level SPI management personnel, which was admitted without objection, as follows:

> It was [Defendant] . . . that says, "could you please talk to John, the outside consultant on IT, about the feasibility of separate domain names for CDS engineers and Marikina to e-mail. Much cleaner and less chance of problems with the outside world if they are separate but still have the same access as spibeams. I don't like CDS and Marikina using spibeams' email."

(Tr. 3175-76.) The Prosecutor then argued the significance of this email while discrediting Defendant's explanation that the email related to insurance concerns:

> Another smoking gun. Less problems with the outside world. Why is he concerned with the outside world if this is a legitimate, legitimate operation? I mean, are they committing insurance fraud? Because we know that CDS is actually doing the erections. They're not paying the premium that they're due. The higher rate for rigging insurance. Is it, maybe that's another reason that they don't want to trace it back because there's an insurance fraud on top of the DBE fraud.

(Tr. 3176.)[66]

---

[66] Following the Prosecution's summation, defense counsel made the following objections:

[The Prosecution] suggested that [Defendant] committed insurance fraud in some way. There certainly was no 404(b) disclosure on insurance fraud, [Defendant]'s not on trial for insurance fraud, and it was [an] improper argument to suggest that he committed some other crime.

(continued...)

79

Directly following the Prosecution's summation and upon consideration of defense counsel's objections, the court gave the following curative instruction:

> Before [defense counsel] starts, there was reference in the government's closing argument to you of thanks for the agents and their professionalism. You will be instructed by me that you are not to give any greater or lesser credibility to any law enforcement officer than you would any other witness in the case.

> There was a reference made that the evidence in this case is just the tip of the iceberg. The government is bound by the evidence that they have . . . presented in this court, and you are to consider only that evidence. With regard to a reference that [Defendant] may be involved in insurance fraud, he's not charged with that and you are not to give that any consideration whatsoever.

(Tr., Sidebar, Apr. 4, 2012, 5-6.)

Also relevant to the Defendant's allegation of prosecutorial misconduct are statements made by the Prosecutor during his closing rebuttal. (*See* Doc. 221, Tr., Gov. Rebuttal, Apr. 4, 2012, pp. 9, 14-15 (hereinafter "Tr., Rebuttal, Apr. 4, 2012, _____").) Specifically, in response to defense counsel's attack on the thoroughness of the agent's investigation, the Prosecutor stated:

> I take very great exception to the attacks [defense counsel has] made on the government agents in this case. He did it when Agent Marakovit[s] was on the stand. He questioned his integrity by saying that he manufactured evidence in this case because he was looking for a promotion and that he saw this case as the biggest DBE fraud in the history of the United States, so therefore he was going to manufacture evidence, create statements for witnesses of things they didn't say.

---

(...continued)
(Tr., Sidebar, Apr. 4, 2012, 2.)

> You heard Marakovit[s] testify. You've seen him during the course of the last four weeks in this trial. You make your own decisions on that. It's very convenient for defense counsel to come up here and attack the integrity of government agents, but it's not up to him to make those types of determinations. You make those determinations.

(Tr., Rebuttal, Apr. 4, 2012, 9.)

Lastly, in response to the portion of defense counsel's argument pertaining to the definition of "proceeds" under the money laundering statute, the Prosecutor stated:

> We talked about the money laundering count and there was no evidence of profits here. We'll look at the . . . documents in the job file. One of those documents in FDP form that you heard about. It shows the profit margin on each one of those jobs where there was a check involved. I'm not going to go through them now and I'm not going to detail it [f]or you, but it's in there. He also gave a mischaracterization of what profits mean. He said something about deducting expenses with net profits. The judge's charge is going to say proceeds equals profits, period.

> The government's position here is that it was all profit. They weren't entitled to any of that money, because it was an entire fraud from the beginning. When they were acknowledging those Marikina contracts going into ECMS, Marikina shouldn't have gotten any of those contracts. None of that money that flowed through Marikina that ended up [with SPI], in [SPI]'s [coffers] should have been there. It was an entirely fraudulent operation.

(Tr., Rebuttal, Apr. 4, 2012, 14-15.)[67]  Following the Government's rebuttal, the court presented a comprehensive charge to the jury.

### 4. <u>Jury Charge</u>

In his motion, Defendant contends that the court's instruction related to willful blindness was unwarranted and flawed, arguing that "there was no evidence from which a juror could find that [Defendant] took 'deliberate actions to avoid confirming a crime'" (Doc. 222, p. 96 of 119), and that giving such an instruction "created confusion" (*Id*. at p. 94 of 119) and allowed the jury to convict Defendant on an improper basis (*Id*.).

Initially, the court must emphasize the contested issue in this matter, namely whether Defendant knowingly, willfully, and intentionally participated in the conspiracy.  The court gave the following fairly standard instruction to the jury regarding the Government's burden of proving Defendant's involvement in the conspiracy:

> If you find that a criminal agreement or conspiracy existed, then in order to find Joseph Nagle guilty of conspiracy you must also find that the government proved beyond a reasonable doubt that Joseph Nagle knowingly, willfully and intentionally joined that agreement or conspiracy during its existence.  The government must prove that Joseph Nagle knew the goals or objectives of the agreement or conspiracy and voluntarily joined it during its existence, intending to achieve the common goals or objectives and to work together with the other alleged conspirators toward those goals or objectives.

---

[67]  In the instant motion, Defendant argues that the statement "proceeds equals profits" is a mischaracterization of the definition of "proceeds" as that term is used in the applicable money laundering statute.  (*See infra* Part II.B.3.d.)

The government need not prove that Joseph Nagle knew everything about the conspiracy or that he knew everyone involved in it, or that he was a member from the beginning. The government also does not have to prove that Joseph Nagle played a major or substantial role in the conspiracy.

You may consider both direct evidence and circumstantial evidence in deciding whether Joseph Nagle joined the conspiracy, knew of its criminal objectives, and intended to further the objectives. Evidence which shows that Joseph Nagle only knew about the conspiracy, or only kept "bad company" by associating with members of the conspiracy, or was only present when it was discussed or when a crime was committed, is not sufficient to prove that Joseph Nagle was a member of the conspiracy even if Joseph Nagle approved of what was happening or did not object to it. Likewise, evidence showing that Joseph Nagle may have done something that happened to help a conspiracy does not necessarily prove that he joined the conspiracy. You may, however, consider this evidence, with all the other evidence, in deciding whether the government proved beyond a reasonable doubt that Joseph Nagle joined the conspiracy.

(Jury Instructions, pp. 37-38 of 77, "Conspiracy- Membership in the Agreement.")

Specifically with regard to the mental state needed for a conviction, the court instructed the jury as follows:

In order to find Joseph Nagle guilty of conspiracy you must find that the government proved beyond a reasonable doubt that Joseph Nagle willfully joined the conspiracy knowing of its objectives and intending to help further or achieve those objectives. That is, the government must prove: (1) that Joseph Nagle knew of the objectives or goals of the conspiracy; (2) that Joseph Nagle willfully joined the conspiracy intending to help further or achieve those goals or objectives; and (3) that Joseph Nagle

and at least one other alleged conspirator shared a unity of purpose toward those objectives or goals.

You may consider both direct evidence and circumstantial evidence, including Joseph Nagle's words or conduct and other facts and circumstances, in deciding whether Joseph Nagle had the required knowledge and intent. For example, evidence that Joseph Nagle derived some benefit from the conspiracy or had some stake in the achievement of the conspiracy's objectives might tend to show that Joseph Nagle had the required intent or purpose that the conspiracy's objectives be achieved.

(Jury Instructions, p. 39 of 77, "Conspiracy - Mental State.")

The court gave the following fairly standard instruction to the jury regarding willful blindness:

To find Joseph Nagle guilty of mail fraud and wire fraud, you must find that the government proved beyond a reasonable doubt that Joseph Nagle knew that the relationship between Schuylkill Products, CDS, and Marikina was fraudulent in nature with respect to DBE requirements. To prove the unlawful monetary transaction counts, the government must prove beyond a reasonable doubt that the defendant knew that the monetary transactions represented the proceeds of criminally derived property. In this case, there is a question whether Joseph Nagle knew that the relationship between Schuylkill Products, CDS, and Marikina was fraudulent in nature with respect to DBE requirements and whether he knew that the monetary transactions represented the proceeds of criminally derived property. When, as in this case, knowledge of a particular fact or circumstance is an essential part of the offense charged, the government may prove that Joseph Nagle knew of that fact or circumstance if the evidence proves beyond a reasonable doubt that Joseph Nagle deliberately closed his eyes to what would otherwise have been obvious to him. No one can avoid

84

responsibility for a crime by deliberately ignoring what is obvious.

Thus, you may find that Joseph Nagle knew that the relationship between Schuylkill Products, CDS, and Marikina was fraudulent in nature with respect to DBE requirements and knew that the monetary transactions represented the proceeds of criminally derived property based on evidence which proves that: (1) Joseph Nagle himself subjectively believed that there was a high probability that this circumstance existed; and (2) Joseph Nagle consciously took deliberate actions to avoid learning about the existence of this circumstance. You may not find that Joseph Nagle knew that the relationship between Schuylkill Products, CDS, and Marikina was fraudulent in nature with respect to DBE requirements and knew that the monetary transactions represented the proceeds of criminally derived property if you find that the defendant actually believed that this circumstance did not exist. Also, you may not find that Joseph Nagle knew that the relationship between Schuylkill Products, CDS, and Marikina was fraudulent in nature with respect to DBE requirements and knew that the monetary transactions represented the proceeds of criminally derived property if you find only that Joseph Nagle consciously disregarded a risk that the circumstance existed, or that Joseph Nagle should have known that the circumstance existed, or that a reasonable person would have known of a high probability that the circumstance existed. It is not enough that Joseph Nagle may have been reckless or stupid or foolish, or may have acted out of inadvertence or accident. You must find that Joseph Nagle himself subjectively believed there was a high probability of the existence of the relationship between Schuylkill Products, CDS, and Marikina was fraudulent in nature with respect to DBE requirements and knew that the monetary transactions represented the proceeds of criminally derived property, consciously took deliberate actions to avoid learning about it, and did not actually believe that it did not exist.

(Jury Instructions, pp. 68-70 of 77, "Willful Blindness.") The willful blindness instruction was directly followed by an instruction on Defendant's asserted good faith defense:

> The offenses charged in the indictment require proof that Joseph Nagle acted knowingly, willfully, and/or with the intent to defraud. If you find that Joseph Nagle acted in good faith, that would be a complete defense to this charge, because good faith on the part of Joseph Nagle would be inconsistent with his acting knowingly, willfully, and/or with the intent to defraud.
>
> A person acts in "good faith" when he or she has an honestly held belief, opinion, or understanding that acts were not unlawful, even though the belief, opinion, or understanding turns out to be inaccurate or incorrect. Thus, in this case, if Joseph Nagle made an honest mistake or had an honest misunderstanding about Marikina Corporation being a "front" company, where funds were passed to CDS and SPI in order to obtain the appearance of DBE participation, then he did not act with the requisite intent to defraud.
>
> Joseph Nagle did not act in good faith, however, if, even though he honestly held a certain opinion or belief or understanding, he also knowingly made false statements, representations, or promises to others.
>
> Joseph Nagle does not have the burden of proving "good faith." Good faith is a defense because it is inconsistent with the requirement of the offenses charged, that Joseph Nagle acted intentionally, knowingly and/or willfully. As I have told you, it is the government's burden to prove beyond a reasonable doubt each element of the offense, including the mental state element. In deciding whether the government proved that Joseph Nagle acted intentionally, knowingly and/or willfully, or, instead, whether Joseph Nagle acted in good faith, you should consider all of the evidence presented in the case that may

bear on Joseph Nagle's state of mind. If you find from the evidence that Joseph Nagle acted in good faith, as I have defined it, or if you find for any other reason that the government has not proved beyond a reasonable doubt that Joseph Nagle acted intentionally, knowingly and/or willfully, you must find Joseph Nagle not guilty of the offense of mail fraud, wire fraud and/or money laundering.

(Jury Instructions, pp. 71-72 of 77, "Good Faith Defense.")

## 5. <u>Verdict</u>

Following these proceedings and after less than two days of deliberation, the jury convicted Defendant of almost all charges levied against him.[68] Notably, the jury returned guilty verdict on the conspiracy charge at Count One, which convicted Defendant on the basis of the jury's finding that:

> [B]etween approximately April 2004 to approximately March 2008, [Defendant] conspired with one or more other individuals, including Ernest G. Fink, Dennis F. Campbell, Timothy G. Hubler, Romero Cruz, and others unknown, to defraud the United States Department of Transportation and commit wire fraud and mail fraud in connection with the U.S. Department of Transportation's DBE Program for the purpose of unjustly enriching themselves.

(Doc. 197, Count I.) Defendant was also convicted of the conspiracy charge at Count Nineteen, which convicted Defendant on the basis of the jury's finding that:

> [F]rom approximately April 2004 until approximately March 2008, [Defendant] conspired with one or more other individuals, including Ernest G. Fink, Dennis F. Campbell,

---

[68] Defendant was acquitted on the following counts: Count 5, which concerned alleged wire fraud related to a wire transmission on July 25, 2005, pertaining to SPI job number 5051130; Count 6, which concerned alleged wire fraud related to a wire transmission on June 13, 2005, pertaining to SPI job number 5042740; Count 7, which concerned alleged wire fraud related to a wire transmission on August 22, 2006, pertaining to SPI job number 5060480; and Count 10, which concerned alleged wire fraud related to a wire transmission on March 1, 2005, pertaining to SPI job number 5032380. (Doc. 197.)

> Timothy G. Hubler, Romero Cruz, and others unknown, to
> commit the offense of making unlawful monetary
> transactions by willfully causing the deposit of criminally
> derived property in excess of $10,000 into SPI's bank
> accounts at M&T Bank.

(Doc. 197, Count XIX.)  Defendant was also convicted of seven counts of wire fraud, six counts of mail fraud, and eleven counts of unlawful monetary transactions.  (*See id.*)

### C.    Post-Trial Proceedings

After Defendant's conviction on April 5, 2012, the court issued a scheduling order for the filing of post-trial motions.  (Docs. 199 & 200.)  On April 18, 2012, Defendant filed a motion of acquittal notwithstanding the verdict (Doc. 198), followed by a timely brief in support on August 22, 2012 (Doc. 222). Defendant's post-trial motion requested that the court grant judgment of acquittal due to the Government's failure to present sufficient evidence to establish the requisite mental state to support a conviction, or in the alternative, that the court grant a new trial because the verdict was against the weight of the evidence.  (*See generally id.*)  Defendant also requested a new trial on the basis that: (1) the Government failed to disclose *Brady* material related to Pishock requesting additional assurances of immunity and Campbell admitting to burning documents (*see id.* at pp. 52-69 of 119); (2) the Prosecutor made improper and prejudicial closing arguments to the jury in the form of improperly vouching for the credibility of witnesses (*Id.* at pp. 79-84 of 119), implying the existence of substantial inculpatory evidence outside the record (*Id.* at pp. 84-87 of 119), suggesting that Defendant committed uncharged crimes (*Id.* at pp. 87-88 of 119), and misleading the jury on the definition of "proceeds" (*Id.* at pp. 88-90 of 119); (3) the court gave an

erroneous instruction on willful blindness (*Id.* at pp. 94-98 of 119); (4) the court erred in excluding the testimony of defense investigator Barnacle (*Id.* at pp. 101-03 of 119); (5) the court erred by denying Defendant's pre-trial motion to suppress (*Id.* at pp. 103-07 of 119); and (6) Defendant is entitled to judgment of acquittal on the money laundering charges as a matter of law or in the alternative, that there was insufficient evidence to support such convictions (*Id.* at pp. 108-17 of 119). The Government filed a timely response to Defendant's motion on October 19, 2012. (Doc. 226.) In its response, the Government informed the court that, "Government counsel was recently informed by S.A. Marakovits that Carol Campbell was interviewed by the [G]overnment on February 5, 2009," and attached a copy of the interview report. (*Id.* at p. 15 n. 3 of 134.) The Government asserted that the failure to produce the report was inadvertent, but that "it did not contain *Brady* information or constitute *Jencks* Act material and was not required to be disclosed." (*Id.*)

On November 8, 2012, Defendant filed a reply to the Government's response. (Doc. 232.) Rather than addressing the Government's responses to the grounds raised in the motion, Defendant's reply argued that the Government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), concerning the untimely disclosure of the witness interview report of Carol Campbell. (*See generally* Doc. 232.) Pursuant to Rule 7.7 of the Local Rules of the United States District Court for the Middle District of Pennsylvania, the court ordered the Government to submit a sur-reply addressing the arguments raised in Defendant's reply. (Doc. 234.) The Government submitted its sur-reply on December 21, 2012. (Doc. 236.) On January 22, 2013, the court granted Defendant's unopposed motion for leave to file a supplemental post-trial memorandum (Doc. 239), which raised

another allegation that the Government violated its *Brady* obligations related to an FBI informant, Bob Green (*Id.*). The Government filed a response in opposition to Defendant's supplemental post-trial memorandum, in which it conceded that the Green documents were inadvertently not disclosed, but argued that the Green documents were not *Brady* material. (Doc. 242.)

On January 23, 2013, the court scheduled a hearing on Defendant's motion,[69] and outlined the issues to be addressed as follows:

> During the hearing, Defendant may present evidence regarding the alleged *Brady* material related to Carol Campbell and Bob Green.

(Doc. 241.) The court scheduled the hearing for February 7, 2013, at defense counsel's request. (*See id.*) On February 4, 2013, Defendant filed a motion to continue the February 7, 2013 hearing on the basis of Carol Campbell's unavailability. (Doc. 243.) The Government opposed the motion to continue, arguing that defense counsel first subpoenaed Carol Campbell on February 4, 2013, which was only three days before the hearing and nearly two weeks after the hearing date was set. (Doc. 244.)

---

[69] The evidentiary hearing was requested as alternative relief in Defendant's reply brief in support of his post-trial motions. The scope of the requested hearing was set forth as follows:

> At such a hearing, the Court would learn when the Carol Campbell 302 [report] was loaded into ACS; what steps agent Marakovits, as the drafting agent, took to ensure the original was not just uploaded, but placed in the physical file; whether Agent Marakovits and Agent Rodeschin preserved their rough notes as required by FBI policy and the law of the Third Circuit; whether any drafts of the 302 were maintained; based on the ACS user activity, who accessed the Carol Campbell 302 after it was loaded and when, why was the 302 not disclosed sooner; and whether there is other evidence of assurances made to Carol Campbell and/or Dennis Campbell. The defense asked the government to answer many of these questions, and the government refused.

(Doc. 232, p. 32-33 n. 7 of 36.)

### 1. **Declaration of Carol Campbell**

In lieu of continuing the hearing, the Government suggested the court accept the affidavit of Carol Campbell, which was submitted pursuant to 28 U.S.C. § 1746. (Doc. 244-1.) The affidavit stated, in pertinent part, as follows:

3. I was interviewed by the FBI on February 5, 2009 regarding a DBE fraud investigation it was conducting of SPI and Marikina.

4. There was no immunity or other type of agreement between me and the government concerning my interview. No promises were made to me by the government in connection with my interview.

5. I agreed to be interviewed without any type of agreement because I believed I didn't do anything wrong. I still don't believe I did anything wrong.

6. During the FBI interview, I was not asked whether I suggested that [Campbell] and Tim Hubler say that Gordon Nagle knew about the money my husband was receiving from Romeo Cruz.

7. As I stated in my interview report, I believed that Gordon Nagle knew about the money [Campbell] was receiving from Cruz based on what [Campbell] told me. I never suggested that [Campbell] and Tim Hubler lie about it.

(Doc. 244-1, ¶¶ 3-7.) Upon consideration of Carol Campbell's signed affidavit and it appearing that the other witnesses from whom Defendant sought to obtain testimony were available for the February 7, 2013 hearing, the court concluded that the affidavit adequately addressed the subject matter that Defendant sought to elicit from Carol Campbell, and denied Defendant's motion to continue. (Doc. 246.)

## 2. **Brady Hearings**

The hearing on Defendant's post-trial motion was held on February 7, 2013. Only Agent Marakovits was called to testify. Agent Marakovits's testimony, which the court found entirely credible, was consistent with his testimony at trial. Specifically, Agent Marakovits described his interactions with Bob Green at the preliminary stages of the investigation of SPI. (*See* Doc. 250, Transcript, Brady Hearing, Feb. 7, 2013, pp. 5-7 (hereinafter "Tr., Feb. 7, 2013, ____").) Relevant to the issues raised by Defendant, the court notes that Agent Marakovits's testimony at trial, namely that Green was only compensated in the amount of $5,000.00 for his participation as a confidential informant, was inaccurate. At the Brady hearing, Agent Marakovits testified that Green was paid $300.00 in 2006, which was in addition to the $5,000.00 Green was paid in 2007. (Tr., Feb. 7, 2013, 8-9.) Marakovits explained that he only discovered this inaccuracy when he checked the paper FBI file, rather than the electronic system, which was prompted by Defendant's post-trial questions related to Green. (Tr., Feb. 7, 2013, 9-13.)[70] The court found that Agent Marakovits's inaccurate trial testimony regarding Bob Green was made inadvertently.

Additionally, at the February 7, 2013 hearing, Agent Marakovits corrected representations made at trial that Carol Campbell was not interviewed in the course of the investigation. (Tr., Feb. 7, 2013, 23.) Specifically, Agent Marakovits testified that Carol Campbell was interviewed on February 5, 2009, at

---

[70] Marakovits explained that, following the FBI's switch to using the "Delta System," it had used the Automated Case System ("ACS") to keep track of reporting. (Tr., Feb. 7, 2013, 21.) According to Marakovits's testimony, older files were not converted to files in the Delta System. (Tr., Feb. 7, 2013, 13.)

which time he took handwritten notes.  (Tr., Feb. 7, 2013, 20, 25-27.)  Marakovits explained that he dictated his notes, *i.e.,* typed the handwritten notes into the computer system, on February 11, 2009 (Tr., Feb. 7, 2013, 29), and that there had been no edits between dictation and transcription, *i.e.,* when the notes were converted to an official form, which occurred on November 17, 2009 (Tr., Feb. 7, 2013, 30-32).  On cross-examination, Agent Marakovits unequivocally confirmed that the official report was an accurate reflection of his notes, and testified as follows:

> Q:    Was every concept and issue that was listed in the
>        notes ultimately discussed in the 302?
>
> A:    To the best of my knowledge, yes.

(Tr., Feb. 7, 2013, 45.)

Agent Marakovits testified that the inaccurate representation at trial, namely that Carol Campbell had not been interviewed, was similarly inadvertent.  (Tr., Feb. 7, 2013, 22.)  Agent Marakovits testified that, throughout the course of the investigation, he met with nearly every employee at SPI, some by way of a formal interview that resulted in official reports and others in a less-formal meeting of which no report was created.  (*See* Tr., Feb. 7, 2013, 48.)  Agent Marakovits did not consider Carol Campbell's testimony important, because she was a "lower-level employee."  (Tr., Feb. 7, 2013, 22.)  The court found that Agent Marakovits's inaccurate trial testimony regarding Carol Campbell was made inadvertently.

At the close of the evidentiary portion of the hearing and preceding oral argument, defense counsel renewed his request to continue the Brady hearing as to allow Carol Campbell to testify.  (Tr., Feb. 7, 2013, 74.)  The court granted the request to continue, and reopened the record to receive evidence from Carol Campbell regarding the alleged *Brady* material.  (Doc. 249.)

The continued hearing was held on March 28, 2013. Only Carol Campbell was called to testify. Carol Campbell's testimony, which the court found entirely credible, was wholly consistent with her affidavit. (Doc. 244-1.) Carol Campbell corroborated Agent Marakovits's hearing testimony and unequivocally stated that the sole occasion on which she was interviewed by the Government in connection with the investigation of SPI was on February 5, 2009. (Doc. 255, Transcript, Brady Hearing, March 28, 2013, pp. 11, 13-14 ("2009 was my first and only interview with [the Government related to this case]") (hereinafter Tr., Mar. 28, 2013, _____").) Carol Campbell testified that, during the interview, she did not ask the agents whether she could be prosecuted, did not inquire into whether her cooperation would benefit her husband, Campbell, and did not receive assurances of immunity. (Tr., Mar. 28, 2013, 20-22.) Relevant to the issues raised by Defendant, Carol Campbell testified that the interview report, which she had reviewed prior to the hearing, was accurate and appeared complete (Tr., Mar. 28, 2013, 28-29), and confirmed that she was not asked whether she suggested Campbell and Hubler say that Gordon knew about the Marikina kickbacks (Tr., Mar. 28, 2013, 35). The court found Carol Campbell entirely credible, and her testimony was consistent with that of Agent Marakovits as well as her declaration.

## II.      Discussion

Defendant challenges the jury's verdict on the basis of the sufficiency and weight of evidence presented at trial, and argues that his rights were jeopardized by errors or omissions during trial, as well as by several trial and pre-trial errors, which he contends undermines the confidence in the jury's verdict. The court will

address Defendant's arguments challenging the evidence presented at trial before addressing his other claims of error.

### A. <u>Judgment of Acquittal under Fed. R. Crim. P. 29</u>

Defendant's argument in support of his motion for judgment of acquittal based on the insufficiency of evidence is identical to his defense asserted at trial, *i.e.*, that the Government produced insufficient evidence to prove that Defendant knowingly participated in the conspiracy to defraud the DBE program. The overarching premise of the Government's case was that Marikina was a sham and Defendant knew as much. Defendant disputed this premise, contending that he had a good faith belief that Marikina was a legitimate company and that the relationship between Marikina and SPI/CDS was consistent with DBE regulations.

### 1. <u>Legal Standard</u>

The standard for granting a motion for judgment of acquittal based on insufficient evidence to sustain a conviction is quite stringent. *United States v. Soto*, 539 F.3d 191, 194 (3d Cir. 2008)*; United States v. Briscoe-Bey*, Crim. No. 03-cr-0018, 2004 WL 555405, *1 (D. Del. Mar. 19, 2004). The defendant bears a heavy burden of demonstrating that relief is appropriate, and the granting of relief under Rule 29 is "confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984) (citing *Burks v. United States*, 437 U.S. 1, 17 (1978)); *see also United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010) (citing *Soto*, 539 F.3d at 194) ("[A]n insufficiency of the evidence claim places a heavy burden on the [challenger] because [the court] will only find the evidence insufficient when the prosecution's failure is clear.").

The district court must view the evidence in the light most favorable to the prosecution to determine "whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006) (citing *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002)). If a challenge to a jury verdict is the sufficiency of the evidence produced at trial, the court "must be ever vigilant . . . not to usurp the role of the jury" by weighing the evidence or make making credibility determinations, or by substituting its judgment for that of the jury. *Mercado*, 610 F.3d at 845; *see also United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006). Relief is only appropriate "if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987) (quoting *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983)). Stated another way, the court must determine "whether a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all of the elements of the offenses." *United States v. Salmon*, 944 F.2d 1106, 1113 (3d Cir. 1991); *Coleman*, 811 F.2d at 807.

The above-mentioned standard of deference is especially important when reviewing a conviction of conspiracy, because a conspiracy, by its very nature, is a secretive operation, and it is unlikely that the co-conspirators will set forth the details of the conspiracy. *See United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005). To support a conspiracy conviction under 18 U.S.C. § 371, the Government must prove: (1) the existence of an agreement; (2) an overt act by one of the conspirators in furtherance of the objectives; and (3) an intent on the part of the

conspirators to agree, as well as to defraud the United States. *United States v. Park*, 505 F. App'x 186, 188 (3d Cir. 2012) (citing *United States v. Shoup*, 608 F.2d 950, 956 (3d Cir. 1979)). For the third element, "the [g]overnment must show that a conspirator has knowledge of the conspiracy's illicit purpose when he performs acts which further that illicit purpose." *Id.* at 188 (internal quotation marks omitted) (citing *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975)). "Knowledge and intent may be inferred from conduct that furthered the purpose of the conspiracy." *Id.* at 189; *United States v. McKee*, 506 F.3d 225, 241 (3d Cir. 2007) (citing *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943)). Nevertheless, it is well-settled that a conspirator need not be fully informed about all of his co-conspirators' specific criminal acts, provided that he agreed to participate in the broader criminal conspiracy and the acts evincing participation were not outside the scope of the illegal agreement. *See Salinas v. United States*, 522 U.S. 52, 63-64 (1997) ("A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." (internal citations omitted)). Indeed, the Government need not prove that the defendant knew of each and every criminal act by an insider in furtherance of the conspiracy, so long as it shows that the defendant willfully participated in and possessed knowledge of the general contours of the conspiracy. *See id.*

Regarding the type of evidence necessary to prove a conspiracy, the Third Circuit has held that direct evidence is not required and "a conspiratorial agreement can be proven circumstantially based upon reasonable inferences drawn

from actions and statements of the conspirators or from the circumstances surrounding the scheme." *McKee*, 596 F.3d at 238. While a conviction based on speculation and surmise alone cannot stand, the prosecution may sustain its burden "entirely through circumstantial evidence." *Bobb*, 471 F.3d at 494; *see also Smith*, 294 F.3d at 478 (finding that a reasonable jury could conclude that "at least a tacit agreement" existed between co-conspirators based on a variety of unusual acts performed by members of the alleged conspiracy); *Brodie*, 403 F.3d at 134 ("[T]he very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence."). "The existence of a conspiracy can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding." *Smith*, 294 F.3d at 477 (quotations and citations omitted).

A court reviewing the sufficiency of the evidence on a conspiracy charge must closely scrutinize the evidence, because "[s]light evidence of a defendant's connection with a conspiracy is insufficient to support a guilty verdict." *Brodie*, 403 F.3d at 134 (quoting *United States v. Samuels*, 741 F.2d 570, 575 (3d Cir. 1984)). "In conducting the sufficiency inquiry, [the court does] not view the government's evidence in isolation, but rather, in conjunction and as a whole." *Id.* at 134. "The court must determine 'whether all the pieces of evidence, taken together, make a strong enough case to let a jury find [the defendant] guilty beyond a reasonable doubt.'" *Coleman*, 811 F.2d at 807 (quoting *United States v. Allard*, 240 F.2d 840, 841 (3d Cir. 1957)).

### 2. **Application**

As stated, Defendant's challenge to the sufficiency of the evidence is a narrow one: he argues that his convictions must be vacated because the government failed to introduce sufficient evidence to establish that he knowingly and willfully participated in the conspiracy to defraud the United States in connection with its DBE program. One of the requisite elements the government must show in a conspiracy case is that the alleged conspirators "shared a 'unity of purpose,' the intent to achieve a common goal, and an agreement to work together toward the goal." *United States v. Wexler*, 838 F.2d 88, 90-91 (3d Cir. 1988) (citing *United States v. Kates*, 508 F.2d 308, 310-11 (3d Cir. 1975)). If the government proves actual knowing participation in the fraud, the prosecution, without more, has satisfied the knowledge component of the willfulness requirement. But carrying this burden requires negating a defendant's claim of ignorance or that he had a good-faith belief that he was not participating in fraud.

The court initially notes that it addressed Defendant's sufficiency challenge at the close of the Government's case, when it denied Defendant's oral Rule 29 motion. (*See* Doc. 184.) Considering the testimony of the witnesses, namely that of Campbell, Hubler, and Fink, Defendant's argument that the evidence was insufficient to warrant conviction merits no discussion, because each of the three co-conspirators either directly implicated Defendant's involvement with the scheme or clearly refuted the asserted defense that Defendant acted in good faith because he was excluded from the fraud. (*See supra*, Part I.B.2.c.) Nevertheless, the court will highlight certain pieces of evidence that sufficiently establish Defendant's guilt beyond a reasonable doubt.

There was abundant evidence establishing the existence of the large-scale conspiracy to defraud the United States in connection with its DBE program, to commit wire and mail fraud, and to launder money. In fact, Defendant conceded the existence of such fraud at trial and again in his brief in support of his post-trial motions. (*See, e.g.,* Doc. 222, p. 9 of 119.) At the very least, trial testimony from Campbell was sufficient to establish Defendant's participation in the fraud. (*See, e.g.,* Tr. 2360.) Although there was comparatively little direct evidence that Defendant had knowledge of the illicit purpose of the conspiracy, the jury was entitled to make a finding of knowledge, and therefore guilt, based on circumstantial evidence and credibility. Indeed, there was more than sufficient circumstantial evidence to connect Defendant with the conspiracy and to support a conclusion that Defendant knew of the fraud and either directly participated or purposefully took steps to avoid confirming the existence of such fraud.

The Government established that Defendant was a long-time employee of SPI and was admittedly "intimately familiar with and fully involved in all aspects of [SPI's] business." (Gov. 4.5; *see also* Tr. 2767-68, 2901.) Defendant held a variety of positions at SPI prior to becoming president, including positions in which he himself drafted correspondence on behalf of Marikina. (*See* Gov. 112.14B.) As president, Defendant was aware that the success of SPI was attributed, in part, to CDS and Marikina. (*See* Gov. 91.6; Gov. 55.1.) Moreover, Defendant regularly attended management meetings with other members of SPI's upper-management, during which Marikina-related business was discussed as a means to grow CDS's erection business. (*See* Tr. 2952-56; Gov. 79.1.)

Additionally, Defendant directed certain lower-level SPI employees to engage in work for Marikina and approved of the employees' Marikina work product to the extent certain employees were unsure as to how they should identify themselves. (Tr. 2992-93.) This work included submitting paperwork on behalf of Marikina to obtain DOT numbers for vehicles that Defendant knew Marikina leased from SPI at no cost (Tr. 1574-75, 2175, 2965, 2993-34), and updating SPI, CDS, and Marikina's ECMS passwords on a monthly basis (Tr. 1784). It was Defendant's suggestion that certain SPI employees have Marikina domain names because it was "much cleaner, and less chance of problems with the outside world, if they are separate but still have the same access as SPI beams." (Gov. 65.4; Tr. 2946, 2981.) Moreover, Defendant was included on numerous email chains during which Marikina business was specifically discussed. (*See, e.g.,* Gov. 96.4.) The evidence also established that Defendant regularly reviewed correspondence drafted by SPI employees on Marikina stationary concerning Marikina operations (*see, e.g.,* Gov. 71.4; Gov. 71.5B; Gov. 71.5C), and in which SPI employees misrepresented themselves as Marikina employees (*see, e.g.,* Gov. 71.9; Gov. 71.11). Defendant also knew that Marikina checks were being deposited directly into SPI's account, but advised that payments had to "flow through" Marikina. (Gov. 77.1.)

Resolving permissible inferences in the Government's favor, all this evidence, which, as the court noted, is not exhaustive of what was admitted at trial, is sufficient to prove that Defendant willfully and knowingly participated in the DBE fraud at SPI, and did not act in good faith. Accordingly, the court concludes that there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Defendant intended to participate in the conspiracy to defraud the United States. The

court will therefore sustain the verdict and deny Defendant's motion for judgment of acquittal.

**B.     Motion for a New Trial under Fed. R. Crim. P. 33**

Rule 33 of the Federal Rules of Criminal Procedure provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Although the rule does not define "interests of justice," the term has been interpreted to permit a new trial in a variety of situations in which the "substantial rights of the defendant have been jeopardized by errors or omissions during trial." *See United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989); *see also United States v. Neff*, 343 F. Supp. 978, 980-81 (E.D. Pa. 1972).

The defendant bears a heavy burden to demonstrate a new trial ought to be granted because the law presumes the verdict against him to be valid. *See United States v. Mote*, Crim. No. 3:11-cr-0194, 2013 WL 1899811, *1 (M.D. Pa. May 7, 2013) (citing *United States v. McCourty*, 562 F.3d 458, 475-76 (2d Cir. 2009)). A new trial should only be granted sparingly and in exceptional situations. *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)); *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003). Exceptional situations include those in which trial errors, "either individually or in combination, 'so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" *United States v. Thornton*, 1 F. 3d 149, 156 (3d Cir. 1993); *United States v. Amirnazmi*, 648 F. Supp. 2d 718, 719-20 (E.D. Pa. 2009). Exceptional situations also include those in which the jury verdict is so against the weight of the evidence that the court "believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has

been convicted." *United States v. Davis*, 397 F.3d 173, 181 (3d Cir. 2005) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). Thus, a new trial is only warranted if (1) after weighing the evidence, the court determines that there has been a miscarriage of justice, or (2) the court determines that trial errors had a substantial influence on the verdict. *United States v. Stewart*, 325 F. Supp. 2d 474, 485 (D. Del. 2004).

### 1. <u>Motion for New Trial Based on Weight of the Evidence</u>

A challenge to the weight of the evidence is properly asserted as a motion under Federal Rule of Criminal Procedure 33. *See* Fed. R. Crim. P. 33; *United States v. Davis*, No. 12-2242, 2013 WL 1800037, *2 (3d Cir. Apr. 30, 2013) (citing *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)).

### a. <u>Standard</u>

Unlike an insufficiency of the evidence claim, in which the court views the evidence in the light most favorable to the government, a challenge to the weight of the evidence permits the court to exercise its own judgment in assessing the government's case. *See Johnson*, 302 F.3d at 150 (citing *United States v. Lacey*, 219 F.3d 779, 783-84 (8th Cir. 2000)). Accordingly, in determining whether a new trial is warranted, the court may weigh the evidence and consider the credibility of witnesses. *See id.* However, the court may not set aside the jury's verdict merely because it reaches a different conclusion than the jury. *See United States v. Ntreh*, Crim. No. 02-cr-0007, 2003 WL 23517145, *1 (D.V.I. Nov. 24, 2003). Indeed, the court should only grant a new trial based on the weight of the evidence when, in the opinion of the trial court, the verdict is contrary to the great weight of the evidence, thus making a new trial necessary to prevent the conviction of an innocent person.

*See Davis*, 397 F.3d at 181.  The decision to grant a new trial on this basis rests within the sound discretion of the court.  *Brennan*, 326 F.3d at 189.

### b.  **Application**

Defendant's challenge to the weight of the evidence assumes the credibility of his own trial testimony.  Clearly, the jury did not believe Defendant's innocent explanations for his actions, nor was it required to.  *See United States v. Smith*, 789 F.2d 196, 207 (3d Cir. 1986) (citing *United States v. Ordones*, 469 F.2d 70, 71 (9th Cir. 1972) (stating that a jury need not believe defendant's story that he had no knowledge of the crime)).  Defendant must recognize that neither the jury, during its deliberations, nor the court, during its post-trial review, is required to accept his claim of innocence and credit his testimony.  To the contrary, the court found Defendant's testimony regarding his good faith belief that the relationship between SPI and Marikina was legal to be highly suspect, especially taken in conjunction with the testimony of other witnesses whom the court, and apparently the jury, found more credible.

Defendant utilizes several pages in his brief to support his argument that Campbell, Hubler, and Pishock are each unworthy of belief, and requests the court to discredit their testimony.  (Doc. 222, pp. 42-49 of 119.)  The court rejects this position.  While Pishock admitted that he received money from Cruz on three occasions and that he initially lied to the investigators during their investigation of SPI (Tr. 1634), the court nevertheless found Pishock's testimony credible.[71]

---

[71] The court notes that, at trial, Pishock admitted his concern that he may be exposed to prosecution for lying to the investigators.  (*See* Tr. 1689.)  However, Pishock also confirmed that he was testifying pursuant to an immunity agreement that provided he would not be prosecuted so long as he testified truthfully.  (Tr. 1633.)

Moreover, the court rejects Defendant's attempt to include Pishock in the kickback scheme with Cruz as akin to the involvement of Campbell and Hubler. (*See, e.g.,* Doc. 222, pp. 46-47 of 119.) The record supports that Pishock only received money from Cruz on three distinct occasions, a situation entirely distinguishable from the arrangement Cruz had with Campbell and Hubler. (*See* Tr. 1634-1636; *see also supra* text accompanying note 12.) The circumstances surrounding each of those occasions were collateral to the kickback scheme, inasmuch as Pishock testified that the first payment was premised on Pishock's expediting an order for Cruz (Tr. 1635), and the second two payments related to Pishock's assistance in helping Cruz negotiate a contract in which CDS was not involved (Tr. 1636). Accordingly, the court rejects Defendant's request, and credits the testimony of Pishock.

Furthermore, the court found credible the testimony of Campbell and Hubler. Despite admitting to being heavily involved in the DBE fraud at SPI, the testimony of Campbell and Hubler is nevertheless credible because it was corroborated by other witnesses, as well as documentary evidence presented at trial. Campbell and Hubler both testified that Defendant was involved in the DBE fraud, and refuted Defendant's good faith defense that he was excluded from the scheme. Their testimony was corroborated by, *inter alia*, documentary and testimonial evidence establishing that Defendant was on multiple email chains that concerned only Marikina (*see, e.g.,* Gov. 96.4), was present and participated at multiple meetings at which Marikina-specific business was discussed (*see* Tr. 2772; *see also, e.g.,* Gov. 65.5; Gov. 65.6; Gov. 80.1; Gov. 80.3), directed lower-level SPI employees to perform essential functions on behalf of Marikina (Tr. 1574-75, 1784, 2175), and knew profits from Marikina benefitted CDS and SPI (*see* Gov. 55.1; Tr.

3020-21).  Accordingly, notwithstanding their history of untruthfulness, the court credited Campbell and Hubler's testimony as it related to Defendant's knowing and willful participation in the conspiracy to defraud the United States in connection with the DBE fraud at SPI.

Moreover, the jury was justified in rejecting Defendant's self-serving testimony.  For example, Defendant denied knowing that SPI personnel used Marikina letterhead.  (*See* Tr. 2924-26.)  However, the evidence produced at trial established that Defendant knew SPI personnel were using Marikina letterhead.  (*See* Gov. 71.6; Gov. 71.7.)  Defendant was clearly aware that SPI personnel represented themselves as Marikina employees, to the extent Quandel requested clarification as to how she should identify her employer.  (*See, e.g.,* Gov. 71.9; Tr. 2985, 2990-91.) Defendant's explanation that he acted in good faith on Campbell's assurances of a mentor-protégé program (*see* Tr. 2880-81) was less than credible in light of Defendant's inability to present a credible alternative explanation for SPI/CDS employees grossly misrepresenting themselves, even if such a program did exist (Tr. 2985. *But see* Tr. 2299 (Campbell denied telling Defendant there was a mentor-protégé program)).

Furthermore, the court found disingenuous Defendant's position that, despite knowing of the various concealment activities, he, like many SPI employees, was entirely unaware fraud was being committed.  Many of the employees to whom Defendant compares himself were lower-level employees.  Defendant, of course, was the president of the company and was actively involved in the operations in that capacity.  Additionally, Defendant's testimony was not credible with respect to his purported nescience regarding how Marikina checks were deposited (Tr. 2878), in

106

light of correspondence in which Defendant suggested funds be directly deposited into SPI's accounts but ensuring they "flow[ed] through Marikina" (Gov. 77.1).

Lastly, the court must distinguish Defendant's lack of knowledge as to the existence of the kickback and high-low schemes from lack of knowledge as to the existence of DBE fraud. In both the high-low and kickback schemes, the participants kept their activities secret from all but those involved,[72] namely because they were stealing from SPI. Unlike the activities related to the DBE fraud, activities relating to either the kickback or high-low schemes were neither discussed at SPI management meetings nor used SPI personnel to facilitate their success. In short, Defendant's argument that his exclusion from the kickback and high-low schemes is evidence that he was excluded from the DBE fraud is unconvincing.

### c.    Conclusion as to Weight of the Evidence

After consideration of all the trial evidence, much – but not all – of which is summarized in this memorandum and involved evidence of Defendant's conduct in furtherance of the conspiracy, including direct evidence that implicated Defendant's knowing and willful participation, and after evaluating the witnesses' credibility, including that of Defendant, in light of their demeanor at trial, the rationality of their testimony, internal consistencies, and the manner in which their testimony corroborated other evidence, the court is persuaded that the weight of the evidence favors conviction and no miscarriage of justice occurred. Although several witnesses who directly implicated Defendant's knowing involvement were indicted co-conspirators who had a history of deception, their testimony was convincing and

---

[72] The court notes that Fink was also unaware of the kickback scheme, despite his admitted participation in the DBE fraud. (Tr. 2753.)

consistent to the extent that they each described Defendant's knowing participation in the conspiracy to the extent that Defendant: (1) suggested no-payment leases (Tr. 2175); (2) directed an SPI employee to obtain Marikina's DOT numbers (Tr. 1574); (3) actively participated in meetings focusing on Marikina (Tr. 2772); (4) knew that SPI employees misrepresented themselves as Marikina personnel (Tr. 2984-85; Gov. 71.5C); (5) affirmatively represented Hubler as a Marikina employee (Gov. 71.1A); (6) authored correspondence on behalf of Marikina (Gov. 112.14D); and (7) proofread Marikina correspondence to general contractors (Gov. 71.5C; Tr. 2961). All the witnesses' testimony was consistent in this regard.

In Part II.A, *supra*, the court found that there was sufficient evidence to support Defendant's conviction for participating in the conspiracy to defraud the United States. Likewise, the court finds that the weight of this same evidence also favors conviction and no miscarriage of justice occurred. Accordingly, Defendant's motion for a new trial based on the weight of the evidence will be denied.

## 2. Motion for New Trial Based on *Brady* Violations

Defendant next argues that he is entitled to a new trial due to the collective effect of multiple violations of the Government's disclosure obligations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), which Defendant contends undermined the confidence in his convictions. In support of his position, which has been the subject matter of the majority of Defendant's post-trial briefs, Defendant asserts a multitude of arguments, namely: (1) that the Government suppressed evidence that Pishock requested and received additional assurances related to his immunity from prosecution for accepting money from Cruz (Doc. 222, pp. 55-58 of 119); (2) that the Government suppressed evidence that Campbell admitted to

burning incriminating documents and provided a contradictory story of obstructing justice as compared to the account set forth by Hubler (*Id*. at pp. 59-64 of 119); (3) that the report from Carol Campbell's interview was not produced to Defendant (Doc. 232); and (4) that the Government suppressed a $300.00 payment request for Green and Agent Marakovits's rough notes of conversations between Green and the agent (Doc. 239-1). The Government denies that it committed any *Brady* violation, inasmuch as it contends the undisclosed information was not favorable, or in the alternative, did not prejudice Defendant. For the following reasons, the court concludes that the Government did not violate its *Brady* obligations.

### a.  Standard

In *Brady*, the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady*, 373 U.S. at 87. Favorable evidence may include both directly exculpatory evidence and impeachment evidence. *See United States v. Walker*, 657 F.3d 160, 184 (3d Cir. 2011) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)); *see also Brown v. Chaney*, 469 U.S. 1090, 1094 (1984) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). In *Giglio v. United States*, the Supreme Court set forth the standard applicable to nondisclosed evidence affecting the credibility of a witness:

> When the reliability of a given witness may well be
> determinative of guilt or innocence, nondisclosure of
> evidence affecting credibility falls within th[e] general rule
> [of *Brady*]. [The Court does] not, however, automatically
> require a new trial whenever a combing of the prosecutors'
> files after the trial has disclosed evidence possibly useful to
> the defense but not likely to have changed the verdict. A

109

> finding of materiality of the evidence is required under
> *Brady*. A new trial is required if the false testimony could
> in any reasonable likelihood have affected the judgment of
> the jury.

405 U.S. 150, 154 (1972) (quotations and citations omitted); *see also Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interests of the witness in testifying falsely that a defendant's life or liberty may depend.").

Under *Brady*, an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment. *Strickler v. Greene*, 527 U.S. 263, 288 (1999). The prosecution's *Brady* obligation extends beyond exculpatory evidence in its own files, and includes exculpatory evidence existing in the files of police agencies of the government bringing the prosecution. *See Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) ("[T]he individual prosecutor has "a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police."). However, nondisclosure will not support a *Brady* violation if the suppressed information is not favorable to the defendant and material to the proceedings. *See United States v. Charles*, Crim. No. 10-cr-0037, 2011 WL 2689353, *5 (D.V.I. July 11, 2011) (citing *Maynard v. Gov't of V.I.*, No. 09-2273, 2010 WL 3330193, *8 (3d Cir. Aug. 25, 2010) ("[N]on-disclosure alone is not sufficient to form the basis of a successful *Brady* challenge.").

On the issue of materiality, the Supreme Court has noted that "[s]uch evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"

*Strickler*, 527 U.S. at 280; *see also Walker*, 657 F.3d at 185 (citing *Kyles*, 514 U.S. at 434) ("The touchstone of materiality is a 'reasonable probability' of a different result."). Thus, the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. "Rather, the question is whether the 'favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435). In making such an assessment, the Third Circuit has recognized that "materiality requires consideration of the totality of the circumstances, including possible effects of non-disclosure on the defense's trial preparation." *United States v. Perdomo*, 929 F.2d 967, 971 (3d Cir. 1991).

Based on these principles, and as succinctly set forth by the Third Circuit, there are three prerequisites a defendant must show to establish a *Brady* violation: (1) the government withheld evidence, either willfully or inadvertently; (2) the withheld evidence was favorable, either because it was exculpatory or had impeachment value; and (3) the withheld evidence was material. *See Walker*, 657 F.3d at 185 (citing *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004)).

It must be emphasized that, despite the government's obligation to produce favorable evidence to the defense, it is well-settled that *Brady* does not create a constitutional right to discovery in a criminal case which requires the prosecution to establish an "open file policy." *Kyles*, 514 U.S. at 436-37. The Supreme Court has noted that the duty imposed upon the prosecution under *Brady* is a limited one. *See, e.g., Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is

no general constitutional right to discovery in a criminal case, and *Brady* did not create one."); *Kyles*, 514 U.S. at 436-37 ("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense."). As the Third Circuit has made clear, *Brady* and its progeny does not require the disclosure of information that is not exculpatory but might merely provide a groundwork for possible arguments or defenses. *See Rivera v. Pennsylvania*, 187 F. App'x 240, 247 (quoting *Agurs*, 427 U.S. at 109-10)) ("The mere possibility that an item of undisclosed information might have helped the defense . . . does not establish materiality in the constitutional sense."); *see also Charles*, 2011 WL 2689353 at *6 (citing *United States v. Aleman*, 548 F.3d 1158, 1164 (8th Cir. 2008) ("*Brady* does not cover evidence that would merely help a defendant prepare for trial but is otherwise immaterial to the issues of guilt or punishment." (citing *Agurs*, 427 U.S. at 112 n. 20))).

### b. **Application**

#### i. **Pishock's assurances**

Within his extensive *Brady* argument, Defendant first argues that the Government suppressed evidence that Pishock had requested and received, in addition to a written immunity agreement, undisclosed benefits in the form of an oral assurance that he would not be prosecuted, in exchange for his trial testimony. (*See* Doc. 222, pp. 55-58 of 119.) Defendant contends that this additional assurance, which was "discovered" during defense counsel's cross-examination of Pishock (*see generally* Tr. 1696), was material in two respects: first, as impeachment evidence tending to establish the extent to which Pishock was "beholden" to the Government and motivated to please the prosecutors with his testimony (Doc. 222, p. 57 of 119);

and second, as evidence tending to discredit the Government's investigation by "demonstrating the nature and extent of crimes it was willing to overlook to obtain" Pishock's testimony (*Id.*). In response, the Government argues that the testimony excerpted by Defendant as the basis for his claim is misleading, inasmuch as Pishock's testimony on redirect demonstrated that only a single immunity agreement existed. (Doc. 226, p. 82 of 134.) Additionally, the Government argues that, even if the court determines that Pishock received additional undisclosed assurances and that those additional assurances constituted *Brady* information subject to disclosure, no prejudice occurred. (*Id.* at p. 83 of 134.) The court agrees with the Government.

In terms of background, during the investigation into this matter, it was discovered that Pishock received money on three occasions from Cruz. (*See* Tr. 1634.) Although Defendant continuously termed these three payments "kickbacks," it was clear that Pishock was not a participant in the kickback scheme involving Cruz, Hubler, and Campbell. Although a possible basis for the prosecution of Pishock is not entirely clear, the Government and Pishock entered into an immunity agreement, which provided that information provided by Pishock would not be used against him in any federal prosecution within the Middle District of Pennsylvania related to either the DBE fraud or his receipt of the money, provided that Pishock provided complete and truthful information. (J.B. 54.4; Tr. 1711-12.)

At trial, the following portion of Pishock's testimony on cross-examination underlies Defendant's claim that Pishock received additional benefits:

> Q:  And you received a letter that was described as an immunity letter at [the] time [you met with the Prosecutor on April 16th, 2008], am I correct?
>
> A:  Yes.

Q: And you understood that if you had lied after getting that immunity letter, they could take that immunity away?

A: Yes.

Q: But you lied to them anyway, am I correct?

A: I don't remember. Yes. I mean, I don't remember [the] exact question or date that you are asking me about, but you're obviously getting to a point.

Q: Did anyone, after you lied to them and finally admitted it, we'll come to that in a minute, did anyone from the prosecution team say, Mr. Pishock, now that we realized you lied to us, your immunity is taken away and you're going to have to plead guilty to something?

A: No. I asked [the Prosecutor] about it, and he said he had no - - he was not going to take away my immunity agreement.

Q: Oh, *so after you were given immunity, you got another promise, a second immunity*; am I correct?

A: *Yes.*

Q: And you're still sitting here worried today that if the Government believes you're not telling the truth, you can get prosecuted for something, am I correct?

A: Yes, but I am telling the truth.

Q: But you're worried about that, am I correct?

A: I would be worried if I lied, yes.

(Tr. 1696-97 (emphasis supplied).) Although Pishock's testimony could be read to indicate his receipt of two immunity agreements, his testimony during redirect clarified and confirmed that only one immunity agreement existed, and that he did

not receive additional assurances of non-prosecution.  Specifically, Pishock's testimony on redirect was as follows:

> Q:     Is this a copy of your [written] immunity agreement?
>
> A:     Yes.
>
> *   *   *
>
> Q:     *Is that the only agreement that you have with the Government?*
>
> A:     *Yes.*
>
> Q:     *There's no other side promises, no other side assurances?*
>
> A:     *No, other than October 2010 when I asked if this was going to - - if I was going to be charged, and they said, no, we're not.*
>
> *   *   *
>
> Q:     In the statement where you made the admission about . . . getting the three checks from Mr. Cruz, that was covered by your agreement, is it not?
>
> A:     Yes.
>
> *   *   *
>
> Q:     So is it your understanding that the Government could or couldn't use your admissions about the payments against you?
>
> A:     They could not.

(Tr. 1711-12 (emphasis supplied).)  Thus, it is clear that, despite his testimony on cross-examination, which appeared to be the result of an arguably confusing and technical line of questioning, Pishock received only one immunity agreement, which covered the entirety of his testimony and his receipt of checks from Cruz.  The

Government could not suppress additional promises or assurances that did not exist. Accordingly, there was no suppression of *Brady* information.

Moreover, as the Government highlights in its response, defense counsel cross-examined Pishock on the issue and argued its significance in his summation, and thus there was no prejudice.[73]  Indeed, a common theme emphasized by defense counsel during trial was the inadequacy of the investigation.  Thus, it can hardly be said that the belated discovery of this information during trial prejudiced the defense.

In conclusion, the court finds that Pishock received only one promise of non-prosecution from the Government, which was appropriately produced before trial, and that the alleged second immunity agreement was, at most, an oral confirmation that the written immunity agreement was still in effect.  Thus, the Government did not suppress any *Brady* information.  Moreover, even if this reassurance qualified as a second promise that should have been produced, the court is persuaded that the information was adequately revealed through cross-examination of Pishock and argued in defense counsel's closing argument, and thus there was no prejudice.

---

[73] During a conference with the court outside the presence of the jury, defense counsel stated as follows:

> It may be technically under that immunity agreement although again that immunity agreement was for statements.  We provided evidence of a kickback to the Government.  They could have investigated further and prosecuted.  So there was a real fear by this witness that he was going to still be prosecuted whether or not he was giving those statements pursuant to that prior agreement.  And he asked for reassurance.

> That's something that is a powerful motivator for a witness.  Again, we brought it out.  *So I don't know that at this stage there's any harm from that one issue*.

(Tr. 1828 (emphasis supplied).)

### ii. **Dennis Campbell's admission to burning documents**

Defendant next argues that the Government suppressed *Brady* information in the form of Campbell's pre-trial admission to the Government that he had burned records with Hubler the day of the search, and that Campbell's version of events was inconsistent with the version Hubler gave to the Government with regard to the individuals present during the burning of documents[74] and whether Carol Campbell suggested that Campbell and Hubler tell the investigators that Gordon knew of the kickbacks.  (Doc. 222, p. 59-64 of 119.)  Defendant contends that Campbell's pre-trial admission to the Government of obstructing justice was material in several respects: first, as evidence tending to establish that Campbell's plea agreement was more favorable (*see id.* at p. 62 of 119); second, as evidence tending to prove that both Campbell and Hubler were willing to lie to protect their immediate family members (*see id.*); third, that the inconsistency between Hubler and Campbell's versions of the events challenges both cooperating witnesses' credibility (*see id.* at pp. 62-63 of 119); and fourth, as evidence tending to further discredit the Government's investigation by demonstrating the Government's failure to further investigate the contradictions between the statements of Campbell and Hubler (*see id.* at p. 63 of 119).  In response, the Government argues that Campbell's admission to burning the documents was not favorable to Defendant, inasmuch as he simply confirmed Hubler's testimony of his participation in the destruction of evidence.

---

[74]  At trial, Hubler testified that his wife was present in addition to him and Campbell (Tr. 2497-98), but could not recall whether his son was present (Tr. 2577 ([By Hubler]: "I don't know if [T.M. Hubler] was there at the time.  All I know, when we were standing out back, it was my wife, [Campbell] and me.")).  Campbell testified that T.M. Hubler was present for the burning of documents. (Tr. 2259.)

(*See* Doc. 226, p. 88 of 134.)  The Government further argues that, even if Campbell's admission was *Brady* information, there was no prejudice, because defense counsel cross-examined Campbell on the subject, and Campbell's participation in destroying the documents was used in both defense counsel's opening statement and summation.  The court agrees with the Government.

Initially, it must be noted that the basis for Defendant's challenge is not that the Government failed to disclose Campbell and Hubler's efforts to destroy evidence of their receipt of kickbacks, but rather that the Government failed to disclose that Campbell did not deny that he and Hubler destroyed records on the day of the search of SPI.  Indeed, the Government produced to the defense an FBI 302 report summarizing an interview of Hubler that took place on January 25, 2008.  That report provided as follows:

> HUBLER stated that on the day of the federal search warrant at his house and at SPI, CAMPBELL came over to his house.  HUBLER stated that CAMPBELL burned the invoices that CAMPBELL used to keep track of the fees that they received from the SEPTA EL project.  HUBLER stated that CAMPBELL burned the invoices in a round tire rim in HUBLER's backyard.

(Doc. 226, Ex. 14.)

On direct examination by the Government, Campbell's testimony was consistent with Hubler's account:

> Q:    What did you do [when you left SPI on the day of the search]?
>
> A:    I went to Tim Hubler's house.
>
> Q:    Did you bring anything with you?
>
> A:    I had some documents that were in my house that, as I was leaving to go out and go to Pishock's, then the

> office, and then [Hubler]'s, I took those out of my
> file. They were documents that were related to
> Marikina; some receipts, some files, and documents.
> And I just felt it was incriminating stuff to have in
> my house, and I just didn't want it there. I just
> grabbed it and put it in my car and left.

(Tr. 2239-2240.)

> Q:   What did you do with the documents?
>
> A:   I got them out of my car and took them up to, there
>      was like an old wheel or a barrel there, and I said,
>      hey, I don't want to have these things, I'm going to
>      burn them. So I burned them.

(Tr. 2260.) Thus, Campbell's trial testimony related to his actions was largely
consistent with the facts set forth in the FBI 302 report of Hubler's interview, which
was disclosed to Defendant prior to trial. To this extent, the court cannot find this
information favorable to Defendant, as it is neither exculpates Defendant nor
impeaches Campbell or Hubler. Moreover, even if Campbell's admission was
considered suppressed *Brady* information, the court is unable to conclude that
Defendant was prejudiced by the nondisclosure. Campbell admitted that he burned
the incriminating documents during his direct examination, and Defendant cross-
examined Campbell on the subject. Moreover, even before Campbell's admission at
trial, defense counsel assumed the truth of Hubler's account during her opening
statement, and the court cannot conclude the defense's trial preparation was in any
way impacted. *See, e.g., Perdomo*, 929 F.2d at 971. Accordingly, it can hardly be
said Defendant was prejudiced by the belated disclosure.

Defendant next focuses on an arguable inconsistency between
Campbell's trial testimony, which was presumably consistent with his pre-trial

admissions, and Hubler's 302 report. (*See* Doc. 222, pp. 62-63 of 119.) The basis for Defendant's argument is that, at trial, Campbell denied Hubler's claim that Carol Campbell suggested they tell the agents that Gordon knew of the kickbacks.[75] Hubler's 302 report provided as follows:

> HUBLER stated that on a different [date], but also after the search warrant, he was at CAMPBELL's house in the backyard. HUBLER stated that CAMPBELL told him that his wife, Carol CAMPBELL, came up with a great idea and that they all have to stick to it. HUBLER stated that the idea was to say that Gordon NAGLE knew that CAMPBELL and HUBLER were getting a percentage of the fixed fee for SPECTRA and MARIKINA.

(Doc. 226, Ex. 14.) At trial, Campbell unequivocally denied that Carol Campbell suggested that Campbell and Hubler tell the Government that Gordon knew of the kickbacks as follows:

> Q:   And then as far as whether or not your wife came up with the story to say Gordon knew about [the kickback fees], what was your answer?
>
> A:   I said, absolutely not.

(Tr. 2264.)

The court cannot conclude that this inconsistency was favorable to Defendant. Neither Campbell nor Hubler testified that Defendant knew about the kickback arrangement with Cruz. Indeed, both Campbell and Hubler testified that no

---

[75] Defendant's brief argues that "both in his pre-trial interview and during his trial testimony, Campbell denied Hubler's claim that, shortly after the search warrant was executed at Schuylkill Products, Carol Campbell devised a plan for blaming the DBE fraud scheme on Gordon Nagle by telling the government that Gordon approved of the kickbacks." (Doc. 222, p. 61 of 119.) Hubler's claim did not concern blaming the *DBE fraud* on Gordon Nagle; rather, the claim apparently concerned telling the investigators that Gordon approved the *kickbacks*. Although argued by the defense as significantly related, it was clear that there were three separate frauds occurring at SPI, each of which had a unique group of participants.

one, other than those directly involved, knew of the kickback scheme. (*See* Tr. 2519.) Moreover, the defense cross-examined Campbell about Hubler's claim that Carol Campbell had suggested that they claim Gordon knew about the kickbacks. (*See* Tr. 2407-08.) Thus, the inconsistency in the witnesses' accounts was exposed and highlighted to the jury. Accordingly, the court concludes that Campbell's pre-trial admissions consistent with Hubler's 302 interview report were not *Brady* information, and that, even if it was, Defendant was not prejudiced by its nondisclosure.

### iii. Report of Carol Campbell's interview

Defendant next argues that the Government suppressed *Brady* information in the form of a FBI 302 report of Carol Campbell's interview ("interview report"). (Doc. 222, p. 61 n. 13 of 119; Doc. 232.) Defendant contends that the interview report contained *Brady* material and that the Government's failure to disclose the report prejudiced the defense. (Doc. 232, pp. 13-25 of 36.) Defendant reasons that the interview report was favorable in several respects: first, the lack of incriminating evidence contained therein from "someone who would have and should have known [Defendant]'s supposed role in the conspiracy . . . is unquestionably favorable," considering that "Carol Campbell had every incentive to implicate [Defendant] in the fraudulent conspiracy perpetrated by [Campbell]" (*see id.* at p. 14 of 36); second, the Carol Campbell interview report shows that additional benefits were provided to Campbell in exchange for his trial testimony (*see id.* at p. 15 of 36); and third, the interview report could have been used to challenge both Campbell and Hubler's credibility as to whether Carol Campbell suggested that Campbell and Hubler claim that Gordon knew about the kickbacks (*see id.* at pp. 16-

17 of 36). In terms of prejudice as a result of the suppression, Defendant contends that the defense was denied the ability to make an informed decision about calling Carol Campbell as a witness (*see id.* at pp. 18-20 of 36); that the defense was denied the opportunity to demonstrate additional benefits Campbell received (*see id.* at pp. 20-22 of 36); and that the defense was denied the opportunity to examine Agent Marakovits on his violations of FBI procedures (*see id.* at pp. 22-24 of 36).

In response, the Government argues that the interview report was neither favorable nor material, inasmuch as the *lack* of incriminating information is not required to be disclosed as favorable to the defense under *Brady*. (Doc. 236, pp. 10-18 of 43.) The Government further argues that the interview report could neither be used to show additional benefits provided to Campbell, because no additional benefits were contained therein, nor challenge the credibility of Campbell or Hubler, because Hubler's statement was not mentioned in the report. (*Id.* at pp. 18-21 of 43.) Moreover, the Government argues that, even if Carol Campbell's admission was favorable and contained *Brady* information that should have been disclosed, there was no prejudice because the information was not material, as there is no reasonable probability that the jury would have reached a different result had Carol Campbell testified consistently with the report of her interview. (*See id.*) Lastly, the Government maintains that the interview report does not support Defendant's position that Agent Marakovits violated FBI procedures. (*Id.* at pp. 28-31 of 43.)

It must be noted that Carol Campbell's interview report was not disclosed to the defense prior to trial.[76] Nevertheless, a *Brady* violation requires, in

---

[76] Furthermore, the interview report's existence was not confirmed until after trial, despite the court asking the Government whether Carol Campbell was interviewed and a report created

(continued...)

addition to suppression, that the information be favorable and material. *See Maynard*, 392 F. App'x at 114. The court does not find the Carol Campbell report to be favorable under *Brady*.

The discovery of the undisclosed interview report, the existence of which was unconfirmed until after trial, prompted the court to hold a hearing on February 7, 2013, and March 28, 2013 ("Brady Hearings"). (*See supra* Part I.C.) At the February 7, 2013 Brady Hearing, Agent Marakovits testified that every concept and issue discussed during the Carol Campbell interview appeared in the report. (Tr., Hr'g, Feb. 7, 2013, 45.) The accuracy and completeness of the interview report

---

(...continued)
therefrom. Specifically, prompted by defense counsel's accusation that the Government was withholding Carol Campbell's interview report, the following exchange occurred:

| The Court: | Was there a meeting with Carol Campbell? |
| [AUSA]: | Frankly, I don't recall. There may very well have been a meeting. My best recollection is, she may have come in with [Campbell] to a meeting where – I don't know that we ever interviewed her individually, but we may have. But I don't remember it. |
| The Court: | Any of the agents interview Carol Campbell? |
| [Purcell]: | Your Honor, I do not recall meeting Carol Campbell for an interview. |
| [Marakovits]: | I mean, I don't recall specifically. The only thing is possibly as a trial prep session for the last trial if she came in with [Campbell]. That's all I know. |
| The Court: | Did you take any notes? |
| [Marakovits]: | No, I wouldn't have taken for trial prep sessions. |
| [Rodeschin]: | No, Your Honor, I never interviewed Carol Campbell. |

(Tr. 2257-58.) Although the court does not find, as Defendant suggests, that the interview report was suppressed in bad faith (Doc. 232, pp. 25-27 of 36), and concludes that the Government's misrepresentations regarding the occurrence of an interview and the existence of a report thereof were done innocently, it would be remiss not to point out the ease with which this issue could have been avoided.

was also confirmed by Carol Campbell during the March 28, 2013 Brady Hearing. (*See* Tr., Hr'g, Mar. 28, 2013, 29.) Although the court recognizes that neither Agent Marakovits (Tr., Hr'g, Feb. 7, 2013, 23) nor Carol Campbell (Tr., Hr'g, Mar. 28, 2013, 31) testified that they had an independent recollection of the February 5, 2009 interview, the court is satisfied that the interview report was complete and accurate.[77]

Carol Campbell's testimony at the hearing refuted each of Defendant's arguments. Specifically, Carol Campbell denied that she or Campbell had been promised additional benefits in exchange for her interview. (Tr., Hr'g, Mar. 28, 2013, 22.) In fact, Carol Campbell testified that she agreed to be interview simply because the Government interviewed nearly all of the lower-level employees at SPI. (Tr., Hr'g, Mar. 28, 2013, 22.) Because there is nothing in the record that demonstrates either Campbell or his wife were promised additional benefits in exchange for Carol Campbell's interview, the court rejects Defendant's argument that the interview report demonstrated additional benefits were granted to Campbell or his wife.

---

[77] Defendant requested the court compel the production of any rough notes of the investigation to confirm that the interview report was complete. However, Defendant has not pointed to any specific information omitted from the interview report. While the court understands the logical argument that he cannot do so because he had never been granted access to the rough notes, *Brady* does not entitle him to conduct a fishing expedition for possible exculpatory evidence. Despite Defendant's speculative allegation that the agents' rough notes may contain *Brady* information not appearing in the interview report, Defendant remains unable to direct the court's attention to a single piece of information that had been omitted from the report, let alone to an undisclosed item that would have been material and favorable to the defense, the improper withholding of which resulted in prejudice. Mere conjecture will not carry Defendant's burden. As such, his argument regarding *Brady* violations related to the belated disclosure of the Carol Campbell 302 report fails.

Moreover, the underlying premise upon which Defendant bases his contention that the interview report was favorable to Defendant is the lack of incriminating evidence contained in her interview report. (*See* Doc. 232, p. 14 of 36.) Such a premise assumes that Carol Campbell "would have and should have known" of Defendant's role in the conspiracy and, further assumes that Carol Campbell and Defendant were similarly situated at SPI in terms of their exposure to and involvement with the DBE fraud. (*See id.*) This was clearly not the case. Despite being the wife of Campbell, Carol Campbell was a "sales administrator" (Tr., Hr'g, Mar. 28, 2013, 4), while Defendant was the president and owner of SPI. Carol Campbell did not attend the meetings with upper-level management and was not copied on the majority of upper-management emails. (Tr., Hr'g, Mar. 28, 2013, 5.) Moreover, the court finds no evidentiary basis to support Defendant's assertion that Carol Campbell "admitted to participating in the Marikina conspiracy herself" (*see* Doc. 232, p. 14 of 36); rather, Carol Campbell did not think she did anything wrong because "it wasn't [her] company. . . . [and that she] just did what [she was] told to do." (Tr., Hr'g, Mar. 28, 2013, 20). Indeed, much of the incriminating evidence, in the form of testimony as well as documentary evidence, involved meetings with, and emails to, upper-level SPI management personnel, including those who controlled the company, namely Defendant and Fink. For these reasons, the court rejects the comparison between Carol Campbell and Defendant.

The purported similarities between Carol Campbell and Defendant forms the basis of Defendant's next argument, namely that the lack of incriminating evidence contained in the interview report is favorable. Statements by a knowledgeable witness that do not implicate a defendant may qualify as "negative"

exculpatory evidence that must be produced under *Brady*. *See United States v. Salerno*, Crim. No. 3:10-cr-0301, 2011 WL 6141017, *9 (M.D. Pa. Dec. 9, 2011) (citing *Jones v. Jago*, 575 F.2d 1164, 1168 (6th Cir. 2005) (ordering new trial based on *Brady* violation where prosecutor failed to disclose eyewitness' statement that made no reference to presence or participation of the defendant)); *see also United States v. Hernandez*, No. 88-5210, 1989 WL 150133, *3 (9th Cir. Dec. 6, 1989) ("[W]e reject the government's contention that negative exculpatory evidence may never be available under *Brady*."). Defendant appears to utilize the "negative exculpatory" argument, contending that, because Carol Campbell and Defendant were similarly situated, the lack of incriminating information regarding Defendant necessarily exculpates Defendant. However, as stated above, the court has rejected the foundation of Defendant's argument finding that he and Carol Campbell were not similarly situated. Thus, Defendant has not shown that Carol Campbell was a knowledgeable witness who "would have and should have known" of Defendant's role in the conspiracy. Accordingly, Defendant's negative exculpatory argument fails.

Having rejected the negative exculpatory argument, the applicable standard requires Defendant to produce material, favorable information. Defendant cannot satisfy this standard by producing information which is merely "not inculpatory."[78] Defendant has not pointed to any portion of Carol Campbell's

---

[78] Defendant has not cited any authority for his argument that the type of similarities between Carol Campbell and Defendant make the "negative exculpatory" evidence favorable. (*See* Doc. 232, p. 14 of 36; Doc. 256.) The Government cites *Jones v. Jago*, 575 F.2d 1164 (6th Cir. 1978), to demonstrate the type of case in which the absence of inculpatory information has been held favorable to the defendant. (Doc. 236.) The court agrees that *Jones* is factually distinguishable from the case herein. In *Jones*, the defendant was indicted for allegedly ordering a member of his organization to randomly

(continued...)

interview report that is exculpatory.  Accordingly, the court concludes that the lack of inculpatory evidence contained in Carol Campbell's interview report does not render the report favorable.  *See Marshall v. Hendricks*, 307 F.3d 36, 57 n. 12 (3d Cir. 2002) (citing *United States v. Marashi*, 913 F.2d 724, 733 (9th Cir. 1990), for the proposition that "where the undisclosed item in question does not have impeachment or exculpatory value, 'it is not *Brady* material'").  Defendant has failed to establish that the Government suppressed evidence favorable to the defense, and therefore, it is not *Brady* material.

Lastly, Defendant argues that the report of Carol Campbell's interview was favorable to the defense in terms of providing a foundation for attacking the credibility of Campbell and Hubler.  (Doc. 232, pp. 16-17 of 36.)  This argument arises from Hubler's statement from his pre-trial interview and trial testimony that, following the search of SPI, Carol Campbell "devised a plan for blaming the DBE scheme on Gordon Nagle by telling the Government that Gordon knew and approved of the kickbacks."  (*Id.*)  The report contained the following information pertinent to Defendant's claim:

---

(...continued)
shoot security guards and police officers. *Id*. at 1165-66. Specifically, the defendant was alleged to have given the shooter, a member in his organization, a shotgun to carry out the defendant's orders. *Id*. at 1166. At trial, the defendant denied ever giving such an instruction, denied furnishing the shotgun to the shooter, and denied participating in the crime. *Id*. The prosecution failed to disclose the shooter's pre-trial statement which detailed his own participation, but made no reference to the defendant or the defendant's participation. *Id*. at 1168. Rather, the undisclosed report refuted the government's theory, and the Sixth Circuit held that the lack of indication of the defendant's involvement was exculpatory. *Id.*

In contrast, Carol Campbell was not in a unique position where her account would implicate or exonerate Defendant. Indeed, Carol Campbell was neither present at the upper-management meetings nor a recipient on the majority of emails. The fact that she was the wife of a co-conspirator and knew that her husband received money from Cruz (although nothing in the record establishes that Carol Campbell knew the illicit nature of the money Campbell received from Cruz) does not place her in a better position than any other lower level employee to know about Defendant's involvement in the DBE fraud.

> [CAROL] CAMPBELL stated that she was aware that
> DENNIS CAMPBELL was getting a portion of the fixed
> fee paid to ROMEO CRUZ. [CAROL] CAMPBELL
> advised that she believed that GORDON NAGLE knew
> that DENNIS CAMPBELL was receiving money back
> from ROMEO CRUZ.

(Doc. 226-1, p. 6 of 95.)  The interview report was consistent with Carol Campbell's declaration, wherein she stated that she believed Gordon knew that Campbell was receiving money from Cruz.  (Doc. 244-1, ¶ 7.)  However, she was not asked during the February 5, 2009 interview whether she ever suggested that Campbell and Hubler tell the Government that Gordon knew of the kickbacks.  (Doc. 244-1, ¶ 6.)[79]

Thus, as reflected in the report itself, this question, which Defendant contends was favorable evidence to impeach Hubler, was not asked during the interview.[80]  The Government cannot suppress information that does not exist, and the report could not have been used to further attack the credibility of Campbell and Hubler, since Hubler's allegation was not a subject contained in the report.

Moreover, the court notes that, even if there was favorable impeachment evidence contained in the interview report, the defense was aware of and cross-examined witnesses about Hubler's allegation.  In fact, this was a basis on which the

---

[79]  Moreover, at the March 28, 2013 hearing, Carol Campbell denied that she suggested to Hubler that he and Campbell tell the Government that Gordon knew about the kickbacks.  (*See* Tr., Hr'g, Mar. 28, 2013, 37.)

[80]  In addition, the court does not find convincing Defendant's allegation that the Government purposefully refrained from asking whether Carol Campbell told Hubler that he and Campbell should tell the agents that Gordon knew they were receiving kickbacks to intentionally avoid discovering material favorable to the defense.  The purpose of the interview was to discover information to support a prosecution for DBE fraud, not the receipt of kickbacks.  (*See* Tr., Feb. 7, 2013, 59 ([Agent Marakovits]: "The purpose of the Carol Campbell interview was to find out what she knew about the DBE fraud going on at [SPI] in her work environment.  That's the focus of the majority of this report.").)

defense challenged the credibility of both Hubler and Campbell on cross-examination. That Carol Campbell denied making the statement, would, at most, cast doubt on Hubler's recollection of an event *following* the search of SPI.[81] The court cannot agree that this would cause the entirety of Hubler's testimony to be discredited. Accordingly, it cannot be said that Defendant was prejudiced by the suppression of the document, even assuming, *arguendo,* that it contained favorable impeachment evidence.

### iv. Bob Green documents

On January 17, 2013, Defendant filed a supplemental memorandum in which he contended that the Government suppressed *Brady* information in the form of a June 9, 2006 request that Bob Green, the confidential informant whose tip initiated the investigation, be paid $300.00 ("payment request"), and "rough notes of eleven separate conversations that Agent Marakovits had with Green *that were never written up in interview reports*." (Doc. 239-1, p. 12 of 60 (emphasis in original).) Defendant contends that the "belated disclosures regarding Green confirm that [Defendant]'s right to a fair trial was prejudiced by government misconduct." (*Id.* at p. 2 of 60.) Defendant reasons that the June 9, 2006 payment request was favorable, inasmuch as it would have provided the defense with "another basis for challenging the accuracy of the agent's testimony and his credibility." (*Id.* at p. 10 of 60.) Defendant further reasons that one of the undisclosed rough notes contained potential *Brady* material. (*Id.* at p. 12 of 60.)

---

[81] Hubler's credibility on this subject was challenged through the testimony of Campbell, who, when confronted with his wife's alleged statement, denied that Carol Campbell made such a suggestion. (Tr. 2264.)

In response, the Government argues that the Green documents were neither favorable nor material, and thus, not required to be produced to the defense. (*See* Doc. 242, p. 15 of 31.) The Government further contends that, even if the court determines that the June 9, 2006 payment request was favorable to the defense, such nondisclosure cannot reasonably be viewed as having any potential impact on the jury's verdicts. (*Id.* at p. 18 of 31.) For the following reasons, the court concludes that the June 9, 2006 payment request was not material, and that the rough notes were not favorable. Accordingly, Defendant was not prejudiced by the nondisclosure of any *Brady* documents related to Bob Green.

The significance of these documents, or lack thereof, is best understood when put in context of the investigation and proceedings. Although the investigation of DBE fraud at SPI commenced in 2006 following Agent Marakovits's receipt of Bob Green's report of a "massive fraud scheme" (Tr. 150-51), neither Defendant nor the Government called Green as a witness at trial. Green's involvement in the investigation was established through Agent Marakovits's testimony. The agent testified that Green made numerous recordings of individuals involved in the fraud, but never produced a recording of Defendant. (Tr. 154 ([By Marakovits]: "No, [Defendant] was never recorded on the recordings [Green] made because Mr. Green really didn't have a lot of contact with [Defendant].").) At trial, Agent Marakovits testified that, shortly before Green was terminated as a source for the FBI on December 29, 2009, he was paid $5,000.00 as compensation for the "time and effort that he put in during . . . the investigation." (Tr. 406-08.) Agent Marakovits explained that:

> [I]nitially[,] I offered to pay Mr. Green early in the case, and he declined. I kept saying, you know, we'll pay for

> your time and everything, and he didn't want it.  Then at
> the very end, after this case had come full circle, he
> requested payment.  And I paid him.

(Tr. 439.)  Although Agent Marakovits's testimony represented that the $5,000.00 payment in December 2009 was the only payment Green received for his work in connection with the investigation (*see* Tr. 409, 439), it was revealed by the Government, several months following the jury's verdicts, that the agent's testimony was inaccurate, because Green received an additional $300.00 payment in June 2006. (Tr., Hr'g, Feb. 7, 2013, 8.) Additionally, in response to questions posed by the defense during the post-trial briefing, the Government disclosed several documents containing Agent Marakovits's rough notes pertaining conversations the agent had with Green.

### iv.A.   $300 payment

Defendant argues that the belated disclosure of the June 9, 2006 payment prohibited the defense from challenging the accuracy of Agent Marakovits's testimony.  It is undisputed that Agent Marakovits's trial testimony with regard to the amount Green was paid was inaccurate and that the payment request was in the possession of Government agents.  *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has "a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.").  During the February 7, 2013 *Brady* hearing, Agent Marakovits explained that he located the June 9, 2006 payment request form in December 2012, after he checked the paper files.  (Tr., Hr'g, Feb. 7, 2013, 9.)  Agent Marakovits, whom the court found entirely genuine at all points of these proceedings, testified

that he did not remember the June 9, 2006 payment, and did not intentionally conceal the payment. (Tr., Hr'g, Feb. 7, 2013, 8.)

Nevertheless, it is no excuse that a nondisclosure was done inadvertently. *Strickler*, 527 U.S. at 288 ("[A]n inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment."). However, to be considered *Brady* information subject to disclosure obligations, the information must have been favorable to the accused and "material either to guilt or punishment." *Bagley*, 473 U.S. at 674 (quoting *Brady*, 373 U.S. at 87). In assessing a potential *Brady* violation, the court must take into account the potential effect of the missing evidence "in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing" the way the proceedings would have been had the missing evidence had been included. *United States v. Shabazz*, 319 F. App'x 127, 133 (3d Cir. 2009) (quoting *Bagley*, 473 U.S. at 683).

There was no *Brady* violation here. Even if the June 9, 2006 had been disclosed, Defendant has not demonstrated that the additional payment "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 132-33 (citing *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006)). The difference between Agent Marakovits's trial testimony – that Green was paid $5,000.00 – compared to the accurate amount, $5,300.00, is relatively insignificant. Moreover, contrary to Defendant's argument, the agent's credibility was not a significant issue in the case. (*See* Doc. 239-1, p. 9-11 of 60.) Indeed, the importance of Agent Marakovits's testimony centered on introducing volumes of documentary evidence that provided the bases for the charges. (*See supra*, Part I.B.2.b.) The court does not agree that the jury's perception of the

investigation's integrity would have been impacted had the defense been able to confront Agent Marakovits regarding the additional $300.00 payment to Green.

### iv.B.    **Rough notes of conversations**

Similarly unpersuasive is Defendant's argument that he was prejudiced by the Government's failure to produce Agent Marakovits's rough notes of conversations he had with Green.  As a preliminary matter, Defendant only contends that "one of the sets of handwritten notes contained potential *Brady* material."  (Doc. 239-1, p. 12 of 60.)  The sentence characterized as "potential[ly] *Brady* material" is a handwritten notation, dated October 17, 2006, indicating that Green told Marakovits that "Joey are [sic] gone most of the time playing golf in N.C."  (*Id.* at p. 47 of 60.)  Defendant argues that this note "suggests [Defendant]'s lack of knowledge of, or involvement in, the conspiracy to defraud the DBE program and is potentially exculpatory."  (*Id.* at p. 12 of 60.)  The court disagrees that this statement contains *Brady* information.

Defendant interprets this sentence as exculpatory because it places him in North Carolina "most of the time," thereby distancing and disassociating himself from the conspiracy.  Defendant's reasoning is flawed.  The statement does not relate to the critical issue for the jury, namely whether Defendant had knowledge that the relationship between the companies was fraudulent and participated with the intent to defraud.  Indeed, even assuming the veracity of Green's statement and that "Joey" referred to Defendant, Defendant's periodic physical absence from Cressona, Pennsylvania, does not contradict his knowing involvement, nor does it prove his good faith belief that the relationship between SPI/CDS and Marikina was legal.  Additionally, interpreting the statement as suggested by Defendant, namely as

substantive evidence that he was frequently physically absent from SPI, would be contrary to Defendant's testimony that he was at the office "every day." (Tr. 2835.)[82] *Cf. United States v. Barnhart*, 979 F.2d 647 (8th Cir. 1992) (holding jury erroneously instructed on willful blindness where defendant was largely absent from company).

Moreover, the statement is not material. Even assuming, *arguendo*, that the court found Green's statement favorable, the court cannot conclude that introduction of this evidence could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Shabazz*, 319 F. App'x at 132-33 (quoting *Youngblood*, 547 U.S. at 870). The fact that Defendant played golf in North Carolina does not eviscerate evidence produced at trial, such as Defendant's attendance at upper-level management meetings during which Marikina business was discussed, his participation in email chains regarding Marikina, and his direction to SPI employees to actively conceal the relationship between the companies. In short, his physical presence – or absence – does not absolve his knowing and willful participation in the DBE fraud. Accordingly, although the statement could be used to provide a groundwork for an argument in defense, the statement, by itself, is not exculpatory. *See Rivera*, 187 F. App'x at 247 (quoting *Agurs*, 427 U.S. at 109-10 ("The mere possibility that an item of undisclosed

---

[82] During Defendant's direct examination, the following exchange occurred:

Q:     Was being president a full-time job?

A:     Oh, yea.

Q:     Did you go into the office every day?

A:     [Yes].

(Tr. 2835.)

information might have helped the defense . . . does not establish materiality in the constitutional sense.")).  For these reasons, the court does not conclude that *Brady* required the Government to produce this statement to Defendant.

### c.  <u>Conclusion as to *Brady* Claims</u>

Based on the foregoing, the court concludes that the Government did not suppress any information related to Pishock, Campbell, Carol Campbell, or Green that was required to be produced under *Brady*.  For these reasons, the court concludes that Defendant was not deprived of a fair trial, and will deny Defendant's motion for a new trial in this regard.

### 3.  <u>Prosecutorial Misconduct During Summation</u>

Defendant next argues that Government counsel made several improper remarks during his summation that warrant a new trial.  (*See generally* Doc. 222, pp. 75-79 of 119.)  Due process of law encompasses the right to a fair trial. "Prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  For due process to have been offended, "the prosecutorial misconduct must be of sufficient significance in the denial of the defendant's right to a fair trial."  *Id*. (internal quotation marks omitted) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). In evaluating whether the remarks of the prosecutor rise to the level of a constitutional violation, the court is required to examine those remarks in the context of the whole trial.  *Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir. 1992) (citing *Greer*, 483 U.S. at 766).  Thus, the remarks must be sufficiently prejudicial in the context of the entire trial to violate the defendant's due process rights.  *United States*

*v. Morena*, 547 F.3d 191, 193-94 (3d Cir. 2008). In making this determination, the court examines any curative instructions, the weight of the properly admitted evidence against the defendant, and the nature of the prosecutor's improper actions. *Id*.

Defendant challenges four remarks made by the Prosecutor during the Government's summation. For the following reasons, the court is not persuaded that the challenged remarks, even if improper, substantially prejudiced Defendant's trial.

### a. **Improper Vouching**

In support of his position that a new trial is warranted based upon prosecutorial misconduct, Defendant first challenges a statement made by the Prosecutor during his summation that he contends constituted improper vouching for a government witness.

Improper vouching for a witness is a form of prosecutorial misconduct which may require the reversal of a conviction and the granting of a new trial. *See United States v. Johnson*, Crim. No. 80-cr-0146, 2010 WL 2103582, *2 (D. Del. May 25, 2010) (citing *United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 287 (3d Cir. 1999)). The prosecutor's assurance may be based on either an "explicit or implicit reference" to information outside the record. *Walker*, 155 F.3d 180, 187 (3d Cir. 1998). Vouching is not permitted because it can "jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury" and the prosecutor's imprimatur "may induce the jury to trust the [g]overnment's judgment rather than its own view of the evidence." *Id.* at 184 (citing *United States v. Young*, 470 U.S. 1, 18 (1985)).

As set forth in *United States v. Walker*, and reiterated in *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006), two criteria must be met for improper vouching to be found: (1) the prosecutor must assure the jury that the testimony of a government witness is credible; and (2) this assurance must be based on either the prosecutor's personal knowledge, or other information not contained in the record. *See Harris*, 471 F.3d at 512 (citing *Walker*, 155 F.3d at 187).

The challenged statement fails to qualify as improper vouching. The statement was in the nature of expressing gratitude to the agents involved in the investigation, whose work culminated in a trial that lasted multiple weeks. Moreover, when viewed in the context of the entire summation, the Prosecutor's statement was isolated and was made in the beginning of the summation and in relation to the length of the trial and the meticulous entry of hundreds of exhibits.[83] Thus, the challenged comment did not constitute an assurance by the Prosecutor that the witness was credible. *See United States v. Brennan*, 326 F.3d 176, 183 (3d Cir. 2003) (citing *Walker*, 155 F.3d at 187).

Even if the Prosecutor's comment could be considered improper vouching, the court's instructions to the jury cured any potential prejudice. Following the Prosecutor's summation and in response to Defendant's objection, the court instructed the jury as follows:

> Before [defense counsel] starts, there was reference in the government's closing argument to you of thanks for the agents and their professionalism. You will be instructed by me that you are not to give any greater or lesser credibility

---

[83] Furthermore, on Marakovits's cross-examination, defense counsel elicited testimony on the benefits received by the agent for his work on the case. (*See* Tr. 411.) Defense counsel put the agent's credibility and thoroughness of investigation at issue early in the trial.

> to any law enforcement officer th[a]n you would any other
> witness in the case.

(Tr., Sidebar, Apr. 4, 2012, 5.)  Additionally, the court gave the standard jury instruction as to credibility of law enforcement officers and related to the arguments of counsel not being evidence.  (Jury Instructions, p. 19, "Credibility of the Witness - Law Enforcement.")  Based on these curative and final instructions, the fact that the challenged statement was a brief, isolated comment made during a closing argument that exceeded two hours, and considering the strength of the evidence in support of conviction, the court cannot conclude that Defendant was prejudiced, even if the comment could be considered improper.  *See, e.g., United States v. Helbling*, 209 F.3d 226, 240-41 (3d Cir. 2000) (holding that any vouching by prosecutor was harmless error because the judge informed the jury not to consider the relevant comments, there was a great deal of evidence to support conviction, and defendant was not prejudiced).

### b.    **"Tip of the Iceberg"**

Defendant next contends that the Prosecutor improperly implied that there existed substantial inculpatory evidence outside the record.  (Doc. 222, p. 84 of 119.)  Defendant bases this argument on the portion of the Prosecutor's closing argument in which he states that the jury has seen "the tip of the iceberg." (Tr. 3130-31.)  In response, the Government argues that, when taken in context, the Prosecutor's "tip of the iceberg" comment referred to the "non-inculpatory" records through which the agents had to sift to uncover the inculpatory evidence.  (Doc. 226, pp. 106-107 of 134.)

When put in context, it is clear that Defendant mischaracterizes the Prosecutor's remarks.  The Prosecutor's comment was made directly following his

acknowledgment of the agents and request that the jury stay attentive during the final moments of the four-week, document-intensive trial. Furthermore, the record supports the Government's position that the agents sifted through a significant amount of non-inculpatory evidence. (*See generally* Tr. 168-173.) Moreover, even assuming, *arguendo*, that there were some risk of prejudice with respect to the Prosecutor's statements, this prejudice is of a type that can be cured with proper injury instructions, and "juries are presumed to follow [the court's] instructions." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *United States v. Hakim*, 344 F.3d 324, 326 (3d Cir. 2003). Here, the court issued a curative instruction immediately following the Prosecutor's closing, instructing the jury that it was only to consider the evidence presented in court. (*See* Tr., Sidebar, Apr. 4, 2012, 5-6.) The court reiterated the instruction in the final jury instructions. (Jury Instructions, p. 3 "Evidence Defined.") Accordingly, the court concludes that these instructions sufficed to cure any possibility of prejudice. *See Zafiro v. United States*, 506 U.S. 534, 541 (1993).

### c. Uncharged Crimes

Defendant next contends that the Prosecutor invited the jury to speculate as to whether Defendant committed uncharged crimes. (Doc. 222, pp. 87-88 of 119.) Defendant bases this argument on the portion of the Prosecutor's summation in which he addressed Defendant's explanation that the reason for certain SPI employees representing themselves as Marikina employees was in caution of "insurance liabilities to SPI." (*See* Tr. 2947; *see also* Tr. 2866-67.) At trial, Defendant explained that many of the activities the Government argued were in

furtherance of concealment were actually done in an attempt to insulate SPI from liability exposure. (*See, e.g.,* Tr. 2865-66).

During his summation, the Prosecutor addressed an email from Defendant, wherein Defendant requested separate email domains be used for CDS and Marikina correspondence, reasoning that separate domain names would be "much cleaner and [have] less chance of problems with the outside world." (Tr. 3175; Gov. 65.3.) During his closing argument, the Prosecutor requested the jury discredit Defendant's explanation, and stated:

> Another smoking gun. Less problems with the outside world. Why is he concerned with the outside world if this is a legitimate, legitimate operation? I mean, are they committing insurance fraud? Because we know that CDS is actually doing the erections. They're not paying the premium that they're due. The higher rate for rigging insurance. Is it, maybe that's another reason that they don't want to trace it back because there's an insurance fraud on top of the DBE fraud.

(Tr. 3176.)

When taken in the context of the trial, the court cannot conclude this statement warrants a new trial. Here, the Prosecutor simply attacked Defendant's explanation. At no point did the Prosecutor accuse or ask the jury to find Defendant guilty of any uncharged crime. *See United States v. Fumo*, Crim. No. 06-0319, 2009 WL 1688482, *44-45 (E.D. Pa. June 17, 2009) (finding that the prosecutor's closing argument was not improper where prosecutor indicated that jury could ponder any number of reasons for the defendant's actions, and offered suggestions for the same, but did not ask the jury to find the defendant guilty of any uncharged crime). Furthermore, the statement can fairly be read as urging the jury to distinguish

between DBE fraud, for which Defendant was charged, and any other type of improper activities at SPI that did not form the basis of a charge.

Even assuming, *arguendo*, that the Prosecutor's comment was in error, the court issued the following curative instruction in response to defense counsel's objection directly following the Prosecutor's summation:

> With regard to a reference that Mr. Nagle may be involved in insurance fraud, he's not charged with that and you are not to give that any consideration whatsoever.

(Tr., Sidebar, Apr. 4, 2012, p. 6.)  Additionally, the court presented the following definition of evidence during the final jury instructions:

> You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside the court influence your decision in any way.
>
> The evidence in this case includes only what the witnesses said while they were testifying under oath; the exhibits that I allowed into evidence; the stipulations that the lawyers agreed to; and the facts that I have judicially noticed.
>
> Nothing else is evidence.  The lawyers' statements and arguments are not evidence; their questions and objections are not evidence; my legal rulings are not evidence, and my comments and questions are not evidence.  Make your decision based only on the evidence, as I have defined it here, and nothing else.

(Jury Instructions, pp. 3-4, "Evidence Defined.")  The Prosecutor's remarks in this regard did not rise to the level of prosecutorial misconduct.  Although the allegation could arguably be construed as an invitation for the jury to consider uncharged crimes, as Defendant suggests, any risk of prejudice was mitigated by a curative

instruction.  *See United States v. Riley*, 621 F.3d 312, 339 (3d Cir. 2010) (noting that jury instruction cured the risk of prejudice caused by an improper comment because juries are presumed to follow their instructions).

### d.    **Misleading Definition of "Proceeds**"

Finally, Defendant argues that the Prosecutor's definition of proceeds, which was stated during the Prosecutor's rebuttal, presented an improper definition of the term as it related to the money laundering counts.  (Doc. 222, pp. 88-89 of 119.)  The court finds this argument to be entirely without merit.

Relevant to this challenge, the Prosecutor stated the following during his rebuttal:

> We talked about the money laundering count and there was no evidence of profits here.  Well, look at the, look at the documents in the job file.  One of those documents is an FDP form that you heard about.  It shows the profit margin on each one of those jobs where there was a check involved.
>
> *            *            *
>
> [Defense counsel] gave a mischaracterization of what profits mean.  He said something about deducting expenses with net profits.  The judge's charge is going to say proceeds equals profits, period.
>
> The government's position here is that was all profit.  They weren't entitled to any of that money, because it was an entire fraud from the beginning.  When they were acknowledging those Marikina contracts going into ECMS, Marikina shouldn't have got any of those contracts.  None of that money that flowed through Marikina that ended up . . . in [SPI]'s [coffers] should have been there.  It was an entirely fraudulent operation.

142

(Tr., Rebuttal, Apr. 4, 2012, pp. 14-15.)  Defendant's challenge focuses on the Prosecutor's statement that "proceeds equals profits, period." (*See* Doc. 222, p. 88 of 119.)  The court cannot conclude that this was misleading.  In fact, the court's final jury instructions related to criminally derived property provided as follows:

> The term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense.  "Proceeds" is defined as "profits."

(Jury Instructions, p. 61, "Second Element - Transaction Involved Criminally Derived Property.")  Moreover, this instruction was based, in part, on Defendant's letter, dated March 30, 2012, which requested the court instruct the jury that the "alleged financial transaction in the underlying scheme are 'profits' as opposed to 'receipts;' and, that such profits have to be shown to exceed $10,000."  (Doc. 183, p. 5 of 6.)  Accordingly, the court cannot agree with Defendant that the Prosecutor's statement related to the jury instruction defining proceeds misled the jury.

### e.    Conclusion as to Prosecutor's Remarks

When taken in context of the entire trial and the lengthy closing arguments and rebuttal, the objectionable references did not significantly, if at all, detract from the proper focus of the arguments.  Moreover, the court instructed the jury that "[t]he statements and arguments of the lawyers are not evidence," (Jury Instructions, p. 3 "Evidence Defined"), and regardless of the Prosecutor's statements, the evidence clearly supported the jury's verdict.  Therefore, the court finds that the challenged comments did not affect the jury's ability to judge the evidence fairly, and concludes that Defendant was not deprived of a fair trial.   Accordingly, Defendant's motion for a new trial will be denied in this regard.

### 4.  Introduction of Evidence on Defendant's Wealth

Defendant argues that the Government introduced prejudicial and misleading evidence on Defendant's wealth for the purpose of "paint[ing] him as a greedy CEO [to] turn the jury against him." (Doc. 222, p. 90 of 119.) This issue is identical to the one raised by Defendant in his October 4, 2010 pre-trial motion to exclude evidence of Defendant's earnings and assets. (Doc. 119; *see also supra* Part I.A.3.) On October 6, 2010, the court granted Defendant's motion to the extent it sought to exclude the make and model of the vehicle leased for Defendant by SPI, but denied the motion in all other respects. (Doc. 126.) The court reasoned that the proffered evidence demonstrated the increase in profits enjoyed by SPI – and therefore Defendant – during his presidency, and was relevant in that it tended to refute Defendant's testimony that he did not know erection revenues from Marikina comprised a significant part of CDS's profitability, and therefore, SPI's total revenue. Although Defendant again argues that the Government misled the jury as to Defendant's assets as owner of SPI, a Subchapter S corporation that was sold for $9.25 million, he fails to provide any new basis for his argument. Thus, for the reasons previously set forth in this court's memorandum and order of October 6, 2010 (*see* Doc. 126), Defendant's motion to exclude evidence of Defendant's wealth and assets was properly denied, and the court declines to revisit the issue.

### 5. <u>Propriety of Willful Blindness Instruction</u>

In support of his motion for a new trial, Defendant argues that the court erred by instructing the jury on willful blindness, which he contends confused and allowed the jury to convict on an improper basis. (*See* Doc. 222, pp. 94-101 of 119.) Initially, the court notes that Defendant's argument in support of his motion is essentially identical to his objection to the instruction at trial, namely that there was

an insufficient evidentiary predicate to justify giving such an instruction, and that the instruction allowed the jury to convict on lesser degree of culpability.  (*Id.* at pp. 94-95 of 119.)  The court does not find Defendant's argument convincing.

> As the Third Circuit stated:
>
> A willful blindness instruction is often described as sounding in deliberate ignorance.  Such instructions must be tailored . . . to avoid the implication that a defendant may be convicted simply because he or she should have known of facts of which he or she was unaware.  Willful blindness is not to be equated with negligence or lack of due care, for willful blindness is a subjective state of mind that is deemed to satisfy a scienter requirement of knowledge.  The instruction must make clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability.

*United States v. Wasserson*, 418 F.3d 225, 237 (3d Cir. 2005) (internal quotations and citations omitted) (citing *United States v. Wertz-Ruiz*, 228 F.3d 250, 255 (3d Cir. 2000)).

Contrary to Defendant's argument that the Government presented "no evidence from which a juror could find that [Defendant] took 'deliberate actions to avoid confirming' a crime" (Doc. 222, p. 96 of 119), when the evidence is viewed in the light most favorable to the Government, the court concludes that there was clearly sufficient evidence for a reasonable jury to find that, if Defendant did not have actual knowledge, he was willfully blind to the fraudulent nature of the relationship between SPI, CDS, and Marikina with respect to the DBE requirements and that the monetary transactions represented the proceeds of criminally derived property.  *See United States v. Stadtmauer*, 620 F.3d 238, 259 (3d Cir. 2010) (citing

*United States v. Singh*, 222 F.3d 6, 11 (1st Cir. 2000) ("The [g]overnment need not present *direct* evidence of conscious avoidance to justify a willful blindness instruction.") (emphasis in original)).

At trial, there was abundant evidence that Defendant was intimately involved with the operations of SPI and was aware of the contract flow between SPI, CDS, and Marikina. (*See, e.g.,* Tr. 2856; Gov. 55.1.) There was also evidence that Defendant participated in meetings, during which strategies to increase Marikina profit were discussed. (*See, e.g.,* Tr. 2276-78, 2772-73.) Moreover, Defendant knew that Marikina's costs were reimbursed by SPI/CDS (*see* 55.1; Tr. 2978), and that checks payable to Marikina were being deposited directly into the account of SPI (*see* Gov. 77.1; Tr. 2878-79, 2980). There was also evidence Defendant understood the contract flow and DBE requirements, as he knew payments from general contractors would have to "flow through Marikina" (*see* Gov. 77.1), that SPI employees were being represented as Marikina personnel (*see, e.g.,* Gov. 71.1A; Tr. 2984), and that SPI employees were drafting letters on Marikina letterhead (*see* Tr. 1840-41; Gov. 90.3A; Gov. 90.3B; Gov. 112.14B). Moreover, there was evidence to support a conclusion that Defendant was aware of the high-probability that the relationship between the companies was fraudulent due to the numerous concealment activities, the questions from SPI employees related to how they should identify themselves (*see, e.g.,* Gov. 71.9; Tr. 2992-93), the meeting with Hoover regarding the relationship between the companies (*see, e.g.,* Tr. 2204-06, 2419, 3004-06), and the article related to DBE fraud found in Defendant's office (*see* Gov. 55.1). Despite this awareness, Defendant did not check with any attorney or other authority as to whether the relationship was legitimate.

Defendant's testimony established that his "good faith belief" was based upon his assurances from Campbell[84] that Marikina was certified as a DBE by PennDOT. The inference the defense asked the jury to draw was that Defendant relied in good faith on Campbell's assurances that the relationship between the companies was consistent with the applicable law and regulations, and thus Defendant had no reason to confirm the legitimacy of the relationship between the companies with an attorney or any authority. However, an equally plausible possible inference is that Defendant deliberately avoided "ask[ing] the natural follow-up question[s]" – *e.g.*, whether Marikina was performing a commercially useful function or was just involved to obtain the DBE subcontracts – despite his awareness of the high probability of the fraudulent relationship, due to the resulting profitability. *See Stadtmauer*, 620 F.3d at 259. The court finds, as the jury did, the later explanation to be more probable.

Defendant relies on *United States v. Barnhart*, 979 F.2d 647 (8th Cir. 1992), to support his position that the court should not have given the willful blindness instruction. Defendant's reliance is misplaced (*see* Doc. 222, pp. 96-97 of 119), as *Barnhart* is factually distinguishable. In *Barnhart*, the defendant was the owner of a mortgage company. 979 F.2d at 648. After several years, a co-defendant, Lunday, became executive vice president and owner of the company. *See id.* After Lunday assumed that position, the defendant's role changed from overseeing the company's daily operation to "wining and dining" the company's current and

---

[84] Campbell denied ever representing to Defendant that the relationship between Marikina and SPI/CDS was legal. (Tr. 2299.)

prospective clients. *See id.* The defendant stopped, almost completely, coming into the office after Lunday assumed daily operations of the company. *Id.*

Lunday began to use proceeds received from Fannie Mae to pay the company's operating expenses, rather than to pay the banks for the money borrowed in conjunction with the mortgages that had been sold. *Id.* The defendant claimed ignorance of the fraudulent transactions. *See id.* The Court of Appeals for the Eighth Circuit found that the trial court improperly instructed the jury as to willful blindness. *Id.* at 652. The *Barnhart* Court reasoned it was not shown that the defendant was presented with facts that put him on notice that criminal activity was afoot. *See id.* Thus, the court concluded that he was "not *deliberately* ignorant" of the facts." *Id.* (emphasis in original).

Unlike the defendant in *Barnhart*, Defendant was not an absentee owner of SPI. (*See* Tr. 2835.) Rather, Defendant confirmed, and the record supported, that he was heavily involved in all aspects of the business, including the companies' internal operations. (*See, e.g.,* Gov. 4.5; Tr. 2767, 2772, 2901.) The record is clear that Defendant regularly attended meetings at which Marikina was discussed. (Tr. 2772-73.) Furthermore, as stated, Defendant knew the contract flow (*see* Gov. 55.1), knew that the money had to "flow through" Marikina (*see* Gov. 77.1), knew that the companies had to appear separate (*see, e.g.,* Gov. 67.1; Gov. 71.34; Tr. 3002), understood that CDS performed the erection work for Marikina, and understood that SPI continued to become more profitable from its "one-stop shop" relationship with Marikina (*see* Gov. 119.1; Tr. 2952-53; *see also* Gov. 81.1). Moreover, Defendant personally engaged in numerous concealment activities to hide the true nature of the relationship between SPI and Marikina. (*See, e.g.,* Gov. 65.3 (requesting separate

SPI and Marikina email addresses); Gov. 71.1A (representing Hubler as Marikina employee).) Thus, there was certainly sufficient evidence to conclude that Defendant was well aware of the facts to put him on notice that criminal activity was afoot, but deliberately closed his eyes and intentionally chose not to ask the natural followup questions. In this context, the court concludes that there was sufficient evidence to warrant the willful blindness instruction.

In the alternative, Defendant argues that even if the willful blindness instruction was appropriate based on the facts of this case, the instruction, as provided, "lacked safeguards to prevent the jury from being confused." (Doc. 222, p. 98-101 of 119.) In particular, Defendant was concerned that the jury understood the instruction to substitute a lesser-degree of culpability for willfulness. (*Id.* at p. 99 of 119.) This argument is without merit.

It is well established that "[j]ury instructions must be read as a whole." *United States v. Flores*, 454 F.3d 149, 157 (3d Cir. 2006) (citing *E.E.O.C. v. Del. Dept. of Health & Soc. Servs.*, 865 F.2d 1408, 1418 (3d Cir. 1989)). In this case, the court instructed the jury, in a form substantially similar to that set forth in the Model Criminal Jury Instructions for the Third Circuit, that it could find knowledge if the evidence showed that Defendant was willfully blind to the object of the conspiracy. (*See supra*, Part I.B.4.) The court believes the language of the instruction met Defendant's concerns by explicitly stating that the jury could not convict for recklessness, stupidity, or foolishness, and that criminal knowledge was based on Defendant's subjective knowledge. The willful blindness instruction did not lower the Government's burden of proving Defendant's knowing or willful participation because it required the jury to find that "[Defendant] himself subjectively believed

149

there was a high probability that the relationship between SPI, CDS, and Marikina was fraudulent in nature, . . . knew that the monetary transactions represented the proceeds of criminally derived property, consciously took deliberate actions to avoid learning about it" (Jury Instructions, p. 70 of 77, "Willful Blindness"), and did not actually have a good faith belief. *See United States v. Basroon,* 38 F. App'x 772, 781-82 (3d Cir. 2002) ("A willful blindness charge does not lower the government's burden of proving intent as long as it emphasizes the necessity of proving a subjective awareness."). Moreover, the balance of the charge adequately instructed the jury on the definitions of "knowingly," "intentionally," and "willfully," as well as Defendant's asserted good faith defense. (*See* Jury Instructions, pp. 65-67, 71-72 of 77.) Thus, a review of the willful blindness portion of the court's charge, in context and read as a whole with the remainder of the charge, lays Defendant's contentions to rest.

In sum, the court's instructions were supported by sufficient evidence for a reasonable jury to find that Defendant had actual knowledge of, or was willfully blind to, the existence of the DBE fraud occurring at SPI, and that he deliberately joined the conspiracy by purposefully acting to further its purpose. Moreover, the court is confident that the instruction, as given, permitted a guilty verdict only if the jury found that Defendant possessed the requisite mental state. Accordingly, Defendant's motion for a new trial in this regard will be denied.

### 6.  Exclusion of Barnacle's Testimony

Defendant next contends that the court erred when it excluded the testimony of James Barnacle, Defendant's private investigator, who was offered to impeach the credibility of Hubler with an alleged prior inconsistent statement regarding Hubler's knowledge that the FBI had searched Marikina's offices prior to the execution of the search warrant at SPI.  (Doc. 222, p. 101-03 of 119.)  The court disagrees.

Defendant contends that Barnacle's testimony was offered to impeach Hubler's testimony with, what Defendant represented was, a prior inconsistent statement.  (Doc. 222, pp. 101-02 of 119.)  The matter is most properly considered in the context of the trial.  The portion of Hubler's testimony pertinent to the instant challenge provided as follows:

> Q:    Now *before the search of [SPI] and your home on October 10th*, you had a conversation with Joy Gloria, and you learned that the FBI had been to Marikina; am I correct?
>
> A:    That is incorrect.
>
> Q:    Did you have a conversation with Joy Gloria where she said that she was under a gag order not to discuss the visit from the FBI?
>
> A:    That is incorrect.

(Tr. 2540 (emphasis supplied).)  The record indicates that, during this portion of his cross-examination of Hubler, defense counsel was referring to a report prepared by Barnacle following his interview of Hubler.  (Tr. 2540-41.)  Defense counsel declined to provide a copy of the report, despite a request from the Prosecutor.[85]

---

[85]  During the cross-examination of Hubler, the following exchange occurred:

(continued...)

151

(*See* Tr. 2540-41.)  Following a sidebar conference, defense counsel unsuccessfully attempted use Barnacle's report to refresh Hubler's recollection of an unsworn statement the witness allegedly made to the investigator.  (*See* Tr. 2541.)  After Hubler characterized the information set forth in the report as "bogus," defense counsel abandoned the matter and moved to a separate line of questioning.  (*See* Tr. 2542.)

Following the Government's indication it would rest, the court held a sidebar conference with counsel, during which several issues pertinent to Defendant's case-in-chief were addressed.  (*See generally* Tr. 2663-97.) Specifically, defense counsel indicated his intention to call Barnacle, who he represented created the aforementioned  report of Hubler's October 12, 2007 interview.  (*See* Tr. 2541-42; *also supra* text accompanying note 81.)  The pertinent section of Barnacle's report provided as follows:

[85] (...continued)

| | |
|---|---|
| [AUSA]: | Do we have a copy of this. |
| [Defense counsel]: | We don't have a copy of this.  This is my notes. |
| [AUSA]: | I'd like to see a copy of it. |
| The Court: | You want to see what he's reading from? |
| [AUSA]: | No, I believe I should have a copy. |
| The Court: | These are his notes. |
| [AUSA]: | Oh, I thought he was reading from Barnacle's interview report. |
| [Defense counsel]: | I'm reading from work product, Your Honor. |
| [AUSA]: | May we approach? |
| The Court: | Yes. |
| [Defense counsel]: | I'm reading - - I am reading from an interview report provided to the defense, work product of Jim Barnacle, summarizing an interview that he had with Tim Hubler. |

(Tr. 2540-41.)

> Mr. Hubler learned from Gloria that the [FBI] was at the
> offices of MCC about a week ago and that she was under a
> "gag order" not to discuss the FBI Investigation with
> SPI/CDS or anyone else.

(Doc. 226-1, p. 95 of 95.)  Defense counsel contended that this paragraph purported

to demonstrate that Hubler received notice from Gloria that the FBI had searched

Marikina prior to the search of SPI, and challenged Hubler's credibility regarding his

denial of receiving the tip.  (Tr. 2673.)  Defense counsel further reasoned that,

because Hubler was warned, it showed that he was involved with the DBE scheme,

and because Defendant was not warned, it demonstrated that he was not a member of

the conspiracy.  (Doc. 222, p. 103 of 119.)

  Under Federal Rule of Evidence 613(b), extrinsic evidence of a prior

inconsistent statement may be admissible to impeach a witness' testimony.  *See*

*United States v. Askew*, 201 F. App'x 858, 859-60 (3d Cir. 2006) (citing *United*

*States v. Mitchell*, 113 F.3d 1528, 1532 (10th Cir. 1997)).  "The rule applies 'when

two statements, one made at trial and one made previously, are irreconcilably at

odds.'" *Id*. at 860 (citing *United States v. Meserve*, 271 F.3d 314, 320 (1st Cir.

2001)); *see also United States v. Hale*, 422 U.S. 171, 176 (1975) (providing that

before "prior inconsistent statements may be used to impeach the credibility of a

witness . . . the court must be persuaded that the statements are indeed inconsistent").

Extrinsic evidence of a prior inconsistent statements may not be used to impeach a

witness under Rule 613(b) unless the witness is given the opportunity to explain or

deny the statements.  Fed. R. Evid. 613(b).  Thus, in order to introduce a witness'

own earlier statement for impeachment, the following four elements must be

established: (1) the statements must be inconsistent; (2) the inconsistency must be

relevant; (3) the inconsistent statement must, on request, be disclosed to opposing counsel, the witness must be allowed to explain the inconsistency, and opposing counsel must be allowed to question the witness; and (4) the court should instruct the jury about the limited purpose of the earlier statement. *United States v. Nacrelli*, 468 F. Supp. 241, 254 (E.D. Pa. 1979) (citing *United States v. Rogers*, 549 F.2d 490, 495-98 (8th Cir. 1976)).

Initially, the court notes that there was a clear violation of Rule 613(a), because the report was not disclosed to the Prosecutor, notwithstanding the Prosecutor's request. Furthermore, Rule 613(b) was violated because Hubler was never permitted to explain the inconsistency, and the Prosecutor was not able to question the witness on the same. (Tr. 2540-42.) Thus, Barnacle's report was not admissible under the Federal Rules of Evidence.

Furthermore, contrary to Defendant's argument, Hubler's trial testimony and his prior statement as contained in Barnacle's report are not inherently inconsistent. The paragraph in Barnacle's report failed to address the issue for which it was being offered, and created a significant risk of misleading the jury. Indeed, the report did not purport to specify precisely when Hubler learned about the search of Marikina from Gloria, which was the portion of Hubler's testimony defense counsel was apparently attempting to discredit. While Defendant interprets the report as indicating that, "about a week [prior to the Barnacle's interview of Hubler]," "Hubler learned from Gloria that the [FBI] was at the offices of [Marikina]," the more natural reading of the report is that, *at some point* prior to Barnacle's interview of Hubler, Hubler learned from Gloria that the FBI searched Marikina about a week before the FBI searched SPI. (*See* Doc. 226-1, p. 95 of 95.) The later reading, which the court

finds to be a more likely interpretation, does not have any appreciable impeachment value, as it does not address whether Hubler learned of the search of Marikina before the FBI searched SPI. In short, the statement has, at best, minimal impeachment value.

Moreover, it is apparent Defendant offered Barnacle's testimony for reasons other than impeaching Hubler's credibility. It is indubitable from Defendant's brief that the statement was being offered for the truth of the matter, *i.e.,* that it would have "supported the defense's argument that Hubler, as a conspirator, received a warning about the federal investigation, while it was undisputed that [Defendant] did not." (Doc. 222, p. 103 of 119.) To be clear, Hubler's statement did not qualify under Rule 801(d)(1)(A), and thus could not be admitted as substantive evidence for the truth of the matter asserted.[86] Thus, the risk that the jury would have considered Barnacle's testimony related to Hubler's statement for the purpose set forth in Defendant's brief substantially outweighed the minimal impeachment value.

Accordingly, the court properly excluded Barnacle's testimony because: (1) defense counsel failed to comply with the procedural prerequisites of Federal Rule of Evidence 613; (2) Hubler's prior statement, to which Barnacle would have testified, was not inherently inconsistent with Hubler's trial testimony; and (3) Hubler's statement to Barnacle was being offered as substantive evidence, rather than for the purpose of impeachment.

---

[86] Rule 801(d)(1)(A) provides that "[a] statement is not hearsay if … [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is … inconsistent with his testimony and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." Fed. R. Evid. 801(d)(1)(A). Since prior inconsistent statements that come within this rule are defined as not being hearsay, they may be admitted as substantive evidence, and not merely for impeachment purposes. Nothing in the record suggests Hubler's statement to Barnacle was made under circumstances making applicable Rule 801(d)(1)(A).

### 7. Propriety of Denying Pre-Trial Motion To Suppress

Defendant next argues that the electronic evidence obtained from the computers and server seized from the premises of SPI and CDS on October 10, 2007, should have been suppressed, because the Government indiscriminately rummaged through more than a million computer files from SPI and CDS, and the warrants used to justify the seizure were unconstitutional general warrants, unconstitutionally over-broad, and were executed in an unreasonable manner. (Doc. 222, pp. 103-107 of 119.) These issues are identical to those raised by Defendant in his April 4, 2010 pre-trial motion to suppress electronic evidence (Doc. 41), which the court denied on the basis that Defendant did not have a personal expectation of privacy in the companies' computers and servers, and therefore lacked standing to challenge the search under the Fourth Amendment (Doc. 89). Defendant now argues that the evidence presented at trial demonstrated that he did in fact have standing because he had an expectation of privacy as a heavily involved president who managed day-to-day operations of his company and who sat "practically shoulder to shoulder with his employees." (Doc. 222, p. 106 of 119.) The court disagrees Defendant's characterization of the evidence, and declines to alter its prior holding. Thus, for the reasons previously set forth in this court's memorandum and order of September 1, 2010 (*see* Doc. 89), Defendant's motion to suppress the electronic evidence seized during the October 10, 2007 search of SPI was properly denied, and the court declines to revisit the issue.

### 8. Money Laundering Charges

Defendant next contends that the court erred in denying his Rule 29 motion for judgment of acquittal at the close of the Government's case. (*See* Doc.

222, p. 108 of 119.)  Defendant argues that the Government failed to prove Counts

Twenty through Thirty of the indictment, which charged Defendant with money

laundering, in violation of 18 U.S.C. § 1957, for depositing checks received by

Marikina for work done on DBE subcontracts into SPI's bank account.  (*See id.*)  In

support, Defendant now cites to the Fourth Circuit Court of Appeals' decision in

*United States v. Cloud*, 680 F.3d 396 (4th Cir. 2012), a decision based, in part, on an

interpretation of *United States v. Santos*, 553 U.S. 507 (2008).  Defendant argues

that, based on *Cloud*, the money laundering convictions must be vacated because

they were "part and parcel" of the underlying fraud on the DBE program.  (Doc. 222,

p. 113 of 119.)  Essentially, Defendant asserts that "proceeds" in the money

laundering statute must mean the "profits," rather than the "receipts," of predicate

crimes.  He argues that whenever a predicate offense to money laundering

necessarily involves the payment of the crime's receipts, the money laundering

offense "merges" with the predicate crime.  (Doc. 222, p. 113 of 119.)  Assuming his

premise is sound, Defendant reasons that the Government did not present evidence to

allow the jury to distinguish which money he laundered for his "profit" and which he

laundered to pay the "costs" of the scheme to defraud the DBE program.  (*Id.*)

Alternatively, Defendant re-raises his argument challenging the sufficiency of the

evidence as to the money laundering charges.  Both issues were addressed by the

court in its March 30, 2012 memorandum and order.  (Doc. 184.)  The court relies on

its prior reasoning in concluding both of Defendant's arguments pertaining to the

money laundering convictions are without merit, but will address Defendant's

challenge to the extent it urges the court to grant relief on the Fourth Circuit's

decision in *Cloud*.

157

Section 1957(a) of Title 18 makes it unlawful for any person to "knowingly engage[ ] or attempt[ ] to engage in a monetary transaction in criminally derived property [that is] of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). A "monetary transaction" includes deposits into financial institutions. *See* 18 U.S.C. § 1957(f)(1). The term "criminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2).[87] In the Third Circuit, "proceeds are derived from an already completed offense, or a completed phase of an ongoing offense, before they can be laundered." *United States v. Moro*, 505 F. App'x 113, 116 (3d Cir. 2012) (citing *United States v. Yusuf*, 536 F.3d 178, 186 (3d Cir. 2008)).

Although the defendant in *Santos* was convicted, *inter alia*, of operating an illegal lottery and Section 1956 money laundering, the Supreme Court's concern for unconstitutional "merger" also applies to Section 1957. The import of *Santos* is its requirement that a court evaluate whether the government has been redundant in its prosecution of a fraudulent scheme – that is, whether the charges separate necessary parts of the whole and treat them as independent bases for criminal liability. For the defendant in *Santos* to have run his lottery, he necessarily *had* to pay his employees and the lottery winners. Indeed, without such payments, his crime was nothing but simple theft. In short, the *Santos* Court held that "[t]he revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not 'proceeds' within the money laundering statute." 553

---

[87] While "proceeds" does not appear in Section 1957(a)'s description of the offense, subsection (f)(2) incorporates the term into the statute when it defines "criminally derived property." *See* 18 U.S.C. § 1957(f)(2).

U.S. at 528 (Stevens, J., concurring). Accordingly, the court must consider whether Defendant's Section 1957 money laundering convictions were based on deposits that funded the essential expenses of DBE fraud so as to present, what the *Santos* Court referred to as the "merger problem." For the following reasons, the court finds that the deposits were not essential expenses of the fraud offenses and thus do not implicate impermissible merger.

The actions underlying the wire and mail fraud convictions were distinct from those underlying the money laundering, thus alleviating any merger concerns. First, the wire fraud convictions (Counts 2-12) have no connection to the monetary transactions–rather the wire fraud was based on the interstate transmission of certain documents, namely the Marikina daily time sheets (Counts 2, 3, 4, and 11), change order (Count 8), lien waiver (Count 9), and application for Marikina's Department of Transportation Number (Count 12). Similarly, two of the mail fraud convictions dealt with the mailing of a lien waiver (Count 13) and a letter (Count 15). While the four remaining mail fraud convictions concern the mailing of checks, namely Counts 14, 16, 17, and 18, there is no corresponding money laundering conviction based on CDS check number 25032 (Count 14) or Nyleve check number 19258 (Count 18). Thus, these transmissions do not present the merger issue identified by the Supreme Count in *Santos*.

This leaves only two mail fraud convictions (Counts 16 and 17) which could present merger problems. Here, Defendant was convicted of mail fraud at Count 16 for mailing New Enterprises check number 27025, payable to Marikina, on November 17, 2005, and was convicted of money laundering at Count 23 for depositing that check into SPI's bank account on November 18, 2005, by using

Cruz's signature stamp.  Defendant was convicted of mail fraud at Count 17 for mailing Hawbaker check number 177341, payable to Marikina, on June 20, 2005, and was convicted of money laundering at Count 21 for depositing that check into SPI's bank account on June 21, 2005, by using Cruz's signature stamp.  (Doc. 197.) However, neither of the deposits providing the basis for the money laundering convictions were central to the actions for which Defendant was convicted of mail fraud.

Defendant's reliance on *Cloud* is misplaced.  In that case, the defendant's scheme, at its essence, involved convincing people to invest in real estate properties that, unbeknownst to the buyers, the defendant had recently purchased for a lesser amount.  *See Cloud*, 680 F.3d at 399-400.  The scheme also involved falsification of loan applications and the payment of "thousands of dollars in kickbacks to buyers, at least one mortgage broker, and the recruiters responsible for finding the buyers."  *Id*. at 400.  The defendant was convicted of several crimes, including, relevant to this case, three counts of mail fraud, thirteen counts of bank fraud, one count of conspiracy to commit money laundering, and six counts of money laundering.  *See id.* at 399.  The substantive counts all concerned various payments the defendant made "to recruiters, buyers, and other co-conspirators of the role each person played in the mortgage fraud scheme."  *Id*. at 406.  On appeal, the Fourth Circuit reversed those convictions, finding that they suffered from the merger problem identified in *Santos*.  *See id.* at 408.  The court concluded that the transactions that formed the basis of the laundering charges were payments of "the essential expenses of the underlying fraud" because it was only through the promise of these payments that the Defendant was able to persuade his co-conspirators to do

business with him. *See id.* at 406-408. That the payments were made after the services were performed did nothing to change that. *See id.* at 408. In order to correct the merger problem, the Fourth Circuit defined "proceeds" as "profits," as the *Santos* Court had done, and reversed the money laundering convictions on that basis. *Id.* at 409.

      *Cloud* is factually distinguished from the instant case because, unlike the defendant in *Cloud*, Defendant's convictions for Section 1957 money laundering relate to the deposits of the profits into CDS/SPI's bank accounts, rather than payments made to the co-conspirators. Here, Defendant was not convicted of unlawful monetary transactions for his actions related to the payment of the fixed fees, i.e., payments that were "essential expenses of the . . . fraud conspiracy." *See id.* at 408. Moreover, in this case, each fraud offense was complete when the general contractor sent money to Marikina. The Section 1957(a) money laundering offenses, in contrast, related to the *subsequent* transfers of those fraudulent proceeds to SPI bank account, thus involving concealment, rather than promotion, of mail fraud. As such, those deposits were not essential expenses of the already completed fraud, and thus the merger problem is not present here. *See Moro*, 505 F. App'x at 116 (finding no merger where substantive fraud offenses were completed when victim sent money to vendor and 1957 convictions related to subsequent transfers of those proceeds); *Abuhoran v. Grondolsky*, 643 F. Supp. 2d 654, 669 (D.N.J. 2009) ("Whatever was done with the proceeds of each loan was the start of a new activity, a separate crime if done with the requisite intent."); *accord United States v. Rubashkin*, 655 F.3d 849, 866 (8th Cir. 2011); *United States v. Aslan*, 644 F.3d 526, 549 (7th Cir. 2011); *United States v. Halstead*, 634 F.3d 270, 279-80 (4th Cir. 2011) ("[W]hen the

financial transactions of the predicate offenses are different from the transfers presented as money laundering, the merger problem recognized in *Santos* does not even arise.").

Moreover, when a person receives illicit proceeds in the form of a check, he obtains criminally derived property. When he knowingly deposits the criminally derived property – the check – in the bank, he commits money laundering. When he possesses the check, he possesses "any property" arising from the proceeds of a criminal offense – whether that property is in the form of cash or checks is of no moment. *See* 18 U.S.C. § 1957(f)(2); *see also* 18 U.S.C § 1956(c)(5) (defining "monetary instruments" used in money laundering transactions to include United States and foreign currency as well as "travelers' checks, personal checks, bank checks, and money orders"). In addition, Defendant appears to overlook the nuance that the checks were made payable to Marikina, but deposited into SPI's account by way of SPI employees' use of Cruz's signature stamp. Indeed, the purpose of the checks being payable in this manner was so that payments would "flow through Marikina" and conceal the account in which the money was ultimately deposited. (*See* Gov. 77.1.) In short, this endorsing and subsequent deposit was a distinct transaction from the underlying mail fraud through which the criminally derive property was originally obtained. Thus, the Section 1957 offenses neither fail under *Santos* nor suffer from a "merger problem." Accordingly, Defendant's motion for judgment of acquittal as to his convictions at Counts Twenty through Thirty will be denied.[88]

---

[88] As previously stated, the court had decided Defendant's challenge to the sufficiency of the evidence, and previously determined that the Government, at the end of its case-in-chief, had

(continued...)

## 9. Cumulative Error

Finally, throughout his briefs in support, Defendant asks this court to examine the "cumulative prejudicial effect" of the multiple errors he alleges. Defendant cannot show that "the errors, when combined, so infected the jury's deliberations that they had a substantial effect on the outcome of the trial." *See Thornton*, 1 F.3d at 156. To the contrary, Defendant has failed to establish any trial or pre-trial errors that may have had a substantial influence on the verdict. "The cumulative effect of each non-error does not rise to constitutional error; as the saying goes, zero plus zero equals zero." *United States v. Powell*, 444 F. App'x 517, 522 (3d Cir. 2011).

## III.    Conclusion

After carefully considering each of Defendant's arguments and for the reasons set forth herein, the court concludes that: (1) there was sufficient evidence to support each of the convictions; (2) the jury's verdict was not against the weight of the evidence; (3) there were no *Brady* violations with respect to Pishock's immunity agreement, Campbell's admissions to burning incriminating documents, Carol Campbell's interview report, or the non-disclosures of the Green documents; (4) there was no misconduct during the Prosecutor's summation or rebuttal; (5) Defendant's motion to preclude evidence of Defendant's wealth was properly denied; (6) the jury was properly instructed on willful blindness; (7) the testimony of Defendant's independent investigator was properly excluded; (8) Defendant's

---

(...continued)
presented sufficient evidence to sustain the jury's verdict as to the money laundering charges. (Doc. 184.) The court declines to further address this issue.

motion to suppress was properly denied; and (9) the money laundering charges were not "part and parcel" of the underlying fraud on the DBE program, and there was sufficient evidence to sustain Defendant's money laundering convictions. For the foregoing reasons, the court will deny Defendant's motion for judgment of acquittal, or in the alternative, motion for new trial in its entirety.

An order consistent with this memorandum will be issued separately.

_s/Sylvia H. Rambo_____
United States District Judge

Dated: July 26, 2013.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Crim. No. 1:09-CR-384-01** |
| **v.** | : | |
| | : | **Judge Sylvia H. Rambo** |
| **JOSEPH W. NAGLE** | : | |

## <u>ORDER</u>

     In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED** that Defendant's post-trial motion (Doc. 198) is **DENIED** in its entirety.

     The court will set a date for sentencing in a separate scheduling order.


                               <u>s/Sylvia H. Rambo</u>
                               United States District Judge

Dated:  July 26, 2013.