IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:09-CR-384-01** |
| **v.** | : | |
| **JOSEPH W. NAGLE** | : | **Judge Sylvia H. Rambo** |

**O P I N I O N**

As a result of his participation in a fraudulent scheme to obtain federally funded highway construction contracts set aside for socially and economically disadvantaged enterprises, Defendant Joseph W. Nagle was convicted by a jury in the United States District Court for the Middle District of Pennsylvania of 26 counts, including several counts of wire fraud, in violation of 18 U.S.C. § 1343, mail fraud, in violation of 18 U.S.C. § 1341, and engaging in unlawful monetary transactions, in violation of 18 U.S.C. § 1957. The jury also found that Defendant knowingly participated in a conspiracy to commit these acts, in violation of 18 U.S.C. §§ 371 and 1956(h). Presently before the court are Defendant's objections to the Presentence Investigation Report, in which he disputes, *inter alia*, the proper method of calculating loss pursuant to Section 2B1.1 of the Sentencing Guidelines and the applicability of Application Note 3(F)(ii) to that section, which addresses loss in connection with the fraudulent receipt of government benefits. For the following reasons, the court concludes that the loss attributable to Defendant's conduct is $53.9 million, which represents the amount of federal funds received by Schuylkill Products Inc. on the fraudulently obtained DBE contracts while Defendant was president. Accordingly, the court will overrule Defendant's objection in this regard and impose a 24-level increase pursuant to U.S.S.G. § 2B1.1.

## I. Background

The factual background presented at trial was set forth at length in this court's memorandum accompanying its order denying Defendant's post-trial motions and is incorporated herein. For purposes of the matter *sub judice*, the following general background is sufficient. During a period of nearly fifteen years, Schuylkill Products Inc. ("SPI") used Marikina Construction Corporation ("Marikina"), an entity certified as a disadvantaged business enterprise ("DBE"),[1] to serve as a "front" on bids for numerous highway construction projects sponsored by the Pennsylvania Department of Transportation ("PennDOT") and the Southeastern Pennsylvania Transportation Authority ("SEPTA"), and partially funded by the federal government. The fraud was extensive, and between 1993 and 2007, Marikina received approximately 336 federally assisted subcontracts from general contractors to furnish and install bridge beams, which were valued in excess of $119 million, making it PennDOT's largest recipient of DBE-designated funds. Most of the bridge beams used by Marikina on these projects were manufactured by SPI, but some required Marikina to install non-SPI products. Although the extensive evidence

---

[1] Pursuant to regulations adopted by the Department of Transportation at the direction of Congress, a state that receives federal funds for highway construction projects must set an annual goal for participation in such projects by disadvantaged business enterprises. *See* 49 C.F.R. § 26.21. Prime contractors, in turn, must ensure that the subcontracts awarded in connection with a highway construction project meet the DBE participation goal for that project. A DBE is a for-profit small business that is at least 51-percent owned by one or more socially and economically disadvantaged individuals, and whose daily business operations are controlled by at least one of those individuals. 49 C.F.R. § 26.5. A DBE must be certified by the state in which it operates. In order to satisfy DBE participation goals, a DBE that is awarded a subcontract on a project must perform a commercially useful function – that is, the DBE itself must perform, manage, and supervise the subcontracted work and must negotiate the price, order, install, and pay for the materials used. 49 C.F.R. § 26.55. A contractor does not receive credit for DBE participation if the relationship between the contractor and the DBE is such that the DBE's "role is limited to that of an extra-participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation." 49 C.F.R. § 26.55(c).

presented at trial established the existence of this scheme during the course of the fifteen years, Defendant first became president of SPI in April of 2004.

Although Marikina was the subcontractor of record, it did not perform a commercially useful function and, in reality, the subcontracts were found, negotiated, coordinated, performed, managed, and supervised by personnel employed by SPI and CDS, a wholly owned subsidiary that operated as the erection division of SPI. Profits for the jobs flowed through Marikina to CDS and SPI, less a "fixed fee" that was paid to Marikina. For example, if an SPI beam was used, Marikina remitted all of the funds received pursuant to the contracts to SPI. If a third-party's beam was used, Marikina submitted the funds less the cost of the third party beam to SPI. In either case, SPI gave Marikina a fixed fee and internally retained the balance of the total subcontract payment. Although laborers received paychecks from Marikina when they worked on "Marikina" jobs, Marikina sent invoices to CDS for the amount paid to the workers, and CDS reimbursed Marikina from its operating account for those amounts. Ultimately, the profits on erection work performed by CDS on Marikina's subcontracts went to CDS's bottom line in exchange for Marikina receiving the fixed fee. Thus, the scheme resulted in money, which the government had intended to go to legitimate DBEs performing commercially useful functions, being funneled through Marikina directly to SPI, a non-DBE.[2] Ultimately, this arrangement resulted in increased profits for SPI.

---

[2] The relationship between Marikina and SPI made Marikina more attractive to general contractors, as it was easier for general contractors to meet DBE goals by subcontracting with Marikina to install beams furnished by SPI, making the company a "one-stop shop." Moreover, by using Marikina to furnish the beams, the general contractor could receive DBE credit on the cost of beams *and* erection.

Revenue generated by the fraud was a substantial part of SPI's business, and during Defendant's tenure as president, which began following the death of his father, both SPI and CDS experienced increased profits due, at least in part, to the companies' receipt of numerous subcontracts through Marikina, which SPI was otherwise ineligible to receive. During the relevant time, SPI/CDS's aggregate annual revenue was between 18 million and 26 million dollars, with 20- to 25-percent of that amount being attributed to the erection division.

A jury convicted Defendant of the numerous charges related to his participation in the foregoing fraud. This necessitated the jury's finding that Marikina did not perform a commercially useful function in connection with any of the PennDOT DBE subcontracts and that Defendant knowingly participated in the fraud that resulted in the non-DBEs receiving funds earmarked for legitimate DBEs. The propriety of the jury's judgment has been discussed at length in a previous memorandum of this court (Doc. 259) and is beyond the scope of this opinion.

## II. <u>Discussion</u>

In the Presentence Investigation Report, the Government calculated the amount of loss attributable to the overall conspiracy to defraud and commit mail and wire fraud to be $135.8 million; however, because the evidence demonstrated that Defendant joined the conspiracy in 2004, the amount of loss attributable to his conduct was $53.9 million, which, pursuant to U.S.S.G. § 2B1.1(b)(1)(M), resulted in a 24-level increase to the Offense Level Computation. Defendant objects to the method utilized by the probation officer and the Government in reaching this calculation.

Specifically, Defendant argues that the Government incorrectly measured the pecuniary harm caused by his conduct and contends that, rather than the entire face value of the contract payments *received* by Marikina, the proper measure of loss is the amount of actual *profits* CDS received during the relevant time period, *i.e.,* from 2004 through 2008, which is a methodology consistent with the United States District Court of the Southern District of New York's 2012 opinion in *United States v. White*, No. 10-cr-516, 2012 WL 4513489 (S.D.N.Y. Oct. 2, 2012), a factually analogous case. Using the *White* court's methodology, Defendant calculates the total profit to be $850,931.20, which, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), would result in a 14-level increase to the Offense Level Calculation. The court rejects Defendant's argument and the reasoning employed by the *White* court.

Section 2B1.1 of the Sentencing Guidelines provides the base offense level for defendants convicted of crimes involving fraud and deceit, and various increases in the offense level depending on the amount of money at issue. In determining the loss attributable to the relevant conduct, the Government bears the burden of proving loss with reliable and specific evidence. The Sentencing Guidelines define actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n. 3(A)(i). Pecuniary harm "means harm that is monetary or that otherwise is readily measurable in money." *Id*. at cmt. n.3(A)(iii). If a loss cannot be reasonably determined, the Guidelines instruct the courts to "use the gain that resulted from the offense as an alternative measure of loss." *Id*. at cmt. n.3(B).

The section also contains a specific provision that addresses how loss is to be calculated when the fraud or deceit involves a government benefits program. The applicable Application Note, titled "Government Benefits," provides, in pertinent part, as follows:

> In a case involving government benefits (*e.g.,* grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be.

U.S.S.G. § 2B1.1 cmt. n.3(F)(ii). Consistent with several other circuits, and as recognized by the district court in *White*, 2012 WL 4513489 at *3, the Third Circuit has held that the DBE program is a government benefits program for purposes of Section 2B1.1 and is subject to Application Note 3(F)(ii). *See, e.g., United States v. Tulio*, 263 F. App'x 258, 263 (3d Cir. 2008) (holding Government Benefits provision of Section 2B1.1 applies to DBE funded contracts); *United States v. Campbell*, No. 08-cr-0007, 2010 WL 2650541, *3 (M.D. Pa. July 1, 2010) (finding Application Note 3(F)(ii) applicable to the calculation of loss in a companion case to the instant matter and citing support from the Fourth, Seventh, and Eleventh Circuits). Thus, in a case such as this, where an "unintended recipient," *i.e.,* someone not socially or economically disadvantaged, obtained government benefits, *i.e.,* construction contracts set aside for disadvantaged business enterprises, the court's calculation of loss is guided by Application Note 3(F)(ii) to Section 2B1.1, which instructs the court to determine the loss which is "not less than the value of the benefits obtained by the unintended recipients." U.S.S.G. § 2B1.1 cmt.n.3(F)(ii).

Defendant adopts the *White* court's interpretation of the term "benefits" as the basis for his argument. *See White*, 2012 WL 4513489 at *4. In *White*, the

defendant was convicted of, among other things, fraudulently certifying that he was a service-disabled veteran, which made him and his company eligible for certain small-business set-aside contracts. *Id*. at *1. The government argued that the loss amount was the face value of the contracts that the defendant fraudulently obtained, *i.e.,* $16.7 million. *Id*. The district court disagreed and held that, pursuant to Application Note 3(F)(ii), the profits obtained by the defendant for fraudulently set-aside contracts was the proper measure of loss. *Id*. at *5.

The *White* court reached this conclusion after interpreting the phrase "value of the benefits obtained" by looking to the ordinary meaning of "benefit," which it defined as "[p]ecuniary advantage, profit, gain, . . . or a payment, [or] gift." *Id*. at *4 (alterations in original and internal citations omitted). Based on this definition, the court substituted "profits" for "benefits" and computed the loss caused by the defendant to be the actual or intended profit rather than the face value of the set-aside contracts fraudulently procured. *Id*. at *5. This court rejects the *White* court's interpretation of the Application Note.

The meaning of "benefits" under Application Note 3(F)(ii) does not require the court to turn to the dictionary as the *White* court did because the term must be read in context of the entire Application Note. Significantly, Application Note 3(F)(ii) is titled "Government Benefits" and contains a non-exhaustive list of examples of types of benefits subject to the provision. The Note provides that, where the defendant is an "unintended recipient [of the government benefits at issue]," the loss amount is considered to be "not less than the value of the [government] benefits obtained." In this context, "benefits" refers to the type of *government benefit* (*see,*

*e.g.*, grants, loans, entitlement program payments, DBE funded contracts[3]) that the defendant improperly obtained. The term is an internal reference to the subject matter fraudulently obtained to which the Application Note applies. Redefining the term is unnecessary.[4]

Here, the entire DBE portions of the contracts were diverted to unintended recipients, *i.e.,* Marikina,[5] CDS, and SPI. Although the contracted-for work was actually performed, the money was not put to its intended use – to pay for work by a DBE on the highway construction projects. The Government paid $53.9 million to Marikina during Defendant's tenure as president of SPI.[6] The proceeds of

---

[3] *See United States v. Tulio*, 263 F. App'x 258, 263 (3d Cir. 2008) (holding that the DBE program is a government benefit subject to Application Note 3(F)(ii)).

[4] This interpretation is not only consistent with other case law addressing the method of calculating loss, but is also consistent with the example provided in the Application Note itself. The example provides that, "if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50." While the court acknowledges that, in the matter *sub judice*, Defendant was *not* the intended recipient of the government benefit at issue, the example is nevertheless instructive. Here, Defendant was the intended recipient of government benefits having a value of $0 but fraudulently received government benefits having a value of $53.9 million. Thus, loss is the difference between the amount to which Defendant was entitled, $0, and the entire value of the benefits fraudulently obtained, which is $53.9 million.

[5] It is of no significance that Marikina was certified as a DBE contractor; what matters is that Marikina did not provide a commercially useful function. *See United States v. Maxwell*, 579 F.3d 1282, 1306 (11th Cir. 2009).

[6] During the February 26, 2014 hearing on loss, evidence was presented to support a finding that the amount of loss applicable to Defendant should be $41 million, the value of the contracts *awarded* to Marikina after Defendant became president, rather than $53.9 million, the amounts *obtained* by Marikina from the government while Defendant was president. The court finds the proper measure to be the latter value. According to Section 1B1.3 of the Sentencing Guidelines, a defendant cannot be held accountable for acts that occur before he engaged in criminal conduct. As highlighted in this court's memorandum addressing Defendant's post-trial motions, the Government presented evidence at trial to establish that Defendant was aware of the fraud before he became president and acted, once he became president, in a manner to ensure the fraudulent contract flow continued and remained concealed. (*See, e.g.*, Doc. 259, p. 72 of 164.) Specifically, on March 11, 2002, two years before Defendant became president of SPI, Defendant sent a fax on SPI letterhead to a general contractor, in which he

(continued...)

the DBE contracts should have, but did not, go to a certified DBE contractor that completed a commercially useful function. Accordingly, the value of the government benefits obtained by the unintended recipient, *i.e.,* payments on the DBE contracts received by Marikina, is the proper measure of loss.[7]

---

[6](...continued)
represented Hubler to be a Marikina employee, although he knew that Hubler was an employee of SPI. (*See id.* at p. 61 of 164 (citing Gov. 106.2).) After he became president, Defendant suggested the following in a May 12, 2004 email sent to several SPI management personnel:

> For contractors that are equipped for direct deposit (some already get paid by PennDOT this way) we should request that we receive electronic payments. *On Marikina contracts, payment would have to flow through Marikina and they would have to be set up to direct deposit to SPI.*

(*Id.* at p. 72 of 164 (emphasis in original) (citing Gov. Trial Ex. 77.1).) This evidence established Defendant's knowledge of the conspiracy and involvement therein. Although Defendant attempted to refute the inferences occasioned by these documents, this court has previously concluded that the inference was both supported by sufficient evidence and in accordance with the weight of the evidence. Thus, the evidence established that, at the time he became president of SPI, Defendant was aware of both the scheme and the source of the payments and method in which the benefits were obtained. Accordingly, the value of the government benefits fraudulently obtained while Defendant was president is the proper measure of loss for purposes of Application Note (3)(F)(ii). At the February 26, 2014 sentencing hearing, the Government proved that SPI fraudulently obtained benefits in the amount of $53.9 million during Defendant's tenure as president. (Gov. Ex. 15, admitted at Hearing, Feb. 26. 2014.)

[7] The court notes that calculating loss by using the face value of the contracts is consistent with other cases involving government benefits obtained by unintended recipients. For example, the Seventh Circuit held that every illegal transaction in food stamps creates a loss. Even if an unlicensed store owner accepts food stamps in exchange for authorized goods, when he sells them to a licensed store owner to be redeemed, he diverts the whole value of the government benefits from their intended uses and recipients. *See United States v. Hassan*, 211 F.3d 380 (7th Cir. 2000); *cf. United States v. Glinsey*, 209 F.3d 386 (5th Cir. 2000) (determining, on collateral review, that loss was the face amount of food stamps illegally purchased and redeemed and, therefore, counsel was not ineffective). Similarly, where a defendant corporation fraudulently represented that a DBE performed work on a highway construction project, the loss was the portion of the contract price allocated to pay for such work. Although the work was actually performed, the money was not put to its intended use. *See United States v. Brothers Const. Co. of Ohio*, 219 F.3d 300 (4th Cir. 2000); *see also United States v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009) (calculating loss to be total amount *paid* to business fraudulently represented as being a DBE).

## III. Conclusion

Based on the foregoing, the court concludes that, in light of Application Note 3(F)(ii) to Section 2B1.1, the amount of loss in this case involving a government benefits programs equals the entire value of the government benefits obtained by Marikina as a result of the fraudulent contracts at issue. Therefore, Defendant's objections to the loss amount in this regard will be overruled and the court will apply a corresponding 24-level increase to Defendant's offense level.

s/Sylvia H. Rambo
United States District Judge

Dated: May 7, 2014.