IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Crim. No. 1:09-CR-384** |
| **v.** | : | |
| | : | |
| | : | **Judge Sylvia H. Rambo** |
| **JOSEPH W. NAGLE and** | : | |
| **ERNEST G. FINK** | : | |

**O P I N I O N**

As a result of their participation in a fraudulent scheme to obtain
federally funded highway construction contracts set aside for socially and
economically disadvantaged enterprises, Defendants Joseph W. Nagle ("Nagle") and
Ernest G. Fink ("Fink") were charged in a 32 count indictment.  (Doc. 1.)  Fink
entered a plea of guilty to Count 1 of the indictment, which charged him with
engaging in a conspiracy to commit wire and mail fraud and to defraud the United
States by impeding, impairing, obstructing, and defeating the lawful governmental
functions of the United States Department of Transportation in the implementation,
execution, and administration of its Disadvantaged Business Enterprises program.
(Doc. 77.)  Nagle proceeded to trial, and was convicted by a jury in the United States
District Court for the Middle District of Pennsylvania of 26 counts, including
several counts of wire fraud, in violation of 18 U.S.C. § 1343, mail fraud, in
violation of 18 U.S.C. § 1341, and engaging in unlawful monetary transactions, in
violation of 18 U.S.C. § 1957.  The jury also found that Nagle knowingly
participated in a conspiracy to commit these acts, in violation of 18 U.S.C. §§ 371
and 1956(h).  At sentencing, the court found that the loss amount was the total
amount of the construction contracts that Defendants had fraudulently obtained.
The Third Circuit reversed, holding that the loss should be the difference between

the total contract amount and the fair market value of the services provided, and remanded both matters to this court for resentencing. Presently before the court are Defendants' motions for immediate release (Doc. 335 & 340), based on, *inter alia*, their belief that the Third Circuit's appellate opinion dictates that this court find the loss to be zero. For the following reasons, the court disagrees, and instead concludes that the loss attributable to Defendants' conduct is the amount of profits that their businesses diverted from legitimate DBEs on the fraudulently obtained contracts while Defendants were in control. Accordingly, the court will deny Defendants' motions for immediate release.

## I.      **Background**

The factual background was set forth at length in this court's memorandum accompanying its order denying Nagle's post-trial motions. *See generally United States v. Nagle*, Crim. No. 09-cr-0384-01, 2013 WL 3894841 (M.D. Pa. July 26, 2013). Additionally, Fink's plea agreement contained an eleven-page statement of facts in support of his guilty plea. (*See* Doc. 77-2.) The court is satisfied that the following recitation of facts is sufficient for purposes of the matter *sub judice*.

During a period of nearly fifteen years, Schuylkill Products Inc. ("SPI") used Marikina Construction Corporation ("Marikina"), an entity certified as a disadvantaged business enterprise ("DBE"),[1] to serve as a "front" on bids for

---

[1]     Pursuant to regulations adopted by the Department of Transportation at the direction of Congress, a state that receives federal funds for highway construction projects must set an annual goal for participation in such projects by disadvantaged business enterprises. *See* 49 C.F.R. § 26.21. Prime contractors, in turn, must ensure that the subcontracts awarded in connection with a highway

(continued...)

2

numerous highway construction projects sponsored by the Pennsylvania Department of Transportation ("PennDOT") and the Southeastern Pennsylvania Transportation Authority ("SEPTA"), and partially funded by the federal government.  The fraud was arrant, and between 1993 and 2007, Marikina received approximately 336 federally assisted subcontracts from general contractors to furnish and install bridge beams, which were valued in excess of $119 million, making it PennDOT's largest recipient of DBE-designated funds.  Most of the bridge beams used by Marikina on these projects were manufactured by SPI, but some required Marikina to install non-SPI products.  Although the extensive evidence presented at trial established the existence of this scheme during the course of the fifteen years, Nagle first became president of SPI in April of 2004.

Although Marikina was the subcontractor of record, it did not perform a commercially useful function and, in reality, the subcontracts were found, negotiated, coordinated, performed, managed, and supervised by personnel employed by SPI and CDS Engineers, Inc. ("CDS"), a wholly owned subsidiary that operated as the erection division of SPI.  Profits for the jobs flowed through Marikina to CDS and SPI, less a "fixed fee" that was paid to Marikina.  For

---

[1](...continued)
construction project meet the DBE participation goal for that project.  A DBE is a for-profit small business that is at least 51-percent owned by one or more socially and economically disadvantaged individuals, and whose daily business operations are controlled by at least one of those individuals.  49 C.F.R. § 26.5.  A DBE must be certified by the state in which it operates.  In order to satisfy DBE participation goals, a DBE that is awarded a subcontract on a project must perform a commercially useful function – that is, the DBE itself must perform, manage, and supervise the subcontracted work and must negotiate the price, order, install, and pay for the materials used.  49 C.F.R. § 26.55.  A contractor does not receive credit for DBE participation if the relationship between the contractor and the DBE is such that the DBE's "role is limited to that of an extra-participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation."  49 C.F.R. § 26.55(c).

example, if an SPI beam was used, Marikina remitted all of the funds received pursuant to the contracts to SPI.  If a third-party's beam was used, Marikina submitted the funds less the cost of the third party beam to SPI.  In either case, SPI gave Marikina a fixed fee and internally retained the balance of the total subcontract payment.  Although laborers received paychecks from Marikina when they worked on "Marikina" jobs, Marikina sent invoices to CDS for the amount paid to the workers, and CDS reimbursed Marikina from its operating account for those amounts.  Ultimately, the profits on erection work performed by CDS on Marikina's subcontracts went to CDS's bottom line in exchange for Marikina receiving the fixed fee.  Thus, the scheme resulted in funds, which the government had intended to go to legitimate DBEs performing commercially useful functions, being funneled through Marikina directly to SPI, a non-DBE.[2]  Ultimately, this arrangement resulted in increased profits for SPI.

Revenue generated by the fraud was a substantial part of SPI's business, and during Nagle's tenure as president, which began following the death of his father, both SPI and CDS experienced increased profits due, at least in part, to the companies' receipt of numerous subcontracts through Marikina, which SPI was otherwise ineligible to receive.  During the relevant time, SPI/CDS's aggregate annual revenue was between 18 million and 26 million dollars, with 20- to 25-percent of that amount being attributed to the erection division.

---

[2]  The relationship between Marikina and SPI made Marikina more attractive to general contractors, as it was easier for general contractors to meet DBE goals by subcontracting with Marikina to install beams furnished by SPI, making the company a "one-stop shop."  Moreover, by using Marikina to furnish the beams, the general contractor could receive DBE credit on the cost of beams *and* erection.

A jury convicted Nagle of the numerous charges related to his participation in the foregoing fraud.  This necessitated the jury's finding that Marikina did not perform a commercially useful function in connection with any of the PennDOT DBE subcontracts and that Nagle knowingly participated in the fraud that resulted in the non-DBEs receiving funds earmarked for legitimate DBEs.  The propriety of the jury's judgment has been discussed at length in a previous memorandum of this court (Doc. 259) and is beyond the scope of this opinion.

Nagle's co-defendant and partner in this fraudulent scheme, Fink, entered into a plea rather than proceeding to trial.  As part of his plea, Fink admitted that he knowingly participated in the foregoing fraud, which included his admitting that he knew that Marikina did not perform a commercially useful function in connection with any of the PennDOT or SEPTA DBE subcontracts and that SPI and CDS, the non-DBEs, received funds earmarked for legitimate DBEs.

In the respective Presentence Investigation Reports for each defendant, the probation officer calculated the amount of loss attributable to the overall conspiracy to defraud and commit mail and wire fraud to be approximately $135.8 million, which included losses in the amount of $119,409,724.04 for funds received by the companies on subcontracts awarded through PennDOT and $16,411,620.65 for funds received by the companies on subcontracts awarded through SEPTA.  (*See also*, Gov. Ex. 5.1-5.11, *admitted at* Hearing, February 26, 2014.)  Pursuant to U.S.S.G. § 2B1.1(b)(1)(N), the aggregate loss resulted in a 26-level increase to the Offense Level Computation for Fink.  However, because the evidence at his trial demonstrated that Nagle did not join the conspiracy until 2004, the amount of loss attributable to his conduct was $53.9 million, which, pursuant to U.S.S.G. §

2B1.1(b)(1)(M), resulted in a 24-level increase to his Offense Level Computation. Defendants objected to the method utilized by their probation officers and the Government in reaching these calculations.  A hearing on Defendants' objections to the loss amount was held on February 26, 2014.

On May 7, 2014, the court issued an opinion overruling Defendants' objections to the loss calculation, in which the court determined that the amount of loss for sentencing guideline purposes was the entire face value of the government benefits obtained by Marikina as a result of the fraudulent contracts.  *United States v. Nagle*, Crim. No. 09-cr-0384-01, Doc. 281, 2014 WL 1808193 (M.D. Pa. May 7, 2014).  The court indicated its intention to apply a corresponding 24-level increase to Nagle's offense level, and a 26-level increase to Fink's, pursuant to U.S.S.G. § 2B1.1.  *Id.*

On June 30, 2014, after reiterating its conclusion that the loss attributable to Nagle's conduct was $53.9 million, which was the face value of the government contracts during Nagle's time with SPI and CDS, the court granted a variance and a departure on the basis that the guideline range overstated the seriousness of the offense and sentenced Nagle to undergo a term of imprisonment of 84 months and to pay a fine of $25,000.00.  (Doc. 297.)  Likewise, on July 14, 2014, the court concluded that the $135,821,344.69 worth of government contracts obtained during Fink's involvement was the appropriate amount of loss, but granted a departure due to the guideline range's overstatement of the seriousness of his offense, and sentenced Fink to a term of imprisonment of 51 months and a $25,000.00 fine.  (Doc. 308.)  Defendants filed their respective notices of appeal on July 1 and 24, 2014.  (Docs. 301 & 311.)

On appeal, the Third Circuit reversed this court's finding as to loss, holding that in a DBE fraud case the court should calculate the amount of loss under § 2B1.1 of the United States Sentencing Guidelines "by taking the face value of the contracts and subtracting the fair market value of the services rendered under those contracts," which includes "the fair market value of the materials supplied, the fair market cost of the labor necessary to assemble the materials, and the fair market value of transporting and storing the materials." *United States v. Nagle*, 803 F.3d 167, 181 (3d Cir. 2015). The Court of Appeals added that, "[i]f possible and when relevant, the District Court should keep in mind the goals of the DBE program that have been frustrated by the fraud." *Id*. Because of its concern that the incorrect loss calculation may have affected Defendants' sentences, the Third Circuit remanded to this court for resentencing. *Id*. at 183.

On October 7, 2015, this court requested briefs from Defendants and the government as to the amount of loss under the Third Circuit's analysis. Fink submitted his brief on October 20, 2015 (Doc. 336), along with a motion for immediate release (Doc. 335) based on his belief that the loss is zero. Nagle filed his brief as to loss on October 26, 2015 (Doc. 339), and a similar motion for release based on a loss amount of zero on November 3, 2015 (Doc. 340). The government responded to Defendants' briefs on November 4, 2015 (Docs. 341, 342, & 343), and opposed the motions for release based on its belief that the loss amount should be the profits that legitimate DBEs were deprived of due to Defendants' fraud. Fink filed a reply on November 6, 2015 (Doc. 344), and the time for a reply from Nagle has lapsed. Thus, the matter is ripe for disposition.

II.            **Discussion**

At sentencing, this court found the amount of loss attributable to the overall conspiracy to defraud and commit mail and wire fraud to be $135.8 million. That loss figure resulted in a 26-level enhancement to Fink's Offense Level Computation pursuant to U.S.S.G. § 2B1.1(b)(1)(N). As for Nagle, because the evidence at his trial demonstrated that he did not join the conspiracy until 2004, the amount of loss attributable to his conduct was $53.9 million, which, pursuant to U.S.S.G. § 2B1.1(b)(1)(M), resulted in a 24-level increase to his Offense Level Computation. Both Defendants objected to the loss calculation, arguing that the loss figure should be reduced by the value of their performance on the contracts, and should be limited to the profits that legitimate DBEs would have received had they performed the government contracts. Fink argued that, under that calculation, the amount of loss attributable to his conduct was $1,037,828.61, and Nagle argued that the amount attributable to his conduct was $850,931.20. While the government did not agree with these loss calculations, it recognized that the sentences associated with its own loss calculations would overstate the seriousness of the offenses, and did not object to the downward departures that Defendants requested in order to sentence them based on their suggested loss figures. The court granted the downward departures and sentenced Defendants within the guideline ranges that would have applied had the court found the loss figures for which they argued.

In their instant motions for release, Defendants now argue that the loss is not the lost profits of legitimate DBEs that would have otherwise been awarded the contracts, as they had previously argued, but is now zero based on the Third Circuit's loss analysis. Defendants' primary argument is that the Third Circuit's

analysis mirrors that which this court used in determining that the amount of restitution was zero, and thus this court should come to the same conclusion as to the amount of loss.[3]  The court disagrees.

Restitution and loss, while related in many cases, are not one and the same.  *See United States v. Badaracco*, 954 F.2d 928, 942-43 (3d Cir. 1992) (calculating loss for sentencing purposes differently than restitution); *United States v. Zangari*, 677 F.3d 86, 92 n.8 (2d Cir. 2012) (collecting cases differentiating restitution from loss); *United States v. Hunter*, 618 F.3d 1062, 1065 (9th Cir. 2010) (stating that "calculating loss under the guidelines is not necessarily identical to loss calculation for purposes of restitution."); *United States v. Crandall*, 525 F.3d 907, 916 (9th Cir. 2008) (finding that "[l]oss for purposes of evaluating the seriousness of a fraud under the Sentencing Guidelines and loss for purposes of restitution are . . . potentially quite different.").  In finding that the amount of restitution payable to the contracting government agencies was zero, the court concluded that those agencies suffered no pecuniary harm because "Marikina – through CDS and SPI – actually performed, and competently performed, the services for which it sought payments of federal funds from PennDOT and SEPTA, and that all such services performed were legitimate highway construction services worth the value of the contracts." (Doc. 292, p. 11.)  Although USDOT did not receive the full benefit of its bargain because the work was not performed by a legitimate DBE, the work was nonetheless

---

[3]  In his brief in support of his motion for immediate release, Fink also argues that the fair market value of the services rendered for purposes of determining loss is "the price a willing buyer would pay a willing seller had it known all the facts."  (Doc. 336, pp. 2-3 of 5.)  Therefore, according to Fink, USDOT paid the price it was willing to pay for the services it received, and the loss is zero.  However, as the government aptly points out, had USDOT known all the facts, namely that Marikina was not a legitimate DBE, USDOT would not have been willing to contract with Marikina at all.  (*See* Doc. 341, p. 18 of 27.)  Accordingly, the court finds this argument unpersuasive.

completed.  Accordingly, USDOT was not a victim of Defendants' conduct for purposes of restitution under the Mandatory Victim Restitution Act.  (*Id*. at p. 12); *see* 18 U.S.C. § 3663(a)(2).

The amount of loss resulting from Defendants' fraudulent scheme, however, is not simply a question of the pecuniary harm that USDOT may have suffered.  As the Third Circuit mandated in its appellate opinion, this court must determine loss by subtracting the fair market value of the services performed by Defendants from the full contract price, while also "keep[ing] in mind the goals of the DBE program that have been frustrated by the fraud." *Nagle*, 803 F.3d at 181. The DBE program "allows a DBE to not only earn a profit on the deal but also to form connections with suppliers, labor, and others in the industry.  The profit earned, therefore, is not the only benefit the DBE obtains when it receives the contract." *Id*.  Here, the proceeds of the DBE contracts should have, but did not, go to a certified DBE contractor that completed a commercially useful function. Instead, it was SPI and CDS that earned a profit and formed or strengthened valuable industry connections.  Thus, while the court would be justified in finding a loss amount higher than the profit figures that Defendants propounded at the February 26, 2014 loss hearing in order to account for the missed industry connections of which legitimate DBEs were cheated, the court concludes that the lost profits are an adequate measure of loss for sentencing purposes in this case. Accordingly, the court finds that the loss attributable to Fink's conduct is $1,037,828.61, and the loss attributable to Nagle's conduct is $850,931.20, as they both initially argued.

Furthermore, although the court determined, at sentencing, that the loss amount was the full value of the contracts, the court imposed a sentence that instead reflected the profits that would have been received by legitimate DBEs during the relevant time by granting downward departures of ten levels to both Fink and Nagle. In imposing the sentences, the court remained mindful of its obligation to impose sentences that were sufficient but not greater than necessary to achieve the sentencing objectives. Indeed, in reaching the durations of imprisonment, the court did not base its sentences on a mechanical operation of the guidelines. Rather, the court determined that, based upon consideration of, *inter alia*, Defendants' conduct and the resulting harm, the appropriate terms of imprisonment were 51 months for Fink and 84 months for Nagle. Defendants' sentences would have been the same duration as originally imposed had the court found at sentencing that loss for sentencing guidelines purposes was limited to the face value of the contracts less the fair market value of the services rendered.

## III.  <u>Conclusion</u>

Based on the foregoing, in light of the Third Circuit's appellate opinion in this matter, the court concludes that the amount of loss for each defendant in this case equals the amount of profits diverted from legitimate DBEs as a result of the fraudulent contracts at issue which amounts to $1,037,828.61 and $850,931.20 for Fink and Nagle, respectively. Accordingly, both motions for release will be denied,

and Defendants will be resentenced to the same sentences previously imposed by this court.

         An appropriate order will issue.


                                           s/Sylvia H. Rambo
                                           United States District Judge

Dated:  November 30, 2015.