IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:09-CR-0384** |
| v. | : | |
| **JOSEPH W. NAGLE** | : | **Judge Sylvia H. Rambo** |

# M E M O R A N D U M

Before the court is Defendant Joseph W. Nagle's ("Nagle") Motion to Vacate Convictions and Sentence filed pursuant to 28 U.S.C. § 2255 in which Defendant argues that in disadvantaged business enterprise ("DBE") fraud cases where services are provided by the defendant to the victim, the defendant cannot, as a matter of law, be convicted of mail or wire fraud. (Doc. 377.) After full consideration of both parties' submissions and for the reasons that follow, Nagle's motion will be denied.

## I. Background

The factual background of Nagle's underlying convictions was set forth at length in this court's memorandum accompanying its order denying his post-trial motions and will not be repeated herein. *See generally United States v. Nagle*, Crim. No. 1:09-cr-0384-01, 2013 WL 3894841 (M.D. Pa. July 26, 2013). The following abridged version of the facts and procedural history of this case is, for purposes of the matter *sub judice*, sufficient to put the issues presently before the court into context.

## A. The offense conduct

Nagle was the President, CEO, member of the Board of Directors, and majority owner of Schuylkill Products Inc. ("SPI") and its wholly-owned subsidiary, CDS Engineers, Inc. ("CDS"). SPI was a manufacturer of concrete products, including pre-stressed concrete bridge beams for use on highway construction projects. CDS operated as the engineering and erection division of SPI, with CDS workers erecting products manufactured by CDS and other suppliers at job sites inside and outside of Pennsylvania. Neither SPI nor CDS were certified DBEs,[1] nor were they eligible to be certified as such.

During a period of nearly fifteen years, SPI used Marikina Construction Corporation ("Marikina"), an entity certified as a DBE, to serve as a "front" on bids for numerous highway construction projects sponsored by the Pennsylvania Department of Transportation ("PennDOT") and the Southeastern Pennsylvania

---

[1] Pursuant to regulations adopted by the Department of Transportation at the direction of Congress, a state that receives federal funds for highway construction projects must set an annual goal for participation in such projects by disadvantaged business enterprises. *See* 49 C.F.R. § 26.21. Prime contractors, in turn, must ensure that the subcontracts awarded in connection with a highway construction project meet the DBE participation goal for that project. A DBE is a for-profit small business that is at least 51-percent owned by one or more socially and economically disadvantaged individuals, and whose daily business operations are controlled by at least one of those individuals. 49 C.F.R. § 26.5. A DBE must be certified by the state in which it operates. In order to satisfy DBE participation goals, a DBE that is awarded a subcontract on a project must perform a commercially useful function—that is, the DBE itself must perform, manage, and supervise the subcontracted work and must negotiate the price, order, install, and pay for the materials used. 49 C.F.R. § 26.55. A contractor does not receive credit for DBE participation if the relationship between the contractor and the DBE is such that the DBE's "role is limited to that of an extra-participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation." 49 C.F.R. § 26.55(c).

Transportation Authority ("SEPTA"), and partially funded by the federal government. The fraud was extensive. Between 1993 and 2007, Marikina received approximately 336 federally assisted subcontracts from general contractors to furnish and install bridge beams, which were valued in excess of $119 million, making it PennDOT's largest recipient of DBE-designated funds. Most of the bridge beams used by Marikina on these projects were manufactured by SPI, but some required Marikina to install non-SPI products.

Although Marikina was the subcontractor of record, it did not perform a commercially useful function and, in reality, the subcontracts were found, negotiated, coordinated, performed, managed, and supervised by personnel employed by SPI and CDS. Profits for the jobs flowed through Marikina to CDS and SPI, less a "fixed fee" that was paid to Marikina. For example, if an SPI beam was used, Marikina remitted all of the funds received pursuant to the contracts to SPI. If a third-party's beam was used, Marikina submitted the funds less the cost of the third-party beam to SPI. In either case, SPI gave Marikina a fixed fee and internally retained the balance of the total subcontract payment. Although laborers received paychecks from Marikina when they worked on "Marikina" jobs, Marikina sent invoices to CDS for the amount paid to the workers, and CDS reimbursed Marikina from its operating account for those amounts. Ultimately, the profits on erection work performed by CDS on Marikina's subcontracts went to CDS's bottom

3

line in exchange for Marikina receiving the fixed fee. Thus, the scheme resulted in money, which the government had intended to go to legitimate DBEs performing commercially useful functions, being funneled through Marikina directly to SPI, a non-DBE.[2]

Revenue generated by the fraud was a substantial part of SPI's business, and during Nagle's tenure as president, which began in 2004 following the death of his father, both SPI and CDS experienced increased profits due to the companies' receipt of numerous subcontracts through Marikina, which SPI was otherwise ineligible to receive. During the relevant time, SPI/CDS's aggregate annual revenue was between $18 million and $26 million, with 20- to 25-percent of that amount being attributed to the erection division.

### b. Procedural Background

On November 19, 2009, a federal grand jury sitting in the Middle District of Pennsylvania indicted Nagle and Ernest G. Fink ("Fink") on 32 counts, consisting of one count of conspiracy to defraud the United States by impeding the United States Department of Transportation's ("USDOT") implementation, execution, and administration of its DBE program, and to commit wire and mail fraud by executing

---

[2] The relationship between Marikina and SPI made Marikina more attractive to general contractors, as it was easier for general contractors to meet DBE goals by subcontracting with Marikina to install beams furnished by SPI, making the company a "one-stop shop." Moreover, by using Marikina to furnish the beams, the general contractor could receive DBE credit on the cost of beams *and* erection.

4

a scheme and artifice to defraud USDOT, various state and local governmental agencies, and various unnamed contractors and subcontractors, in violation of 18 U.S.C. § 371 (count 1); eleven counts of wire fraud in violation of 18 U.S.C. § 1343 (counts 2-12); six counts of mail fraud in violation of 18 U.S.C. § 1341 (counts 13-18); conspiracy to commit unlawful monetary transactions in violation of 18 U.S.C. § 1956(h) (count 19); ten counts of unlawful monetary transactions in violation of 18 U.S.C. § 1957 (counts 20-30); and two asset forfeiture allegations (counts 31-32). (Doc. 1.)

Nagle retained Michael A. Schwartz and Kristen H. Jones, two experienced lawyers with Pepper Hamilton, L.L.P., to assist with his defense. Mr. Schwartz and Ms. Jones engaged in extensive pre-trial litigation, including filing motions to suppress electronic evidence seized during the execution of the search warrants (Doc. 41), to compel discovery pursuant to *Brady v. Maryland* (Doc. 43), and to compel compliance with a trial subpoena they directed to Fink after he pleaded guilty (Doc. 94).[3]

On April 5, 2012, after nearly four weeks of trial, a jury convicted Nagle on 26 out of the 30 substantive counts charged in the Indictment.[4] This court has

---

[3] Fink pleaded guilty to count one of the Indictment on August 16, 2010. (Doc. 87.) The court granted Fink judicial immunity compelling him to testify pursuant to Nagle's subpoena. (Doc. 120.) The government unsuccessfully appealed that decision which substantially delayed the trial (Doc. 140-41), and Fink ultimately testified as a defense witness.

[4] Nagle was not convicted of counts 5, 6, 7 and 10 (wire fraud). (Doc. 197.)

5

previously detailed at length the evidence presented at trial, including the offense conduct as outlined above, and will not repeat it herein.[5] *See Nagle*, 2013 WL 3894841, **3-39. Following denial of post-trial motions, the court imposed a sentence of 84 months' imprisonment and a $25,000 fine. (Doc. 297.) The court did not order restitution. (Doc. 292.)

Following sentencing, Nagle obtained new counsel, William M. Kent, a well-known appellate specialist, and appealed the denial of his motion to suppress electronic evidence and the calculation of the loss under the sentencing guidelines. The Third Circuit, in a precedential opinion, affirmed the conviction, but vacated the sentence and remanded for a new sentencing. *United States v. Nagle*, 803 F.3d 167 (3d Cir. 2015). Although the Third Circuit determined that the loss calculation was

---

[5] It should be noted that, with respect to the wire fraud counts, the court charged the jury, in pertinent part, as follows:

> The first element that the government must prove beyond a reasonable doubt is that Joseph Nagle knowingly and willfully devised or willfully participated in a scheme to defraud the victim of money or property by materially false or fraudulent pretenses, representations, or promises.
>
> ***
>
> Thus, a scheme to defraud is any plan, device, or course of action to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises reasonably calculated to deceive persons of average prudence.

(Doc. 314, pp. 23-23.) The court gave a similar charge with respect to the mail fraud counts. (*See id.*, p. 27.)

erroneous because it did not credit Nagle with the fair market value of the services rendered, the court made clear that the government was deprived of an essential element of its bargain, stating:

> We find the government's position persuasive, particularly in light of the goals of the DBE Program. The DBE Program cares about who performs the work. It assumes that performance of a contract allows a DBE to not only earn a profit on the deal, but also to form connections with suppliers, labor, and others in the industry. The profit earned, therefore, is not the only benefit the DBE obtains when it received the contract. Therefore, when SPI and CDS *fraudulently received the transportation contracts*, the DBE Program assumed that all of the contract price was going towards benefitting a true DBE. Instead, the entire contract price was put towards a different use: profiting SPI and CDS and improving their business connections.
>
> ***
>
> They did not receive the entire benefit of their bargain, in that their interest in having a DBE perform the work was not fulfilled, but they did receive the benefit of having the building materials provided and assembled.

*Nagle*, 803 F.3d at 181-82 (emphasis added).

Upon remand, this court issued a memorandum on November 30, 2015 finding that the loss amount was $850,931.20, which represented the net profits CDS obtained as a result of the fraud. *United States v. Nagle*, No. 1:09-cr-384, 2015 WL 7710467 (M.D. Pa. Nov. 30, 2015). The court resentenced Nagle to the same sentence that was imposed on June 30, 2014. (Doc. 348.)

Nagle filed a second appeal, arguing that the correct loss amount according to the Third Circuit's appellate opinion and under the Sentencing Guidelines was zero.

7

The Third Circuit rejected the argument and affirmed this court's loss calculation and sentence. *United States v. Nagle*, 664 F. App'x 212 (3d Cir. 2016). In its decision, the Third Circuit again found that the government was deprived of an essential element of its bargain. The court explained:

> In the instant case, due to defendant's fraud, the government was unaware of an especially relevant fact: that defendants, rather than legitimate DBEs, would be performing the federally sponsored contracts, "the primary purpose" of which "is to help small minority-owned businesses develop and grow, creating new jobs and helping to overcome the effects of past discrimination in the construction industry." *United States v. Maxwell*, 579 F.3d 1282, 1306 (11th Cir. 2009). Thus, the government—*which contracted with defendants under the mistaken impression that they were DBEs*—"did not receive the entire benefit of their bargain"; it paid for the provision and installation of concrete beams by DBEs, and got the provision and installation of concrete beams by non-DBEs instead. *See Nagle*, 803 F.3d at 171-72, 182. As a result, the government did not achieve the goals of the DBE program and provided profit opportunities to entities not entitled to them. *See id.* at 183. Thus, using the profit defendants received is an appropriate measure of loss.

*Nagle*, 664 F. App'x at 215 (emphasis added).

Nagle filed a petition for a writ of certiorari with the United States Supreme Court, and that petition was denied on April 24, 2017. *Nagle v. United States*, 137 S. Ct. 1831 (2017).

On April 24, 2018, Nagle filed the instant motion to vacate his conviction and sentence together with a supporting brief. (Docs. 377-78.) In his motion, Nagle argues that the Indictment and conviction are grounded in a legally invalid theory of mail and wire fraud and that both trial and appellate counsel were ineffective for

8

failing to advance the legal invalidity of the government's theory of the case. The motion has been fully briefed and is ripe for disposition.

**II.    Legal Standard**

A petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255 is the appropriate vehicle by which a defendant in federal custody may challenge the legality of a conviction or sentence. *See* 28 U.S.C. § 2255; *In re Dorsainvil,* 119 F.3d 245, 249 (3d Cir.1997). When reviewing a motion to vacate, the court must accept the truth of the petitioner's factual allegations unless clearly frivolous based on the existing record. *Gov't of V.I. v. Forte,* 865 F.2d 59, 62 (3d Cir.1989).

The Sixth Amendment right to counsel is the right to the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984). This right to effective assistance of counsel also extends to the first appeal. *Lewis v. Johnson,* 359 F.3d 646, 656 (3d Cir.2004). In *Strickland,* the Supreme Court articulated a two-prong test in assessing whether a petitioner has been denied the effective assistance of counsel. *Strickland,* 466 U.S. at 687-88. A petitioner must demonstrate: (1) that his or her counsel's representation "fell below an objective standard of reasonableness" and (2) that such defective performance caused the petitioner prejudice. *See id.* To prevail on a claim for ineffective assistance of counsel, a petitioner must satisfy both prongs of the *Strickland* test. *Carpenter v. Vaughn,* 296 F.3d 138, 149 (3d Cir.2002). The inquiry may begin with either the deficient

performance or prejudice prong, and the court is not required to consider the second prong of the test if the petitioner is unable to satisfy the first one. *Strickland,* 466 U.S. at 697.

**III. Discussion**

In the interest of brevity, the court will move directly to the merits of Nagle's argument that the DBE scheme referenced in the Indictment cannot support a conviction under the applicable mail and wire fraud statutes. "To be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating." *United States v. Small*, 793 F.3d 350, 352 (3d Cir. 2015). To indict on mail or wire fraud, the government must allege that a defendant "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" and used mail or wires to effect the scheme.[6] *United States v. Hird*, 913 F.3d 332, 339 (3d Cir. 2019) (citing

---

[6] In full, the mail fraud statute provides as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be F.3 sent or delivered by the Postal Service, . . . shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341. The wire fraud statute, 18 U.S.C. § 1343, is identical to the mail fraud statute, but requires the use of communications transmitted by wire. *United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994).

18 U.S.C. §§ 1341, 1343.) To prove that a defendant committed a crime under these statutes, the government must establish (1) the defendant's knowing and willful participation in a scheme to defraud; (2) with the specific intent to defraud; and (3) the use of the mail or interstate wires to further the scheme. *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012); *Jaye v. Oak Knoll Vill. Condo. Owners Ass'n, Inc.*, 751 F. App'x 293, 297 (3d Cir. 2018). "[T]he well-settled meaning of 'fraud' require[s] a misrepresentation or concealment of *material* fact." *Neder v. United States*, 527 U.S. 1, 22 (1999) (emphasis in original). And in this context, a particular misrepresentation is "material if it has 'a natural tendency to influence or [is] capable of influencing, the decision of the decision-making body to which it was addressed.'" *Id.* at 16 (alteration in original) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). These statutes do not require the government to prove either contemplated harm to the victim or any loss, as it is not necessary to show that the victim was actually deprived of any money or property. *United States v. Leahy*, 464 F.3d 773, 787 (7th Cir. 2006). Instead, the relevant inquiry is the defendant's intent. *See Tulio*, 263 Fed. App'x at 261 ("The Government correctly notes that the relevant inquiry concerns what Tulio intended—not whether SEPTA was actually deprived of money or property.") (citing *United States v. Rayborn*, 495 F.3d 328, 338 (6th Cir. 2007)). *See also Maxwell*, 579 F.3d at 1302 ("Financial loss is not the core of

these mail and wire frauds. Instead, the penal statutes also seek to punish the intent to obtain money or property from a victim by means of fraud and deceit.").

Here, the mail and wire fraud counts of the Indictment tracked §§ 1341 and 1343 and charged Nagle with using Marikina as a front to fraudulently acquire over 300 DBE contracts, and consequently funds, that SPI was otherwise not eligible to receive. The Indictment details precisely how Nagle and Fink used or caused to be used mail and wires in furtherance of this scheme.

Nagle argues, however, that, despite its express reference to the money SPI received as a result of this fraud, the Indictment fails to allege that the scheme deprived any victim of money or property. He arrives at this conclusion by positing that SPI fulfilled its obligation under the contracts by manufacturing, delivering and erecting the concrete beams used in highway bridges and overpasses, and Nagle never intended otherwise. (Doc. 381, pp. 5-6.) Consequently, SEPTA and PennDOT received the full economic value of the contracts. (*Id.* at p. 6.) According to Nagle, SEPTA and PennDOT only lost "compliance with contractual and regulatory conditions of a non-economic nature, which they wished to enforce by exercising their right to control with whom they entered into contracts." (*Id.*) As such, "[t]he deception . . . did not go to the economic aspect of the contracts and therefore did not involve an intent (or "scheme") to cause economic harm, that is, to 'deprive' any victim of [money or] property in the pertinent sense used in the statutes." (*Id.* at p.

9.) Consequently, according to Nagle, the government failed to establish the necessary elements of mail and wire fraud.

In making this argument, Nagle refuses to acknowledge that the property interest at stake is not the goal of DBE participation or even the agencies' right to choose, according to their own criteria, the contractors with whom they do business, but rather the actual dollars used for the bridge work. Nagle's conviction is not improper on the basis that the work was actually performed and therefore the agencies suffered no economic harm. Economic harm is not an essential element of mail and wire fraud. Instead, the relevant inquiry is whether Nagle intended to obtain money or property from the victim of the deceit. *Tulio*, 263 F. App'x at 261. As the Indictment clearly set out, and as the government proved beyond a reasonable doubt at trial, the object of the scheme to defraud was the money derived from the fraudulently obtained DBE contracts. (*See* Doc. 1, p. 14, ¶ 22 and pp. 23-23, ¶ 29.) Nothing more is required.

Indeed, as has been held by numerous courts, both inside and outside the Third Circuit before and after Nagle's conviction, the object of a DBE fraud is money, "plain and simple," even if the services are actually performed by the defendant. *See, e.g.*, *United States v. Tulio*, 263 F. App'x 258, 261 (3d Cir. 2008) ("Beyond property rights, Tulio's fraudulent scheme directly targeted SEPTA's 'money, plain and simple' as SEPTA paid for services—construction done by a certified DBE—that it

did not receive."), quoting *United States v. Leahy*, 464 F.3d 773, 788 (7th Cir. 2006). *See also United States v. Maxwell*, 579 F.3d 1282, 1302 (11th Cir. 2009) ("Regardless of the quality or cost of the work completed by FLP and Fisk, the money used to pay FLP under those contracts was set aside by the County and the national sovereign to pay only CSBE and DBE electrical subcontractors that were actually performing commercially useful functions . . . but, through Maxwell's scheme, FLP obtained construction contracts and substantial payments from the County and the United States for which it was not eligible."); *United States v. Bunn*, 26 F. App'x 139, 142-43 (4th Cir. 2001) ("The government's evidence established that appellants obtained money to which they were otherwise not entitled by falsely representing that subcontract work would be performed by DBEs. Nothing more is required."); *United States v. Azteca Supply Co.*, No. 10-cr-80, 2010 WL 3940717, \*5 (N.D. Ill. Oct. 6, 2010) ("To put a finer point on it, as the Third Circuit [in line with the Seventh] has posited, a jury is entitled to find that by depriving a governmental entity of a 'fundamental basis' of [its] bargain, a defendant can deprive that entity of a property right."); *United States v. Evans Landscaping, Inc.*, No. 1:17-cr-053, 2018 WL 1794336, \*3 (S.D. Ohio April 16, 2018) ("[T]he Indictment alleges a scheme to intentionally defraud the City of Cincinnati of money by using false pretenses to obtain contracts.").

Accordingly, the court finds that Nagle was prosecuted under a legally valid theory and that his counsel was not ineffective for failing to advance a meritless argument. The § 2255 motion will be denied.

                                                           <u>s/Sylvia H. Rambo</u>
                                                           SYLVIA H. RAMBO
                                                           United States District Judge

Dated: March 28, 2019